## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

_____

Dr. Mark Geier and David Geier
14 Redgate Court
Silver Spring, Maryland 20905
          *Plaintiffs*,
    vs.
Department of Health and Human Services
200 Independence Avenue, SW
Washington, DC 20201

Dr. Sarah K. Parker
Children's Hospital - Department of Pediatrics
1056 East 19th Avenue
Denver, CO. 80218

Dr. James Todd
Children's Hospital - Department of Pediatrics
1056 East 19th Avenue
Denver, CO. 80218

Dr. Benjamin Schwartz
National Vaccine Program Office
Department of Health and Human Services
200 Independence Avenue, SW - Room 725-H
Washington, DC 20201

Dr. Larry Pickering
CDC - National Immunization Program
1600 Clifton Road, MS E05
Atlanta, GA 30333

The American Academy of Pediatrics
601 13th Street, NW
Suite 400-North
Washington, DC 20005
          *Defendants*.

_____

Docket No. _____

## **COMPLAINT**

(For (1) defamation, (2) interference with contract, (3) interference with prospective business advantage, (4) review of adverse agency action, and (5) interference with and deprivation of Constitutional rights arising from publication by Defendants of article falsely accusing Plaintiffs of fabricating scientific data.)

## NATURE OF THE ACTION

1.  Dr. Mark Geier and David Geier ("Plaintiffs" or "the Geiers") bring this action against the Department of Health and Human Services ("HHS"), Dr. Benjamin Schwartz and Dr. Larry Pickering ("Government Defendants"), and Dr. Sarah Parker, Dr. James Todd, and The American Academy of Pediatrics ("Private Defendants"), for declaratory and injunctive relief and damages to remedy common law torts, interference with and deprivation of Constitutional rights, and adverse agency action inflicted by Defendants.  Defendants published an article on September 4, 2004, "Thimerosal-Containing Vaccines and Autistic Spectrum Disorder: A Critical Review of Published Original Data," *Pediatrics*, Vol. 114, No. 3 ("Article").  *Pediatrics* is a medical journal published by Defendant American Academy of Pediatrics.  The Article contained false and misleading statements, accusing the Geiers of lying and inventing data to help establish a causal relationship between thimerosal (an organic mercury compound used as a preservative in vaccines) and various neurological disorders including autism.  The Article  injured and will continue to injure the Geiers in their trade and business, and damaged their reputation in the community of scientists.  The Geiers are suing the Private Defendants for defamation, interference with contractual relations, and interference with prospective business advantage.  The Geiers seek to have adverse

agency action (original and repeated publication of the Article and refusal to withdraw or retract it) by the Government Defendants declared unlawful and enjoined. The Geiers also allege a *Bivens* cause of action against the individual Government Defendants (Schwartz and Pickering) for deprivation of and interference with the Constitutional rights (protected by the First and Fifth Amendments) of the Geiers to appear as an expert witness on behalf of vaccine-injured children and others in proceedings brought in the U.S. Court of Federal Claims under the National Vaccine Injury Compensation Program ("NVICP"), 42 U.S.C. § 300aa-1, *et seq*., and in other courts.

2. In addition, the Private Defendants defamed the Geiers knowing that the accusation that the Geiers had fabricated the results of their scientific investigations would interfere with contracts between the Geiers and those who seek the value of their expert testimony in National Vaccine Injury Compensation Program ("NVICP") proceedings. Private Defendants not only interfered with existing contracts entered into by the Geiers but, by virtue of their on-going tort of defamation caused by allowing, if not encouraging the propagation of their false information, Private Defendants are engaged in the tortious interference with the Geiers' prospective business advantage.

## PARTIES TO THE ACTION

3.  David A Geier is a Maryland resident and serves as President of MedCon, Silver Spring in Montgomery County, Maryland.

4.  Dr. Mark R Geier, M.D. Ph.D, is a Maryland resident and serves as President of the Genetic Centers of America, a private consulting firm in Silver Spring, Montgomery County, Maryland.  Mark Geier has been a practicing physician, licensed in Maryland and Virginia.

