IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DR. MARK GEIER, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 05-1749 (RWR) |
| ) | |
| DEPARTMENT OF HEALTH AND ) | |
| HUMAN SERVICES, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**FEDERAL DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS**

Plaintiffs Mark Geier, M.D., Ph.D., and David Geier ("Plaintiffs" or "the Geiers") have filed a seven-count complaint against the United States Department of Health and Human Services ("HHS"), Larry K. Pickering, M.D., Benjamin Schwartz, M.D., and several private defendants seeking declaratory and injunctive relief and damages.  See Complaint.  Plaintiffs allege that on September 4, 2004, the defendants published an article in *Pediatrics* entitled "Thimerosal-Containing Vaccines and Autistic Spectrum Disorder: A Critical Review of Published Original Data" ("Defendants' Article"), containing false and misleading statements that injured and will continue to injure Plaintiffs' reputation, trade and business.  Id.

Plaintiffs have directed two counts of their complaint against HHS and HHS employees. Count VI of the complaint, directed to HHS, alleges that publication of Defendants' Article and reliance thereon by Government attorneys who litigate cases filed pursuant to the National Vaccine Injury Compensation Program ("NVICP") constitutes "final agency action" within the

meaning of the Administrative Procedure Act, 5 U.S.C. 701, et seq., which should be declared contrary to law and enjoined.  Count VII is directed against Dr. Pickering and Dr. Schwartz, both of whom are HHS employees who are alleged to have violated the Geiers' constitutional rights "to seek and be fairly considered for federal contracts" and to "access the courts . . . in their capacity as expert witnesses and on behalf of vaccine injury claimants."  Id. at 25.  Plaintiffs seek damages from Dr. Pickering and Dr. Schwartz in their individual capacities pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), for their alleged violations of the "constitutional rights" quoted above.

**Statement of the Case**

Plaintiffs allege that they are scientists engaged in the study of vaccination and that they are experts on adverse reactions to vaccines who serve as expert witnesses in cases brought pursuant to the NVICP.[1]  Complaint at 6-7.  Plaintiffs further allege that they engage in scientific research to better understand the risks attending vaccination and "also publish studies analyzing the benefits of vaccines and recommending vaccine policy reflecting the societal benefits of

---

[1] The NVICP established procedures through which claimants may seek compensation for certain vaccine-related injuries.  42 U.S.C. §§ 300aa-10 to 300aa-34.  It established a specialized tribunal of special masters in the U.S. Court of Federal Claims through which vaccine-related injury claims must initially be submitted.  42 U.S.C. § 300aa-11(a)(2).  Currently, the vaccines covered under the Program are diphtheria, tetanus, pertussis, measles, mumps, rubella, polio, Hepatitis B, Haemophilis influenza type b, varicella, rotavirus, and streptococcus pneumoniae.  42 C.F.R. 100.3 (Vaccine Injury Table).  Claimants who suffer injuries according to criteria outlined in the Vaccine Injury Table make out a prima facie case for compensation that the Secretary may rebut only by proving the injury was caused by factors unrelated to the vaccine.  42 U.S.C. §§ 300aa-11(c)(1)(C)(i) and 13(a)(1)(B).  Those not suffering a "Table injury" may still obtain compensation by showing by a preponderance of evidence that the injury was caused in fact by the vaccine.  The Vaccine Injury Table currently contains nine injuries presumptively related to certain listed vaccines.  42 C.F.R. § 100.3.  The Table does not list any injury presumptively linked to thimerosal.

vaccinations." Id. at 7.  One such study by the Geiers, titled "Thimerosal in Childhood Vaccines: Neurodevelopmental Disorders and Heart Disease in the United States," ("Plaintiffs' Article") was published in the *Journal of American Physicians and Surgeons*, and concluded that there was "strong epidemiological evidence for a link between increasing mercury from thimerosal-containing childhood vaccines and Neurodevelopmental disorders and heart disease." Id. at 10. Plaintiffs' Article is their contribution to what they allege to be a "vigorous debate within the scientific community about whether there is a causal relationship between the presence of thimerosal (an ethyl-mercury preserving agent) in multi-dose vaccines and a recent and dramatic rise in the prevalence of neurological disorders, often diagnosed as autism." Id. at 10-11.