5.  Dr. Sarah K. Parker, M.D., is a Colorado resident and a pediatrician at Children's Hospital and University of Colorado Health Sciences Center in Denver, Colorado.

6.  Dr. James K. Todd, M.D., is a Colorado resident and a pediatrician at Department of Pediatrics, Children's Hospital and University of Colorado Health Sciences Center, Denver, Colorado.

7.  Dr. Benjamin Schwartz, M.D., is a Georgia resident and is an employee working in the National Vaccine Program Office at HHS in Washington.  At the time of publishing the Article, he was employed in the National Immunization Program of the Centers for Disease Control and Prevention.  Dr. Schwartz was an agent of CDC and HHS with respect to publication of the Article.

8.  Dr. Larry Pickering is a Georgia resident and works at the Epidemiology and Surveillance Division for the CDC within the Department of Health and

Human Services ("HHS").  Dr. Pickering was an agent of CDC and HHS with respect to publication of the Article.

9.  The American Academy of Pediatrics ("AAP") claims to have 60,000 pediatricians as members.  AAP has an office in Washington, DC at 601 13th Street, NW, Suite 400-North, Washington, DC 20005 USA.  *Pediatrics* is the official journal of The American Society of Pediatrics.

10.  The Department of Health and Human Services is an agency of the United States that administers the National Vaccine Program, including the program for compensating vaccine injuries.  CDC is an agency within HHS that administers the National Immunization Program, and, *inter alia*, recommends vaccines for the immunization schedule, participates in the development of new vaccines, and purchases vaccines for administration to children.

<u>JURISDICTION and VENUE</u>

11.  This Court has jurisdiction over this action under 28 U.S.C. § 1332(a) as the amount in controversy exceeds $75,000, and under 28 U.S.C. § 1331 with respect to the challenge to adverse agency action.

12.  Venue is appropriate under 28 U.S.C. § 1391(b) as Defendant AAP is located in the District of Columbia, and under 28 U.S.C. § 1391(e) as this action is against an agency of the United States located in the District of Columbia.

## FACTUAL BACKGROUND

13.  The Geiers are scientists engaged in the study of genetics, molecular biology, and epidemiology.  Through their inquiries into genetics, molecular biology, and epidemiology, the Geiers have engaged in the study of vaccination.

14.  The study of the vaccination as it relates to genetics, molecular biology, and epidemiology has made the Geiers experts on the adverse reactions to vaccines.

15.  Because of their experience in the study of vaccine injury, Mark Geier was an early advocate for, and an architect of the National Vaccine Injury Compensation Program ("NVICP").

16.  The NVICP is a Federal alternative "no-fault" system designed to compensate individuals who claim an injury from a vaccine and adverse event listed in the vaccines injury table.  *See* 42 U.S.C. §§ 300aa-12-36.

17.  The NVICP is administered jointly by the Department of Health and Human Services ("HHS"), the U.S. Court of Federal Claims ("the COFC"), and the Department of Justice ("DOJ").  Claims alleging vaccine injury are heard by special masters within COFC ("vaccine court").  Compensation is funded by a small tax on all vaccines.  Claimants not satisfied with an award from vaccine court can seek damages in normal civil tort actions brought in state or federal court.

18.  Because of their expert knowledge in the adverse reactions to vaccines, Mark and David Geier serve as expert witnesses and consultants in cases involving adverse reactions for the NVICP, and receive compensation for these services under that program.

19.  Those with potential claims under the NVICP seek the expertise of the Geiers.  The retention of the Geiers' services takes the form of written contracts between the Geiers and those who seek the value of their testimony in their proceedings.

20.  Given the expertise they have attained on vaccine injury and given the demand for their services as expert witnesses, the Geiers dedicate a substantial amount of their time and resources to their role as expert witnesses.  Dr. Mark Geier has appeared in approximately 100 cases and has participated in the review of approximately 1,000 claims.