Both Dr. Pickering and Dr. Schwartz are employees of the Public Health Service ("PHS"), and for purposes of this Memorandum will be referred to as the "PHS defendants."  Dr. Pickering serves as the Senior Advisor to the Director of the National Immunization Program ("NIP"), a component of the Centers for Disease Control and Prevention ("CDC"), which in turn is an operating division of HHS.  See Declaration of Larry K. Pickering, attached as Exhibit 1. Similarly, at the time that he contributed to the Article giving rise to Plaintiffs' complaint, Dr. Schwartz was the Associate Director for Science in the NIP.  See Declaration of Benjamin Schwartz, attached as Exhibit 2.  As part of their job responsibilities, the PHS defendants, together with academic co-authors, participated in an analysis of the scientific data related to the alleged association between vaccines containing thimerosal and autism. Id.  Their analysis reviewed studies published in the medical literature on thimerosal and autism, assessed the quality of the studies using accepted criteria, and drew conclusions based on the scientific evidence.  The PHS defendants and their academic co-authors identified methodological

3

shortcomings in the Geiers' studies and concluded that the alleged link between vaccines containing thimerosal and autism was not supported by the evidence.  Id.  The results of this joint analysis by the PHS defendants and their academic co-authors were published in Defendants' Article, attached hereto as Exhibit 3.

In their Article, Defendants questioned the Geiers' analysis of manufacturer-specific adverse event reporting rates because it was the policy of CDC not to release those confidential data outside the agency.  See Exs. 1 and 2.  The question raised by the PHS defendants and their academic co-authors, which is characterized by the Geiers in their complaint as a false "accusation that the Geiers fabricated the manufacturer-specific dose data," Complaint at 16, is worded as follows:

> Substantial questions regarding the accuracy of the denominator data for the incidence calculation also exist.  The denominator requires the total number of children in the United States who received thimerosal-containing DtaP9 (exposed) and the total number who received thimerosal-free DtaP (unexposed).  The authors indicated the source of these data as the "Biological Surveillance Summaries of the CDC."  However, CDC reports only aggregate doses distributed for DtaP and other vaccines and provides no manufacturer-specific data.  It is unclear how the authors estimated manufacturer-specific data because, on the basis of agreements with manufacturers, CDC does not release these data.  No source is cited in the publication.  The authors provided no details on how total DtaP doses distributed were translated into the number of children vaccinated with specific thimerosal-containing or thimerosal-free vaccines, which is particularly problematic for a vaccine administered in a 5-dose schedule over a 4- to 5-year period.

See Ex. 3 at 796.  Defendants' Article posed the question set forth above because the PHS defendants had been told by the supervisors of the CDC offices where the manufacturer-specific data were maintained that they would not have been released outside of CDC and, as stated above, no source was cited in Plaintiffs' Article.  *See* Exs. 1 and 2.  However, when Dr. Geier

4

informed the PHS defendants that he had in fact obtained the manufacturer-specific data from CDC, they and their academic co-authors published a letter in *Pediatrics* noting the correction and expressing regret for the error, following standard practice for corrections. See Exhibit 4.

Plaintiffs' complaint characterizes the above-quoted language in Defendants' Article as "false and misleading statements, accusing the Geiers of lying and inventing data." Complaint at 2. Notably, plaintiffs do not allege that Defendants' Article came to the wrong conclusions on the merits of their studies, but rather, "above and beyond a fair critique of the Geiers' published articles, the authors made statements they know or should have known were false." Id. at 14-15. Yet, notwithstanding even an allegation that the conclusions contained in Defendants' Article were wrong, false, or misleading, plaintiffs seek draconian relief in the form of an injunction barring HHS from relying on Defendants' Article in its entirety in all NVICP proceedings and an "official retraction" of the Article by HHS. Id. at 26-27. As we will show, even assuming plaintiffs' factual allegations to be true, they fail to state a claim against HHS and its employees.