21.  As a consequence of dedicating substantial time and resources to serving as expert witnesses, the Geiers are dependent upon the compensation they receive as expert witnesses as a significant source of income.

22.  The Geiers engage in independent scientific research to further their understanding of the risk, danger, and injury that can result from vaccination and also publish studies analyzing the benefits of vaccines and recommending vaccine policy reflecting the societal benefits of vaccinations.

23.  The Vaccine Adverse Event Reporting System ("VAERS") is a cooperative program for vaccine safety of CDC and the Food and Drug Administration ("FDA").  VAERS is a post-marketing safety surveillance program, collecting information about adverse events that occur after the administration of US-licensed vaccines.

24.  In furtherance of their understanding of adverse reactions to vaccines, the Geiers have analyzed the VAERS database using techniques similar to ones previously published by authors from the CDC/FDA.

25.  In order for the Geiers to conduct their evaluations of the VAERS database using similar techniques to ones previously published by authors from the CDC/FDA, the Geiers have sought permission and received data on the yearly net number of doses of different types of vaccines distributed as detailed in the Biologic Surveillance Summaries of the CDC.

26.  The Geiers initially received the manufacturer-specific dose data, which the Article claimed they did not have and fabircated, in a facsimile transmission on January 18, 2001 from Robert H. (Bob) Snyder, National Immunization Program, CDC, Immunization Services Division, Program Support Branch.

27.  The Geiers subsequently received updated information regarding the Biologic Surveillance Summaries of the CDC by facsimile transmission on April 23, 2002, from Lisa Galloway, National Immunization Program, CDC,

Immunization Services Division, Program Support Branch.

28. Based on prior access that the CDC provided to the Geiers for the purpose of studying adverse reactions to the Hepatitis B vaccine, the Geiers published a warning that complications from the Hepatitis B vaccines should be discussed with patients before it is administered.

29. As part of their on-going research into the risks associated with the use of mercury-containing thimerosal as a vaccine preservative, the Geiers sought permission to receive data on the yearly net number of doses of different types of vaccines distributed by different vaccine manufacturers as detailed in the Biologic Surveillance Summaries of the CDC, since different vaccine manufacturers used different preservatives or no preservatives.

30. The National Immunization Program of the CDC, granted a request by the Geiers to access the Biologic Surveillance Summaries of the CDC broken down by vaccine manufacturer and vaccine.

31. On May 23, 2002, Lisa Galloway of the CDC sent the Geiers an email, with an attachment, providing the requested Biologic Surveillance Summary data broken down by vaccine manufacturer.

32. Based on their analysis of the VAERS database and the Biological Surveillance data that had been sent to them by the CDC, the Geiers published an article in the Journal of American Physicians and Surgeons titled, "Thimerosal in

Childhood Vaccines: Neurodevelopmental Disorders and Heart Disease in the United States," J. Am. Phys. Surg. 2003:8:6-11. In describing the methodology of their study, the article explained, "The incidence of neurodevelopmental disorders and heart disease following thimerosal-containing DTaP and DTwcP vaccines in comparison to thimerosal-free DTaP vaccines was based upon analysis of the VAERS database, using Microsoft Access." The article concluded that: "This study provides strong epidemiological evidence for a link between increasing mercury from thimerosal-containing childhood vaccines and Neurodevelopmental disorders and heart disease."

33. In this article, the Geiers stated that "We analyzed DTaP and DTwcP vaccines by manufacturer, so that we could compare thimerosal-containing DTaP and DTwcP vaccines administered from 1992 through 2000 against thimerosal-free DTaP vaccines administered from 1997 through 2000. We used denominators obtained from the Biological Surveillance Summaries of the CDC to determine the number of doses of each manufacturer administered. Based upon this information, we were able to calculate incidence rates of adverse events following vaccination." (emphasis added).

34. The Geiers are engaged in a vigorous debate within the scientific community about whether there is a causal relationship between the presence of thimerosal (an ethyl-mercury preserving agent) in multi-dose vaccines and a recent

and dramatic rise in the prevalence of neurological disorders, often diagnosed as autism.