**Legal Standard for Dismissal for Failure to State a Claim**

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of a complaint. Atchinson v. District of Columbia, 73 F. 3d 418, 421 (D.C. Cir. 1996). A complaint may be dismissed for failure to state a claim upon which relief may be granted if the facts pled and reasonable inferences therefrom are legally insufficient to support the relief requested. Appleton v. United States, 69 F. Supp. 2d 83, 86 (D.D.C. 1999). In reviewing a motion to dismiss, whether on grounds of lack of jurisdiction over the subject matter or for failure to state a cause of action, all factual allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-

5

moving party. Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Scheuer v. Rhodes, 416 U.S. 232 (1974). The court need not, however, accept as true the plaintiff's legal conclusions. See Taylor v. FDIC, 132 F.3d 753, 762 (D.C. Cir. 1997). From the facts alleged in the complaint in this case, it appears beyond doubt that plaintiffs can prove no set of facts that would entitle them to relief.

**Argument**

I.  **Authorship of a Scientific Journal Article by Government Employees is Not Reviewable "Final Agency Action" Under the Administrative Procedure Act**.

The Administrative Procedure Act ("APA") limits the non-statutory right of judicial review to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; see also Reliable Automatic Sprinkler Co., Inc., v. Consumer Product Safety Comm'n, 324 F.3d 726, 729, 731-35 (D.C. Cir. 2003). "Agency action" is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). To constitute final agency action, it must mark the consummation of the agency's decision making process, and the action must be one by which "rights or obligations have been determined" or from which "legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177-178 (1997) (internal quotation marks and citations omitted); see also Reliable Automatic Sprinkler Co., Inc., 324 F.3d at 731 ("Agency action is considered final to the extent that it imposes an obligation, denies a right, or fixes some legal relationship").

As a preliminary matter, the journal article to which the PHS defendants contributed does not constitute an "agency action." The APA's definition of agency action reaches statements "that announce a rule of law, impose obligations, determine rights or liabilities, or fix legal

6

relationships." Industrial Safety Equip. Corp. v. EPA, 656 F. Supp. 852, 855 (D.D.C. 1987), aff'd 837 F.2d 1115 (D.C. Cir. 1988).  Defendants' Article does not promulgate a rule, adjudicate an issue, issue or withdraw a license, or impose administrative sanctions.  Thus, Defendants' Article is clearly not a "rule" as defined in 5 U.S.C. § 551(4);  a "sanction" within the meaning of 5 U.S.C. § 551(10);  an "order" within the meaning of 5 U.S.C. § 551(6); a "license" within the meaning of 5 U.S.C. § 551(8); or "relief" as defined in 5 U.S.C. § 551(11).

Essentially Defendants' Article is a discretionary scholarly review and critique of prior original research publications that have assessed the epidemiology of thimerosal and autistic spectrum disorders ("ASD").  As a scientific endeavor undertaken solely on a discretionary basis, the entirety of Defendants' Article has no legal force and promulgates neither agency rules nor policy.  The endeavor simply sought to summarize and critique prior research, and as such is merely advisory information for the scientific community engaged in the study of the relationship between thimerosal and ASD.  Thus, the PHS defendants' actions do not constitute "agency action" within the meaning of the APA.