35.  It has been estimated that if thimerosal was determined to be a cause of the various neurological disorders, civil damages for the injury to hundreds of thousands of children could reach in to the multiple billions of dollars, either paid for under the NVICP or in private civil litigation.

36.  Congress commenced a series of hearings in 1998, and there are various ongoing investigations, to determine the extent to which officials at CDC and others in government knew of the dangers posed by thimerosal, well-known at the time several new vaccines containing thimerosal were licensed by FDA in the early 1990's to be a potent immune system and neurological toxin.

37.  The Subcommittee on Human Rights and Wellness, Committee on Government Reform of the United States House of Representatives, following a three-year investigation, issued a report, "Mercury in Medicine – Taking Unnecessary Risks" in May 2003 that already determined that the U.S. Public Health agencies are guilty of, "institutional malfeasance for self-protection and misplaced protectionism of the pharmaceutical industry." (emphasis added).

38.  A significant number of parents are choosing to forego vaccination (though it should be emphasized that the Geiers do not consider themselves to be anti-vaccine), partially due to a perception that the CDC and the FDA have not

adequately warned parents about the risks associated with vaccination, and partially because of a belief that the CDC and FDA are not doing enough to ensure the safety of vaccines.

39.  On several additional occasions prior to the September 4, 2004 publication of the Article, the Geiers provided additional instances in the scientific literature regarding their obtaining from CDC and use of the Biologic Surveillance Summaries broken down by vaccine manufacturer, including specific responses to the American Academy of Pediatrics and the National Immunization Program of the CDC.

40.  For example, the Geiers published in the Fall 2003 issue of the J. Am. Phys. Surg., Volume 8, Issue 3, pgs. 68-70, an article, "Response to Critics on the Adverse Effects of Thimerosal in Childhood Vaccines," which specifically responded to issues raised by Defendant American Academy of Pediatrics on their website (http://www.aap.org/profed/thimaut-may03.htm, "[Geiers'] Study Fails to Show a Connection Between Thimerosal and Autism,"  regarding the Geiers' publication on thimerosal in the Journal of American Physicians and Surgeons.

41.  The Geiers responded to AAP's criticism, explaining in part, "Unfortunately, we were unable to provide the identities of the vaccine manufacturers or the number of doses distributed based upon the Biological Surveillance Summaries of the CDC, which are broken down by manufacturer.

<u>The CDC claims that this information is proprietary and required us to agree not to divulge it, as a condition of being given access to these summaries.</u>" (emphasis added).  Thus, Defendant AAP knew well before publication of the Article both that the Geiers were given access to manufacturer-specific net dose data by CDC <u>and</u> that they had agreed with CDC to aggregate the data in any publication so as to respect proprietary claims made by manufacturers.

42.  In another example, the Geiers responded to queries raised by Penina Haber and Frank DeStefano of the National Immunization Program of the CDC regarding the Geiers access to the Biological Surveillance Summaries of the CDC broken down by vaccine manufacturer (Influenza vaccination and Guillain Barre Syndrome. Clin Immunol. 2003 Dec;109(3):359).

43.  Specifically Haber and DeStefano had stated, "First, we do not understand how the authors were able to calculate incidence rates by manufacturer. Manufacturer specific vaccine distribution data are not available in the Biologics Surveillance data [1,2] that the authors report to have used for this purpose."  The Geiers in their response letter (Clin. Immunol. 2003 Dec; 109(3):360-361) stated, "We are surprised authors from the NIP of the CDC do not acknowledge that the Biologic Surveillance Data (BSD) of the CDC includes a breakdown by manufacturer type.  <u>We were granted access to the BSD broken down by manufacturer from the NIP of the CDC on condition that we not reveal the</u>

<u>identities of the manufacturers</u>."  (emphasis added).  As officials and agents of CDC's NIP, Defendants Schwartz and Pickering knew or should have known that CDC released the manufacturer-specific dose data to the Geiers so that they could perform their statistical analyses, <u>and</u> that the Geiers had agreed to keep the specific dose figures confidential.