Courts have consistently concluded that agency dissemination of advisory information cannot be viewed as "final agency action."  See, e.g., Franklin v. Massachusetts, 505 U.S. 788, 798 (1992) (holding that Secretary of Commerce's report conveying census data to the President carried "no direct consequences" and thus was not "final agency action").  The Fourth Circuit, for example, has determined that the EPA's issuance of a report on the health hazards of second-hand tobacco smoke was not final agency action because it carried no direct and appreciable legal consequences and therefore was not reviewable under the APA.  Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA, 313 F.3d 852, 859-62 (4th Cir. 2002); see also Industrial Safety

Equip., 656 F. Supp. at 855 (holding that where a publication neither binds an agency nor alters the "rights, liabilities, obligations, or legal relationships of private parties," there is no reviewable agency action), aff'd, 837 F.2d at 1117, 1119 (holding that a government report issued by EPA did not constitute "agency action" at all, let alone "final agency action"). But see Impro Products, Inc. v. Block, 722 F.2d 845 (D.C. Cir.) (questioning the continued validity of Hearst Radio, Inc. v. FCC, 167 F.2d 225 (D.C. Cir. 1948) (finding no agency action whatsoever where FCC published a report containing allegedly misleading information)), cert. denied, 496 U.S. 931 (1983). Thus, the PHS defendants' actions in this case do not constitute "final agency action" under the APA.

Additionally, in general, action by subordinate agency officials is not final agency action subject to judicial review. Stauffer Chem. Co. v. FDA, 670 F.2d 106, 108 (9th Cir. 1982). See also Franklin v. Massachusetts, 505 U.S. at 798. Here the agency has not spoken, acted, or made an unequivocal statement of its position, but rather two of its employees, along with academic co-authors from outside the agency, simply undertook a project to contribute to the scientific knowledge base regarding the epidemiology of thimerosal and ASD. This scientific undertaking was wholly discretionary, and thus the PHS defendants' actions were not required by any statute.

Moreover, even if the decision to participate in authoring and publishing the Article somehow did constitute final agency action, the actions of the PHS Defendants and HHS would still be judicially unreviewable as committed to agency discretion by law within the meaning of the APA. See 5 U.S.C. § 701(a)(2). This follows because there simply is no statutory standard that governs the alleged agency action and so there is no judicially discoverable and manageable standard which this Court could use to assess whether the action was arbitrary, capricious, or

8

contrary to law.  See generally Citizens to Protect Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971) (no judicial review where there is "no law to apply"); Drake v. FAA, 291 F.3d 59, 70 (D.C. Cir. 2002), cert. denied, 537 U.S. 1193 (2003).

Finally, even if the PHS defendants' contribution to this journal article is agency action pursuant to 5 U.S.C. § 551(13), and is final agency action subject to judicial review under the APA, their actions were in no way arbitrary or capricious under 5 U.S.C. § 706.  Specifically, the statement in Defendants' Article to which plaintiffs take exception, that the CDC's Biological Surveillance Summaries with manufacturer-specific data would not have been available to Dr. Geier to consider in his analysis of children potentially exposed to thimerosal in the diphtheria-tetanus-acellular pertussis vaccine, was included because the PHS defendants had a good faith basis to believe these statements were accurate at the time they were made.  See Exs. 1 and 2.  As is noted, in part, in the correction letter published in *Pediatrics*:

> Since 1962, the Centers for Disease Control and Prevention has collected brand- specific information on annual vaccine doses distributed by manufacturers for planning purposes. At the manufacturers' request, these data are kept confidential because they consider this information to be proprietary. Our statement was based on this policy. We were not aware that these data had been released before publication of our article.

See Ex. 4.  Soon after Dr. Geier informed the authors that he had in fact received these data, the PHS defendants (along with their co-authors) dutifully sought to correct their prior statement and submitted for publication the above-referenced correction notice, in the form of a Letter to the Editor, in the journal *Pediatrics*.  The standard practice among professional journals, including *Pediatrics*, for correcting errors in previously published articles is through publication of a correction notice in the Letters section of the journal.  The article was originally published in September of 2004, and the authors submitted the correction notice to the journal on November

1, 2004. The correction notice was published in the journal in January of 2005. Any alleged harm that might have been suffered by plaintiffs was obviated through publication of this correction notice. Therefore, the PHS defendants' actions were in no way arbitrary or capricious.

## II. The PHS Defendants are Immune from Suit Because Plaintiffs Have Not Alleged That They Violated Clearly Established Constitutional Rights.