44.  On or about September 4, 2004, Defendants published an article titled "Thimerosal-Containing Vaccines and Autistic Spectrum Disorder: A Critical Review of Published Original Data" in Volume 114, No. 3 of *Pediatrics* ("Article").

45.  Defendants stated in the article that the purpose of their study was to "systematically review published articles that report original data pertinent to the potential associations between thimerosal-containing vaccines" so as to "assess the quality of evidence assessing a potential association between thimerosal-containing vaccines and autism and evaluate whether that evidence suggests accepting or rejecting the hypothesis" that thimerosal might contribute to autism.
Of the ten articles that were reviewed by the authors, five of the articles had been authored by the Geiers.  Of the remaining five articles, only one of the articles was based on U.S. children.

46.  The authors were highly critical of the Geiers' research.
Yet, above and beyond a fair critique of the Geiers' published articles, the authors

made statements they know or should have known were false.

47.  Specifically, notwithstanding the fact that the CDC had granted permission to the Geiers to examine the Biological Surveillance data, and notwithstanding the fact that Defendants Schwartz and Pickerings's own colleagues had provided the Biological Surveillance data to the Geiers, the authors stated as follows:

> Substantial questions regarding the accuracy of the denominator data for the incidence calculation also exists.  The denominator requires the total number of children who received thimerosal-containing DTaP (exposed) and the total number who received thimerosal-free DTaP (unexposed).  The authors indicated the source of these data as the "Biological Surveillance Summaries of the CDC."  However, CDC reports only aggregated doses distributed for DTaP and other vaccines and provides no manufacturer-specific data.  It is unclear how the authors estimated manufacturer-specific data because, on the basis agreements with manufacturers, CDC does not release these data.  No source is cited in the publication.  The authors provided no details on how total DTaP does distributed were translated into number of children vaccinated with specific thimerosal-containing or thimerosal-free vaccines, which is particularly problematic for a vaccine administered in a 5-dose schedule ever a 4- to 5- year period.

Article at 796 (emphasis added).

48.  The authors made this fabrication allegation  notwithstanding the fact that the Geiers, in the very article that the Defendants had reviewed, stated clearly, that they had obtained the Biological Surveillance data from the CDC. To make a public accusation that the Geiers did not actually possess the data that provided the foundation for their articles is to accuse the Geiers of fabricating their

results.

49.  The Article's accusation that the Geiers fabricated the manufacturer-specific dose data to enable their calculation of the increased risk of adverse events to children who received thimerosal-containing (as opposed to thimerosal-free) DTP vaccines was extremely damaging to the Geiers' reputation, especially in the context of the scientific community.

50.  The accusation that the Geiers fabricated their data  has been used to attack and damage the Geiers' reputation in the Vaccine Court.  For example, in *Conlon v HHS*, 02-1133V, HHS filed a Motion To Exclude the Testimony of Petitioner's Expert Mark R. Geier, MD, to exclude Mark Geier from testifying an expert witness, citing the statements in the Article.

51.  HHS has discouraged potential petitioners from relying on the Geiers, citing the Article as evidence of the Geiers' poor reputation in the expert and scientific community.

52.  The Article is available online and in various databases of journal articles.  Defendants have continued to distribute, cite, and rely upon the Article.  Despite requests from the Geiers, Defendants have not retracted or withdrawn the Article.

53.  The authors published a letter in the January, 2005 issue of *Pediatrics*.  The letter stated that "Dr. Geier has informed us that he had received these data;

we regret the error." This letter was inadequate as a legally effective "retraction" for several reasons. It was not featured with equal prominence to the Article in *Pediatrics*. It did not retract or withdraw the Article. The authors failed to acknowledge that the Geiers' conclusions based upon the CDC data were, in fact, not fabricated because the Geiers did, in fact, have the required data on which to base such conclusions.