Plaintiffs allege that the PHS defendants are personally liable to them in damages under Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971), for depriving them of or interfering with their constitutional rights. It is well settled that the PHS defendants are entitled to qualified immunity from suit for personal damages if their conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." Saucier v. Katz, 533 U.S. 194 (2001); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). See Siegert v. Gilley, 500 U.S. 226 (1991); Davis v. Scherer, 468 U.S. 183, 197 (1984). The qualified immunity defense in this context is "an immunity from suits rather than a mere defense from liability." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). The Supreme Court has repeatedly stressed the desirability to resolve the qualified immunity issues at the earliest stage of litigation. Hunter v. Bryant, 502 U.S. 224, 227 (1991); Anderson v. Creighton, 483 U.S. 635 (1987); Mitchell v. Forsyth, supra. In fact, "[u]ntil the threshold of immunity is resolved, discovery should not be allowed." Siegert, supra, at 231.

The District of Columbia Circuit Court established a two-prong test to review the applicability of the qualified immunity defense. First, the court will look at whether "the facts show the officer's conduct violated a constitutional right." Lederman v. United States, 291 F.3d 36, 46 (D.C. Cir. 2002) (citations omitted). Second, the Court will look at whether the right was

clearly established. In assessing whether a particular right is sufficiently established to place a defendant on notice that his conduct was unconstitutional, the D.C. Circuit looks to decisions of "the Supreme Court, the District of Columbia Circuit, and, to the extent there is a consensus, other circuits [that] have spoken clearly on the lawfulness of the conduct at issue." Butera v. District of Columbia, 235 F.3d 637, 652 (D.C. Cir. 2001). Defendants are only liable "if they knew, or were unreasonable in not knowing, that their behavior violated the Constitution." Harris v. District of Columbia, 932 F.2d 10, 13 (D.C. Cir. 1991).

The immunity question is resolved by examining the reasonableness of the defendant's conduct in light of clearly established federal law. Malley v. Briggs, 475 U.S. 335, 345 (1986). Therefore, the defendant's conduct is "analyzed according to an objective, rather than subjective, standard of reasonableness." Foster v. McGrail, 844 F. Supp. 16, 23 (D. Mass. 1994) (quoting Anderson v. Creighton, 483 U.S. 635 (1987)). For example, prison officials are entitled to qualified immunity when a plaintiff fails to plead any specific direct evidence or intent to deprive him of his right and fails to articulate any specific injury sustained as a result of the actions complained of. Deutsch v. United States Department of Justice, 881 F. Supp. 49 (D.D.C. 1995), aff'd, 93 F.3d 986 (D. C. Cir. 1996).

Where, as here, the PHS defendants have raised qualified immunity as a defense, the courts ordinarily will resolve two issues: (1) whether a constitutional right would have been violated on the facts alleged; and (2) assuming the violation is established, whether the right alleged to have been violated was clearly established such that a reasonable person would have known of its existence. Saucier 533 U.S. at 196. As we will show, even accepting Plaintiffs' factual allegations as true, they fail to establish that plaintiffs' constitutional rights were violated

11

by the PHS defendants.

### A. Plaintiffs Do Not Have a Constitutionally Protected Right of Access to Court as Expert Witnesses.

Plaintiffs have alleged that the PHS defendants violated their "Constitutional rights to (1) seek and be fairly considered for federal contracts (expert witnesses in the NVICP) and (2) access the courts (NVICP and in state and federal civil proceedings) in their capacity as expert witnesses and on behalf of vaccine injury claimants." See Complaint at 25. Plaintiffs assert that these constitutional rights are "protected by the First and Fifth Amendments." Id. at 3. Review of applicable law and the allegations as presented in plaintiffs' complaint demonstrate that the PHS defendants did not violate any clearly established right of the plaintiffs. Accordingly, qualified immunity requires dismissal of any constitutional claims against them.