54. The accusation in the Article that the Geiers fabricated their data has damaged the Geiers in the scientific community as reported by the popular press. For example, in July 2005, the Scripps Howard News Service distributed an article that discredits the Geiers as sources for information regarding the link between autism and thimerosal. As another example, a June 24, 2005 article in *The Wall Street Journal* cited the Article to discredit the credibility of Geiers.

## COUNT I
Defamation and Libel Per Se
(Private Defendants - The American Academy of Pediatrics, Parker, Todd)

55. Plaintiffs re-allege and incorporate the allegations of paragraphs 13 through 54 into the allegations of Count I.

56. The Private Defendants defamed the Geiers by publishing the accusation in the Article quoted above at ¶ 47. The Private Defendants falsely accused the Geiers of falsifying key data used in their statistical analysis of the

relative risk of vaccine adverse events caused by increasing levels of thimerosal – specifically, the net doses of particular vaccines consumed from particular manufacturers. Publishing this allegation with actual malice, Private Defendants knew or should have known that the Geiers were given the manufacturer-specific dose data by the CDC.

57. The Private Defendants made no attempt to verify their highly damaging allegation with the Geiers or with CDC.

58. Private Defendants published the defamatory allegations for the purpose of discrediting the Geiers in the on-going debate on the possible links between the use of thimerosal and the increased rates of neurodevelopmental delays (often diagnosed as autism) and other adverse events.

59. Private Devendants published the defamatory allegations as part of a campaign to defuse the growing public concern over vaccine safety, to convince the public that vaccines (including those that contained thimerosal) were safe, to brand those scientists and experts who dared to scrutinize the safety of vaccines as engaging in "junk" science, and to defuse calls for oversight and continued Congressional investigation of, *inter alia*, whether the principle cause of (and those persons and agencies responsible for) the present epidemic of autism and other neurological disorders was vaccine-induced thimerosal (mercury) poisoning.

60. Private Defendants published the defamatory allegations to damage the

Geiers in an effort to make it economically more difficult for the Geiers to continue pursuing their research into the relationship between vaccines containing thimerosal (mercury) and adverse events, including neurodevelopmental disorders.

61.  Private Defendants published the defamatory allegations with actual malice, knowing them to be false, or with reckless disregard as to their truth or falsity.

62.  The defamatory allegations in the Article have injured and will continue to injure the Geiers in their trade as expert witnesses and damaged their reputation in the community of scientists.

63.  The defamatory allegations in the Article impute misconduct to the Geiers, constituting libel per se.

64.  As a consequence of this diminished reputation, and lowered estimation by their colleagues, the Geiers have suffered damages and are entitled to compensation.

## **COUNT II**
Tortious Interference with Contracts for Expert Testimony
(Private Defendants - The American Academy of Pediatrics, Parker, Todd)

65.  Plaintiffs re-allege and incorporate the allegations of paragraphs 13 through 54 into the allegations of Count II. The Article defamed the Geiers by suggesting that the Geiers falsified their key data and therefore the results based upon analysis of that data.

66.  Private Defendants were aware (or should have been aware) when they published the Article that the Geiers appear as expert witnesses in National Vaccine Injury Compensation Program proceedings, and in civil litigation cases involving vaccine injury.

67.  PrivateDefendants were aware (or should have been aware) that the Geiers have contracts with, and are compensated by those who seek their expert opinion in NVICP (expert fees paid with program funds) proceedings and in civil litigation.

68.  Private Defendants were aware (or should have been aware) when they published the Article that the defamatory allegations will make performance of the Geiers' contractual obligations more expensive or impossible due to the fact that the defamatory allegations are being (and will continue to be) used against the Geiers as "evidence" in motions to have the Geiers disqualified as experts in NVICP and civil proceedings.

69.  Private Defendants knew (or should have known) that their defamatory allegations against the Geiers would interfere with the contracts that the Geiers had with those seeking to have them testify in NVICP proceedings and in civil litigation.

70.  The Geiers have been damaged by Private Defendants' intentional interference with the existing contracts that the Geiers have with those who seek

their expert testimony in NVICP proceedings and in civil litigation and are entitled to compensation for such damage.