Turning first to plaintiffs' allegation that their right to "access the courts" has been violated, there is no such constitutional right on the part of witnesses. Rather, the jurisprudence on the right of access to the courts is based on the rights of litigants. Christopher v. Harbury, 536 U.S. 403 (2002). In Christopher, the widow of a Guatemalan citizen brought a Bivens action alleging, inter alia, that State Department officials' concealment of information about her husband's fate had violated her First and Fifth Amendment rights of access to courts to obtain injunctive relief in an effort to save his life. In its review of cases on the denial of access to courts, the Court observed that such claims fell into two categories: First, claims that "systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time;" and second, "cases that cannot now be tried . . . no matter what official action may be in the future." 536 U.S. at 413-14 (citations omitted).

The Geiers have not alleged that official action has denied them an opportunity to file suit or to obtain a favorable result in litigation to which they are parties. Rather, they claim that they have lost income opportunities as expert witnesses because of the defendants' actions. In Christopher, the Court held that "the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." 536 U.S. at 415. Like the complaint which the Court found wanting in Christopher, the Geiers' complaint does "not even come close to stating a constitutional claim for denial of access upon which relief could be granted." Id. at 417. Even assuming, arguendo, that a scholarly article co-authored by government employees acting within the scope of their employment could fairly be described as "official acts," plaintiffs have not even alluded to, let alone described, the "underlying cause of action" that was frustrated by Defendants' Article. The only litigation referenced in the Geiers' complaint is litigation brought by claimants under the NVICP. The Geiers are merely witnesses to such litigation, but not parties. Thus, plaintiffs' complaint fails to allege an underlying cause of action that has been frustrated by the PHS Defendants' conduct and therefore fails to state a claim that their constitutional right to access the courts has been violated.

      **B.**      **Plaintiffs Do Not Have a Constitutionally Protected Liberty Interest in Continued Employment as Expert Witnesses.**

Reading the Geiers' complaint in the most charitable light, their second constitutional claim appears to be that the defamatory statements by the PHS defendants violated liberty interests protected under the due process clause of the Fifth Amendment, i.e., to "seek and be fairly considered for federal contracts (expert witnesses in the NVICP)." See Complaint at 25.

As a threshold matter, plaintiffs' allegations that Defendants' Article accused the Geiers of "lying and inventing data," id. at 2, and "fabricating" their data, id. at 15, exaggerates what defendants actually wrote, i.e., that there were "substantial questions" about the Geiers' data that were left unanswered because the Geiers did not cite the source for their data. Id. at 15. Even assuming, arguendo, that Defendants' Article was in fact defamatory, it is clearly established that "government defamation, standing alone, cannot be the basis of an 'employment foreclosure' liberty claim." Kartseva v. Dept. of State, 37 F.3d 1524, 1527 (D.C. Cir. 1994) (citing Paul v. Davis, 424 U.S. 693 (1976) and Siegert v. Gilley, 500 U.S. 226 (1991)). In Kartseva, the court explained that "a government action that potentially constrains future employment opportunities must involve a tangible change in status to be actionable under the due process clause." Id.

Plaintiffs' complaint fails to allege any tangible change in their status flowing from the publication of Defendants' Article. Plaintiffs have not alleged that they have been debarred from contracts with HHS or other government agencies as a result of the actions by the PHS defendants. Rather, the Geiers' appear to be arguing that HHS has failed to fairly consider hiring them as expert witnesses in NVICP proceedings. However, government officials have considerable discretion in awarding contracts, O'Hare Truck Services, Inc. V. City of Northlake, 518 U.S. 712 (1996), and this is particularly true when the government chooses its expert witnesses in litigation to which it is a party. Kartseva teaches that "to demonstrate a status change of this sort, [plaintiffs] must show that [their] disqualification from future opportunities is automatic or formal," and not simply that the government's actions have placed them at a competitive disadvantage to other potential expert witnesses. 37 F.3d at 1529.