## COUNT III

Tortious Interference with Contracts for
Patient Care and Medical Advice
(Private Defendants - The American Academy of Pediatrics, Parker, Todd)

71.  Plaintiffs re-allege and incorporate the allegations of paragraphs 13 through 54 into the allegations of Count III.

72.  The Article defames the Geiers by alleging that the Geiers falsified key data and therefore the results based upon analysis of that data.

73.  Private Defendants were aware (or should have been aware) when they published the Article that the Geiers derive income from contracts entered into for patient care and medical advice.

74.  Private Defendants were aware (or should have been aware) that the publication of the defamatory Article will interfere with existing and future contracts for patient care and medical advice because the allegation that the Geiers fabricated key data and results of their scientific research would cause some patients and some doctors to lose confidence in the Geiers.

75.  In fact, as a consequence of the Private Defendants' publication of the Article, some patients and some doctors have lost confidence in the Geiers and

have severed their contractual relations with the Geiers.

76. The Geiers have been damaged by Private Defendants' intentional interference with the existing contracts for patient care and medical advice and are entitled to damages for this damage.

## COUNT IV
Tortious Interference with
Prospective Business Relations for
Expert Testimony
(Private Defendants - The American Academy of Pediatrics, Parker, Todd)

77. Plaintiffs re-allege and incorporate the allegations of paragraphs 13 through 54 into the allegations of Count IV.

78. The Article defames the Geiers by alleging that the Geiers falsified key data and therefore the results based upon analysis of that data.

79. Private Defendants were aware (or should have been aware) when they published the Article that the Geiers will derive future income from those who would retain the Geiers to appear as expert witnesses in National Vaccine Injury Compensation Program proceedings and as expert witnesses in civil litigation.

80. Private Defendants were aware (or should have been aware) when they published the Article of prospective business that the Geiers will have in appearing as expert witnesses in future NVICP proceedings and in civil litigation.

81. Private Defendants were aware (or should have been aware) that their

publication of the Article will make prospective business relations for such appearances before NVICP and in civil litigation less likely or more expensive.

82.  Private Defendants knew (or should have known) that their defamatory allegations would interfere with prospective business of the Geiers.

83.  The Geiers have been, and will continue to be damaged by Private Defendants' intentional interference with their prospective business relations.

### Count V
Tortious Interference with
Prospective Business Relations for
Patient Care and Medical Advice
(Private Defendants - The American Academy of Pediatrics, Parker, Todd)

84.  Plaintiffs re-allege and incorporate the allegations of paragraphs 13 through 54 into the allegations of Count V.

85.  The Article defames the Geiers by alleging that the Geiers falsified key data and therefore the results based upon analysis of that data.

86.  Private Defendants were aware (or should have been aware) when they published the Article that the Geiers will derive future income from contracts for patient care and medical advice.

87.  Private Defendants were aware (or should have been aware) that their publication of the defamatory Article will interfere with and make prospective business relations for such patient care and medical advice less likely.

88.  Private Defendants knew (or should have known) that the defamatory Article would interfere with prospective business of the Geiers to provide patient care and medical advice.

89.  The Geiers have been, and will continue to be damaged by Defendants Pickering, Schwartz, Todd, and Parker's intentional interference with their prospective business relations for patient care and medical advice.

**Count VI**
Review of Adverse Agency Action
(Government Defendants - HHS, Schwartz, Pickering)

90.  Plaintiffs re-allege and incorporate the allegations of paragraphs 13 through 54 into the allegations of Count VI.

91.  Government authors Schwartz and Pickering acted as agents for CDC and HHS when the y published the Article.

92.  The allegation in the Article that the Geiers falsified key data and therefore the results based upon analysis of that data was adverse agency action and imposed on the Geiers a severe sanction that has caused and will continue to cause them significant economic injury.

93.  The Government Defendants have continued to distribute, cite, and rely on the Article, in particular in motions in the NVICP to exclude participation by the Geiers and/or to give their testimony and opinions less weight.