Plaintiffs also appear to suggest that, beyond not being fairly considered for federal

contracts as expert witnesses in NVICP proceedings, other parties to those proceedings have not hired them as expert witnesses because of the defendants' defamatory statements. Complaint at 25. Absent an allegation that HHS has determined the Geiers to be legally ineligible for future contracts, however, plaintiffs cannot state a claim of violation of their due process liberty interests unless they allege that the PHS defendants' actions had "the broad effect of largely precluding [them] from pursuing their chosen career[s]." Id., 37 F.3d at 1528 (citing Greene v. McElroy, 367 U.S. 886, 895-96 (1961) (emphasis in original)). Although Plaintiffs allege that the Defendants' Article "injured and will continue to injure the Geiers in their trade and business, and damaged their reputation in the community of scientists," Complaint at 2, this "interference" with their "rights" to appear as expert witnesses on behalf of litigants in the NVICP and other courts falls far short of establishing that they have been precluded from pursuing their chosen careers in violation of the due process clause.[2]

As noted by the Court in Siegert, "A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." 500 U.S. at 232. Viewing the Geiers' allegations in the light most favorable to them, they have not asserted a violation of their constitutional right of access to the

---

[2] Although the Geiers' allegations that publication of the Defendants' Article in September 2004 had an adverse effect on their credibility as expert witness in NVICP cases must be accepted as true for purposes of this Motion, the United States Court of Federal Claims repeatedly rejected the testimony of Dr. Mark Geier in such cases before September 2004. See, e.g., Weiss v. Sec. of Health and Human Servs., No. 03-190V, 2003 WL 22853059 (Fed. Cl. Oct. 9, 2003) (expressing doubts about Dr. Geier's qualifications as an expert witness and listing no fewer than nine cases predating September 2004 in which his testimony has been accorded no weight in NVICP cases) (attached as Exhibit 5).

courts nor to their liberty interest in continued employment as expert witnesses in NVICP cases. Even if they had stated a claim of violation of their constitutional rights, the record shows that the problems Dr. David Geier alleges that he has encountered as an expert witness in NVICP cases predate the publication of Defendants' Article.

## Conclusion

For all of the reasons set forth above, the United States respectfully requests that Plaintiffs' complaint against HHS and the PHS defendants be dismissed for lack of subject matter jurisdiction and/or failure to state a claim.

November 14, 2005

Respectfully submitted,

KENNETH L. WAINSTEIN, D.C. Bar # 451058
United States Attorney

R. CRAIG LAWRENCE, D.C. Bar # 171538
Assistant United States Attorney

ALAN BURCH, D.C. Bar # 470655
Assistant United States Attorney
555 4th St., N.W.
Washington, D.C. 20530
(202) 514-7204
alan.burch@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DR. MARK GEIER, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 05-1749 (RWR) |
| ) | |
| DEPARTMENT OF HEALTH AND ) | |
| HUMAN SERVICES, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**FEDERAL DEFENDANTS' MOTION TO DISMISS**

Federal Defendants, the Department of Health and Human Services, and Dr. Larry K. Pickering, M.D., and Dr. Benjamin Schwartz, M.D., respectfully move to dismiss the claims against them for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted. Plaintiffs allege that defendants defamed them and interfered with their alleged right to appear as expert witnesses, in violation of the Administrative Procedure Act ("APA") and their constitutional rights. Because their allegations do not constitute reviewable final agency action under the APA, nor do they state constitutional violations, the claims against the federal defendants must be dismissed.

A memorandum in support of this motion is attached hereto.

November 14, 2005                                Respectfully submitted,

                                                 _____
                                                 KENNETH L. WAINSTEIN, D.C. Bar # 451058
                                                 United States Attorney

_____
R. CRAIG LAWRENCE, D.C. Bar # 171538
Assistant United States Attorney

_____
ALAN BURCH, D.C. Bar # 470655
Assistant United States Attorney
555 4th St., N.W.
Washington, D.C. 20530
(202) 514-7204
alan.burch@usdoj.gov

2