94.  The Geiers informal attempts to seek retraction/withdrawal of the Article have been unsuccessful.

95.  The Administrative Procedure Act, 5 U.S.C. § 701, *et seq*., authorizes this Court to review this adverse agency action, which, *inter alia*, can be found arbitrary and capricious and set aside as provided in § 706.

### Count VII
Deprivation of and Interference With Constitutional Rights
(Individual Government Defendants - Schwartz, Pickering)

96.  Plaintiffs re-allege and incorporate the allegations of paragraphs 13 through 54 into the allegations of Count VII.

97.  The Supreme Court has authorized a cause of action against federal employees in their individual capacities for deprivation of or interference with Constitutional rights.  Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971).

98.  The Geiers have Constitutional rights to (1) seek and be fairly considered for federal contracts (expert witnesses in the NVICP), and (2) access the courts (NVICP and in state and federal civil proceedings) in their capacity as expert witnesses and on behalf of vaccine injury claimants.

99.  Publication by Schwartz and Pickering of the Article has (and will continue to) interfered with and deprived the Geiers of these Constitutional rights

because it is being used by HHS to discredit and disqualify the Geiers as expert

witnesses and its continued availability (without adequate retraction or withdrawal)

significantly discourages third parties from seeking the assistance of the Geiers in

NVICP and state and federal court proceedings.


## DEMAND FOR JURY TRIAL

The Geiers request a trial by jury.

## PRAYER FOR RELIEF

The Geiers seek the following relief to remedy the torts and Constitutional

deprivations caused by Defendants:

A.  A finding and declaration that the allegations in the Article that the

Geiers falsified key research data and the results derived therefrom was false,

arbitrary and capricious, unsupported by substantial evidence, and that this adverse

agency must be found unlawful and set aside.

B.  An injunction ordering HHS to file notices disavowing reliance on the

Article in all NVICP proceedings in which it has introduced the Article in any

effort to disqualify the Geiers as expert witnesses.

C.  An injunction against HHS barring any future references to the Article,

requiring that any reliance on the Article be removed from any HHS website or any

other future publication, and ordering HHS to prominantly publish on its websites

an official retraction of the Article.

D.  The payment by Private Defendants of $200,000 (or proof at trial) in compensation to the Geiers to remedy the damage to their reputation and standing in their profession inflicted upon them by the defamatory statements in the Article.

E.  The payment by PrivateDefendants of $300,000 (or proof at trial) in compensation to the Geiers for the damage caused by the intentional interference with their existing contracts for their service as expert witnesses.

F.  The payment by PrivateDefendants of $300,000 (or proof at trial) in compensation to the Geiers for the damage caused by the intentional interference with their existing contracts for patient care and medical advice.

G.  The payment by PrivateDefendants of $100,000 (or proof at trial) in compensation to the Geiers for the damage caused by the intentional interference with their prospective business advantage as expert witnesses.

H.  The payment by PrivateDefendants of $100,000 (or proof at trial) in compensation to the Geiers for the damage caused by the intentional interference with the Geiers' prospective business advantages as providers of medical care and medical advice.

I.  The payment by Schwartz and Pickering of $400,000 (or proof at trial) as damages for interference with and deprivation of Constitutional rights.

I.  An ORDER that Defendants apologize to the Geiers for the false

statement contained in the Article.

J.  Attorney fees and costs.

K.  Such other relief as the Court considers necessary to provide full relief to the Geiers.

Respectfully submitted this .

_____
James Moody (DC Bar: 294504)
Suite 300
1101 30th Street NW
Washington, DC 20007
202-298-4766
202-944-8611 (fax)
Email: moodyjim@aol.com

_____
Joseph Hennessey (DC Bar: 453582)
7315 Wisconsin Avenue, NW
Suite 700-East
Bethesday, MD. 20814
301-654-0341
240-465-3084 (fax)
Email: joseph@hennesseylaw.com

Attorneys for Plaintiffs

August 31, 2005