**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DR. MARK GEIER**, *et al.*, | |
| **Plaintiffs,** | |
| **vs.** | **Case No. 05-CV-1749(TFH)** |
| **DEPARTMENT OF HEALTH AND HUMAN SERVICES**, *et al.*, | |
| **Defendants.** | |

**DEFENDANT AMERICAN ACADEMY OF PEDIATRICS'
MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT**

Defendant American Academy of Pediatrics ("AAP") respectfully moves pursuant to

Rule 12(b)(6) to dismiss the Complaint for failure to state a claim and/or pursuant to Rule 56 for

summary judgment. As set forth more fully in the accompanying memorandum of points and

authorities, this motion should be granted and judgment entered for AAP for each of the

following independent reasons:

1.    The statements at issue are not reasonably capable of conveying the defamatory
      meaning alleged by plaintiffs, or any defamatory meaning.

2.    The allegedly defamatory statements are not capable of reasonably being
      understood as actionable statements of fact.

3.    Plaintiffs' claims for tortious interference are barred by the First Amendment and
      also fail at common law for multiple reasons.

4.    All of the causes of action are barred by the statute of limitations.

WHEREFORE, AAP respectfully requests that its motion be granted and that judgment

be entered in its favor.

**REQUEST FOR HEARING**

Pursuant to Local Rule 7(f), AAP respectfully requests a hearing on this motion.

Dated:   December 1, 2005                    Respectfully submitted,

                                             LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

                                             By: /s/ Jay Ward Brown
                                                 Jay Ward Brown (D.C. Bar No. 437686)
                                                 Adam J. Rappaport (D.C. Bar No. 479866)
                                             1050 Seventeenth Street, N.W., Suite 800
                                             Washington, DC  20036
                                             (202) 508-1100

                                             *Counsel for Defendant*
                                             *American Academy of Pediatrics*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DR. MARK GEIER,** *et al.*, | |
| **Plaintiffs,** | |
| **vs.** | **Case No. 05-CV-1749(TFH)** |
| **DEPARTMENT OF HEALTH AND HUMAN SERVICES,** *et al.*, | |
| **Defendants.** | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT AMERICAN ACADEMY OF PEDIATRICS'
<u>MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT</u>**

Jay Ward Brown
Adam J. Rappaport
LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
1050 Seventeenth Street, N.W., Suite 800
Washington, DC  20036
(202) 508-1100

*Counsel for Defendant
American Academy of Pediatrics*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 2

    The Public Controversy ........................................................................................ 2

    The *Pediatrics* Article ......................................................................................... 4

    Publication of the Article ..................................................................................... 9

    The Complaint ...................................................................................................... 10

ARGUMENT ................................................................................................................... 11

I.     THE *PEDIATRICS* ARTICLE IS NOT ACTIONABLE IN
       DEFAMATION ...................................................................................................... 12

       A.    The Challenged Portion Of The *Pediatrics* Article Is Not
               Reasonably Capable of Conveying Any Defamatory Meaning ........................... 12

             1.    The ordinary meaning of the *Pediatrics* Article is not
                   defamatory ......................................................................................... 13

             2.    The *Pediatrics* Article does not reasonably imply that the
                   Geiers falsified data ........................................................................... 15

             3.    The *Pediatrics* Article cannot in any event reasonably be
                   understood as intended by AAP to convey the implication
                   alleged by the Geiers ......................................................................... 19

       B.    Viewed In Context, Statements In The *Pediatrics* Article
               Regarding The Geiers Cannot Reasonably Be Understood As
               Actionable Statements Of Fact ........................................................... 21

II.    THE GEIERS CANNOT STATE A CAUSE OF ACTION FOR
       TORTIOUS INTERFERENCE WITH CONTRACT OR PROSPECTIVE
       BUSINESS RELATIONS ..................................................................................... 26

       A.    The Geiers Cannot Use Other Causes Of Action To "End-Run"
               The First Amendment Limitations On Their Defamation Claim ........................ 26

       B.    The Tortious Interference Claims Fail At Common Law In Any
               Event ................................................................................................... 28

III.    IN THE ALTERNATIVE, AAP IS ENTITLED TO SUMMARY
        JUDGMENT BECAUSE ALL OF THE GEIERS' CLAIMS ARE
        BARRED BY THE STATUTE OF LIMITATIONS .......................................................32

CONCLUSION.................................................................................................................35

## TABLE OF AUTHORITIES

### CASES

*A.I. Trade Finance, Inc. v. Petra International Banking Corp.*, 62 F.3d 1454
(D.C. Cir. 1995) ................................................................................................32

*Agora, Inc. v. Axxess, Inc.*, 90 F. Supp. 2d 697 (D. Md. 2000) ....................................12

*Bannum, Inc. v. Citizens for a Safe Ward Five, Inc.*, 383 F. Supp. 2d 32
(D.D.C. 2005) ...........................................................................................29, 31

*Barr v. Clinton*, 370 F.3d 1196 (D.C. Cir. 2004) ..........................................................11

*Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180 (4th Cir. 1998) ...................................22

*Bowhead Information Technology Services, LLC v. Catapult Technology, Ltd.*,
377 F. Supp. 2d 166 (D.D.C. 2005) ...............................................................28

*Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262 (7th Cir. 1983)........30

*Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) ...................................................32

*Cambridge Title Co. v. Transamerica Title Insurance Co.*, 817 F. Supp. 1263
(D. Md. 1992), *aff'd*, 989 F.2d 491 (4th Cir. 1993)......................................29

*Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087 (4th Cir. 1993).....................................17

*Chesapeake Publishing Corp. v. Williams*, 661 A.2d 1169 (Md. 1995)...........13, 14, 19

*Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26 (D.D.C. 1995), *aff'd*,
88 F.3d 1278 (D.C. Cir. 1996) .......................................................................12

*Community for Creative Non-Violence v. Pierce*, 814 F.2d 663 (D.C. Cir. 1987)......12, 14, 15, 18

*Connors, Fiscina, Swartz & Zimmerly v. Rees*, 599 A.2d 47 (D.C. 1991) ...................31

*Crowley v. Fox Broadcasting Co.*, 851 F. Supp. 700 (D. Md. 1994) ...................*passim*

*Dilworth v. Dudley*, 75 F.3d 307 (7th Cir. 1996).....................................................23, 24

*Dulgarian v. Stone*, 652 N.E.2d 603 (Mass. 1995).......................................................30

*El-Ghori v. Grimes*, 23 F. Supp. 2d 1259 (D. Kan. 1998) .......................................18, 19

*Ellis v. Time, Inc.*, 26 Media L. Rep. (BNA) 1225 (D.D.C. 1997).............................27, 28

*Ezrailson v. Rohrich*, 65 S.W.3d 373 (Tex. App. 2001)...................................................23, 24, 25

*Fleming v. AT & T Information Services*, 878 F.2d 1472 (D.C. Cir. 1989) ................................13

*Food Lion, Inc., v. Capital Cities/ABC, Inc.*, 194 F.3d 505 (4th Cir. 1999)................................27

*Foretich v. Advance Magazine Publishers, Inc.*, 765 F. Supp. 1099 (D.D.C. 1991)...................27

*Foretich v. Glamour*, 753 F. Supp. 955 (D.D.C. 1990) ................................................................32

*Freyd v. Whitfield*, 972 F. Supp. 940 (D. Md. 1997)...............................................................22, 25

*Gregorie v. G.P. Putnam's Sons*, 81 N.E.2d 45 (N.Y. 1948) .......................................................33

*Huggins v. National Broadcasting Co.*, 1996 WL. 763337
    (N.Y. Sup. Ct. Feb. 7, 1996) ...................................................................................................31

*Huggins v. Povitch*, 24 Media L. Rep. (BNA) 2040 (N.Y. Sup. Ct. 1996) ................................31

*Hustler Magazine v. Falwell*, 485 U.S. 46 (1988)........................................................................27

*Ideal Electric Security Co. v. International Fidelity Insurance Co.*, 129 F.3d 143
    (D.C. Cir. 1997) .......................................................................................................................32

*Immuno AG. v. Moor-Jankowski*, 567 N.E.2d 1270 (N.Y. 1991)................................................24

*K & K Management, Inc. v. Lee*, 557 A.2d 965 (Md. 1989) ...................................................29, 32

*Kirk v. CBS, Inc.*, 1987 WL. 11831 (N.D. Ill. June 4, 1987)..................................................23, 24

*Klayman v. Segal*, 783 A.2d 607 (D.C. 2001) .............................................................................14

*Lane v. Random House, Inc.*, 985 F. Supp. 141 (D.D.C. 1995)....................................................18

*Lewis v. McTavish*, 673 F. Supp. 608 (D.D.C. 1987) ..................................................................22

*In re Lorazepam & Clorazepate Antitrust Litigation*, 295 F. Supp. 2d 30
    (D.D.C. 2003) ...........................................................................................................................11

*Lyon v. Campbell*, 707 A.2d 850 (Md. Ct. Spec. App. 1998)......................................................31

*Marsh v. Hollander*, 339 F. Supp. 2d 1 (D.D.C. 2004) ................................................................2

*Martin v. U.S. Environmental Protection Agency*, 271 F. Supp. 2d 38 (D.D.C. 2002)................11

*Mercer Management Consulting, Inc. v. Wilde*, 920 F. Supp. 219 (D.D.C. 1996)......................28

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) ...................................................22

*Moldea v. New York Times Co.*, 22 F.3d 310 (D.C. Cir. 1994) .............................22, 27

*Moldea v. New York Times Co.*, 793 F. Suup. 338 (D.D.C. 1992) ................................27

*Mountain States Legal Foundation v. Bush*, 306 F.3d 1132 (D.C. Cir. 2002) .............11

*Mullin v. Washington Free Weekly, Inc.*, 785 A.2d 296 (D.C. 2001)............................32

*Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1984) ........................................................22

*Palestri v. Monogram Models, Inc.*, 875 F.2d 66 (3d Cir. 1989) ..................................34

*Partington v. Bugliosi*, 56 F.3d 1147 (9th Cir. 1995) ..................................................22

*Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724 (1st Cir. 1992)..........22

*Ratliff v. Farm Progress Cos.*, 1992 WL 240661 (E.D. Ky. May 4, 1992).................33

*Schuler v. McGraw-Hill Cos.*, 989 F. Supp. 1377 (D.N.M. 1997), *aff'd*,
    145 F.3d 1346 (10th Cir. 1998) ............................................................................30

*Seminole Tribe of Florida v. Times Publishing Co.*, 780 So. 2d 310
    (Fla. Dist. Ct. App. 2001) ...................................................................................31

*Southern Air Transport, Inc. v. American Broadcasting Cos.*, 670 F. Supp. 38
    (D.D.C. 1987) ........................................................................................................2

*Southern Air Transport, Inc. v. American Broadcasting Cos.*, 877 F.2d 1010
    (D.C. Cir. 1989) ...................................................................................................16

*Southern Volkswagen, Inc. v. Centrix Finance, LLC*, 357 F. Supp. 2d 837
    (D. Md. 2005) .......................................................................................................30

*Spengler v. Sears, Roebuck & Co.*, 878 A.2d 628 (Md. Ct. Spec. App.), *cert. denied*,
    883 A.2d 915 (Md. 2005) .....................................................................................28

*Strick v. Superior Court*, 192 Cal. Rptr. 314 (Cal. Ct. App. 1983)..............................33

*Thomas v. News World Communications*, 681 F. Supp. 55 (D.D.C. 1988)....................32

*Underwager v. Salter*, 22 F.3d 730 (7th Cir. 1994).....................................................24

*Washington v. Smith*, 893 F. Supp. 60 (D.D.C. 1995), *aff'd*, 80 F.3d 555
(D.C. Cir. 1996) .................................................................................. 22, 27-28

*Weiss v. Secretary of Health & Human Services*, 2003 WL 22853059
(Fed. Cl. Oct. 9, 2003) ........................................................................... 31

*Wells v. Marton*, 794 F. Supp. 1092 (S.D. Fla. 1991) ................................. 30

*White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990) .................................. *passim*

*White v. Fraternal Order of Police*, 707 F. Supp. 579 (D.D.C. 1989) ................................... 12, 16

## STATUTES

D.C. Code § 12-301(4)................................................................................... 32

## OTHER AUTHORITIES

F. Harper & F. James, *The Law of Torts* § 5.4 (1986) ................................... 19

*Restatement (Second) of Torts* § 563 (1977)................................................ 19

Robert D. Sack, *Sack on Defamation* § 2.4.5 (3d ed. 2005) .......................... 19

Defendant American Academy of Pediatrics ("AAP") respectfully submits this memorandum in support of its motion pursuant to Rule 12(b)(6) to dismiss and/or pursuant to Rule 56 for summary judgment on the Complaint filed by Dr. Mark Geier and David Geier ("plaintiffs" or the "Geiers").

**<u>INTRODUCTION</u>**

This case arises out of an article published in the September 2004 issue of *Pediatrics*, the official medical journal of AAP. The article assessed previously published medical studies concerning the possible association between thimerosal, a preservative used in some vaccines, and autism, to determine whether these studies met standards of scientific reliability. In the article, the authors raised questions about or otherwise noted shortcomings in the methodologies employed in each of the studies examined, including four studies published by the Geiers. Insofar as pertinent to the Complaint, the authors observed that it was "unclear" how the Geiers were able to estimate the total number of vaccines containing thimerosal given to children in the United States because the Centers for Disease Control and Prevention ("CDC"), the indicated source of the Geiers' data, did not release such information publicly.

Based on this passage, the Geiers filed suit against AAP, the four authors of the article, and the Department of Health and Human Services ("HHS"), which employs two of the authors. Count I of the Complaint purports to assert a cause of action against AAP and the two non-federal authors for defamation, alleging that the article accused the Geiers of falsifying their data. Counts II to V purport to assert causes of action against the same group of defendants for tortious interference with contract and with prospective business relations based on publication of the article. The remaining counts are directed against the federal defendants and allege that publication of the article constitutes an adverse agency action and deprived the Geiers of their

constitutional rights.  The two non-federal authors have moved to dismiss the Complaint as against them for lack of personal jurisdiction, and the federal defendants have moved to dismiss the Complaint for failure to state a claim against them.

AAP now moves to dismiss the Complaint and/or for summary judgment because the Geiers cannot properly state a cause of action against AAP for either defamation or tortious interference for multiple, independent reasons:

1. The statements at issue are not reasonably capable of conveying the defamatory meaning alleged by plaintiffs, or any defamatory meaning.

2. The allegedly defamatory statements are not capable of reasonably being understood as actionable statements of fact.

3. Plaintiffs' claims for tortious interference are barred by the First Amendment and also fail at common law for multiple reasons.

4. All of the causes of action are barred by the statute of limitations.

## BACKGROUND

### The Public Controversy

For several years, there has been vigorous debate in the medical community and among the public at large about the safety of thimerosal.  Thimerosal is an agent that can be used as a vaccine preservative.  *See* Sarah K. Parker, et al., *Thimerosal-Containing Vaccines and Autistic Spectrum Disorder: A Critical Review of Published Original Data*, 114 Pediatrics 793, 793 (2004) (the "Article" or the "*Pediatrics* Article").[1]  It contains mercury, which led to concerns

---

[1] A true and correct copy of the *Pediatrics* Article is attached hereto as Exhibit 1. Because it is referenced in, and central to the Complaint, the Article may properly be considered by the Court in the context of the portion of this motion brought pursuant to Rule 12(b)(6).  *See, e.g.*, *Marsh v. Hollander*, 339 F. Supp. 2d 1, 5 n.4 (D.D.C. 2004) (court may consider allegedly defamatory material referred to in complaint and central to plaintiff's claim in connection with motion to dismiss); *Southern Air Transp., Inc. v. Am. Broad. Cos.*, 670 F. Supp. 38, 42 (D.D.C. 1987) (court reviewed videotape and transcript of broadcast in connection with motion to dismiss).

that its use in childhood vaccines could be harmful. *See id.* at 793-94. In July 1999, the Food and Drug Administration, the U.S. Public Health Service, and AAP requested that manufacturers remove thimerosal from vaccines where possible and, by 2001, it had been removed from nearly all childhood vaccines in the United States. *See id.* at 794, 796. However, it is still used in some influenza vaccines for children in this country, and continues to be used in other countries. *Id.*

Some believe that thimerosal is associated with increased rates of autism and other neurodevelopmental disorders ("NDDs"), while others believe there is no link. *See id.* at 793-94. This debate in the scientific and medical community has resulted in numerous studies, journal articles, and responses to them. *See, e.g.*, Compl. ¶¶ 32, 40-43; *Pediatrics* Article at 794. Concerns about the safety of thimerosal also have led to controversy in the public at large. "A significant number of parents are choosing to forego vaccination" of their children due to the unresolved controversy, Compl. ¶ 38, and pediatricians "are questioned regularly by parents about the possibility of an association and asked to provide their opinion on the safety of these vaccines," *Pediatrics* Article at 794. Congress has conducted several hearings and investigations related to the issue, one of which resulted in a House subcommittee report in 2003. Compl. ¶¶ 36, 37. In short, the "growing public concern over vaccine safety," *id.* ¶ 59, has made the hypothesized association between thimerosal and autism/NDDs a "controversial topic," *Pediatrics* Article at 793.

The Geiers are significant participants in this on-going debate. Compl. ¶ 34 ("[t]he Geiers are engaged in a vigorous debate within the scientific community" about thimerosal's safety). They have jointly published several studies concluding there is an association between thimerosal and autism/NDDs, *id.* ¶ 32; *Pediatrics* Article at 795-97, and have both the means and the will to forcefully defend their research when it has been questioned, *see* Compl. ¶¶ 41, 43.

3

The Geiers have frequently been proffered as expert witnesses and served as consultants in cases that are part of the National Vaccine Injury Compensation Program ("NVICP"), a no-fault alternative dispute resolution system administered by the Court of Federal Claims and HHS that is designed to compensate individuals who claim they were harmed by a vaccine. *See id.* ¶¶ 16-18.

AAP, which is a non-profit association of 60,000 pediatricians, pediatric medical subspecialists, and pediatric surgical specialists with its headquarters in Illinois, has published various articles and letters related to this controversy, including the Article challenged in this action, in *Pediatrics*, its official monthly journal. *See id.* ¶ 9; *see also* Exhibit 1.

### The *Pediatrics* Article

The challenged Article, "Thimerosal-Containing Vaccines and Autistic Spectrum Disorder: A Critical Review of Published Original Data," was published in the September 2004 issue of *Pediatrics*. The Article notes that, while most pediatricians are familiar with the controversy over whether vaccines containing thimerosal are a cause of autism and NDDs, many are not familiar with the "type or quality" of the published articles that have addressed the issue. *Pediatrics* Article at 793. By reviewing the medical literature on the potential association between vaccines that contain thimerosal and autism/NDDs, the authors sought to assess whether these studies met standards of scientific reliability and to evaluate whether the published evidence suggests accepting or rejecting the hypothesized link. *See id.*; *see also id.* at 794 ("The purpose of this article was to identify systematically and evaluate critically the design, methods, analysis, and conclusions of each original research publication that has assessed the epidemiology of thimerosal and [autism].").

4

The Article reviews twelve published studies of the subject, four of which were written by the Geiers. *See id.* at 794. The Article first assesses "Neurodevelopmental Disorders after Thimerosal-Containing Vaccines: A Brief Communication," a study authored by the Geiers and published in *Experimental Biology and Medicine* in 2003. *See Pediatrics* Article at 795 & n.29. In this study, the Geiers concluded that there was a significant increase in the incidence of NDDs, including autism, in children who received doses of the diphtheria, tetanus and acellular petrussis vaccine ("DTaP") that contained thimerosal. *See id.* at 795.

As the authors of the *Pediatrics* Article observe, in reaching their conclusion, the Geiers analyzed data from two sources. *See id.* at 795-96. First, the Geiers reviewed reports of "adverse events" following DTaP vaccinations from the Vaccine Adverse Events Reporting System ("VAERS") database that is maintained and monitored by the CDC and the FDA. *See id.* at 795. When an adverse event is reported to VAERS, the type of vaccine and its manufacturer (from which it can be determined whether or not the vaccine contained thimerosal) is recorded. *See id.* at 795-96. Second, the Geiers said they determined the total number of children in the United States who received DTaP vaccines containing thimerosal, and the number who received thimerosal-free DTaP vaccines, from the Biological Surveillance Summaries ("BSS") of the CDC. *See id.* at 796.

Using the VAERS data, the Geiers counted the number of autism/NDD-related adverse events reported both for children who received a DTaP vaccine containing thimerosal and those who received a thimerosal-free DTaP vaccine. *See id.* at 795. To determine whether there was a greater incidence of autism/NDD-related adverse events among children who received a DTaP vaccine containing thimerosal, the Geiers proceeded in their study to compare the VAERS data concerning adverse events to the BSS data, which the Geiers said identified the total number of

children in the United States who received each type of DTaP vaccine (that is, the number of children who received any DTaP vaccine, including both those who experienced an adverse event and those who did not). *See id.*

The authors of the *Pediatrics* Article indicate that they "identified multiple methodological concerns regarding [the Geiers'] article." *Id.* First, the authors assess the accuracy and reliability of the VAERS data on which the Geiers relied to determine how many autism/NDD-related adverse events occurred, and how the Geiers used that data. *See id.* Several factors contributed to the "substantial inaccuracy" of the VAERS data itself, the Article notes. *Id.* First, adverse events are likely to have been underreported to VAERS. *See id.* Contrary to the Geiers' assertion, the authors observe, federal law does not require that all adverse events be reported to VAERS. *See id.* Only adverse events included in the NVICP's "injury table" must be reported, which does not include all autism and other NDDs potentially associated with DTaP vaccines or thimerosal exposure. *See id.* Moreover, the Article notes, underreporting is particularly common where, as here, the adverse events are not part of the vaccine compensation program, or where they are not easily diagnosed or clearly related to vaccination. *See id.*

The authors of the Article also observe that VAERS data may be biased toward greater reporting of adverse events in children who received the DTaP vaccine that contained thimerosal. *See id.* Due to the media attention to the issue following the July 1999 request that thimerosal be removed from childhood vaccines, parents and health care providers – either of whom can report an adverse event to VAERS – may have reported such events more frequently. *See id.* at 796. This "reporting bias" could also affect how symptoms were described and how they were coded in VAERS. *See id.* In addition, the Article notes, a "diagnostic bias," in which health care

providers were more likely to diagnose autism and NDDs for children who were exposed to thimerosal, may have occurred. *See id.*

The Article also questions the Geiers' application of the VAERS data. The Geiers' acceptance that VAERS accurately classified certain adverse events as NDD-related was "particularly troubling," the authors observe. *See id.* at 795. It can take a long time for a physician to distinguish between autism/NDDs and other problems, but, the Article points out, the Geiers did not indicate in their study how they dealt with VAERS reports in which the diagnosis of autism/NDD overlapped with another potential diagnosis. *See id.* The authors similarly raise questions about the Geiers' reliance on the VAERS data because the average age reported in VAERS for children with autism was below the age at which a reliable diagnosis can be made. *See id.* Finally, the Article points to a "significant limitation" of the Geiers' analysis based on their assertion that a child's risk was related to the total amount of his or her thimerosal exposure. *Id.* at 796. VAERS only reports on vaccines received within four weeks of the doctor's visit associated with the adverse event, the Article observes, so it is impossible to discern from the VAERS data whether a child was exposed to other vaccines containing thimerosal during earlier periods. *See id.*

After raising these questions about the VAERS data and the Geiers' application of it, the *Pediatrics* Article turns to assessing the Geiers' analysis based on the BSS data concerning the total number of children in the United States who received thimerosal-containing and thimerosal-free DTaP vaccines. *See id.* There are "[s]ubstantial questions regarding the accuracy of" this data, as well, the Article notes. *Id.* Calculation of the incidence of adverse events for each type of vaccine "requires the total number of children in the United States who received thimerosal-containing DTaP (exposed) and the total number who received thimerosal-free DTaP

7

(unexposed)." *Id.* In their published study, the Geiers "indicated the source of these data as the

'Biological Surveillance Summaries of the CDC.'" *Id.* In the *single* passage of the Article

challenged by the Geiers in this lawsuit, however, the authors of the *Pediatrics* Article observe:

> CDC reports only aggregate doses distributed for DTaP and other
> vaccines and provides no manufacturer-specific data [from which it
> could be determined whether or not the vaccine contained thimerosal].
> It is unclear how the authors estimated manufacturer-specific data
> because, on the basis of agreements with manufacturers, CDC does not
> release these data. No source is cited in the publication. The authors
> provided no details on how total DTaP doses distributed were
> translated into number of children vaccinated with specific thimerosal-
> containing or thimerosal-free vaccines, which is particularly
> problematic for a vaccine administered in a 5-dose schedule over a 4-
> to 5-year period.

*Id.*

The Article then proceeds to raise essentially the same questions about two other studies

published by the Geiers because those studies were based on the same data. *See id.* at 796-97.

It bears emphasis that the Article similarly assesses whether studies of this subject

published by other researchers meet standards of scientific reliability. For example, the Article

criticizes one study based on HMO records for failing to indicate whether it adequately

accounted for the fact that children who visit clinics or hospitals are more likely than other

children to receive vaccinations. *See id.* at 797. The data on which this study was based, the

*Pediatrics* Article adds, had been analyzed three times, which created a risk of "'investigator

bias' whereby the investigators' beliefs regarding outcome could affect the analysis and results."

*See id.* at 797-98. The Article similarly questions the methods used in a different study that

measured the amount of mercury in children after vaccinations: Very few of the children who

received thimerosal-containing vaccines had blood tests within five days, when mercury levels

would be expected to be at their highest. *See id.* at 801. That study also did not obtain

"baseline" blood mercury levels, the *Pediatrics* Article points out, so there was no way to tell if there were increases after exposure. *See id.* And there was evidence that the children who received thimerosal-containing vaccines also had greater prenatal exposure to mercury, making any comparison between the two groups "problematic." *Id.*; *see generally id.* at 797-802 (critically assessing all published studies on topic).

After the Article was published, the authors were informed by the Geiers that a CDC employee had, despite the CDC's long-standing policy to the contrary, provided to them data from the Biological Surveillance Summaries that specified the number of doses distributed by particular vaccine manufacturers. *See* Compl. ¶ 53. In a letter to the editor of *Pediatrics* published in the January 2005 issue, the authors acknowledged that the Geiers had acquired the data in question and stated that they "regret this error." *Id.* The letter (a copy of which is attached hereto as Exhibit 2) explained that the CDC has collected brand-specific information on annual vaccine doses from manufacturers since 1962, but that this information is kept confidential at the manufacturers' request. The authors said their statement in the *Pediatrics* Article was based on this policy, and that they were not aware until after publication of the Article that any exception had been made.

### Publication of the Article

The Geiers allege that the *Pediatrics* Article was published "[o]n or about" September 4, 2004. AAP, however, first published the issue of *Pediatrics* dated September 2004 on August 30, 2004. Each issue of *Pediatrics* is printed and bound by Cadmus Professional Communications in Easton, Maryland, which also prepares the copies for mailing to AAP's 60,000 members and other subscribers. *See* Declaration of Roger F. Suchyta, M.D. ("Suchyta Decl.") ¶¶ 3, 5. Cadmus then delivers the copies to a United States post office. *See id.* Once

9

these copies are delivered to the Postal Service, neither AAP nor Cadmus has any further control

over them.  *See id.* ¶ 6.  This regular practice was followed with respect to the September 2004

issue.  *See id.* ¶ 7.  On August 30, 2004, Cadmus delivered 62,641 copies of this issue of

*Pediatrics* to the Postal Service.  *See id.* ¶¶ 7-8 & Ex. A.

### **The Complaint**

In their Complaint, the Geiers challenge one and only one passage in the Article, alleging

that the authors' observation that it is "unclear" how the Geiers were able to estimate the total

number of thimerosal-containing and thimerosal-free vaccines given to children in the United

States is false and defamatory.  Compl. ¶¶ 47, 56.  More particularly, the Geiers allege that a

single false and defamatory implication flows from this passage:  According to the Complaint,

the Article accuses the Geiers of "fabricating" and "falsifying key data."[2]  This purported

implication, the Complaint alleges, has "injured and will continue to injure the Geiers in their

trade as expert witnesses and [has] damaged their reputation in the community of scientists."  *See*

*id.* ¶ 62.

With regard to their claims for tortious interference with contracts and prospective

business relations, the Geiers' allegations are based on precisely the same conduct on which their

cause of action for defamation is premised.  Specifically, the Geiers allege that the Article

"defamed the Geiers by suggesting that the Geiers falsified their key data and therefore the

---

[2] *See* Compl. ¶ 1 (Article accused Geiers of "of lying and inventing data"), ¶ 2 (accusation was that "the Geiers had fabricated the results of their scientific investigations"), ¶ 26 (Article said they "fabricated data"), ¶ 48 (authors made "fabrication allegation" and accused Geiers "of fabricating their results"), ¶ 49 (Article's accusation was that the Geiers "fabricated the manufacturer-specific dose data"), ¶ 53 (authors' letter to editor did not acknowledge that data were "not fabricated"), ¶ 54 (accusation in Article was "that the Geiers fabricated their data"), ¶ 56 (defendants "accused the Geiers of falsifying key data"), ¶ 65 (Article suggested that "the Geiers falsified their key data"), ¶ 72 (Article alleges that Geiers "falsified key data"), ¶ 74 (allegation was that "the Geiers fabricated key data"), ¶ 78 (Article alleges that "the Geiers falsified key data"), ¶ 85 (same), ¶ 92 (same).

results based upon analysis of that data." *Id.* ¶ 65; *see also id.* ¶¶ 72, 78, 85.  As a result of publication of the Article, the Geiers allege, they have been damaged in: (1) their existing contracts and prospective business relations "with those who seek their expert testimony in NVICP proceedings and in civil litigation," *id.* ¶¶ 70, 83; and (2) their existing contracts and prospective business contracts "for patient care and medical advice," *id.* ¶¶ 76, 89.

The Geiers seek $1,000,000 in compensatory damages, an order that all defendants apologize for the allegedly false statements in the Article, and a declaration that the purported allegation that the Geiers falsified key research data was false.  AAP now moves to dismiss the Complaint or, in the alternative, for summary judgment.

## ARGUMENT

Pursuant to Rule 12(b)(6), "'[a] court must dismiss a complaint where, even assuming all the factual allegations are true, the plaintiff has failed to establish a right to relief based upon those facts.'"  *Martin v. U.S. Envtl. Prot. Agency*, 271 F. Supp. 2d 38, 47 (D.D.C. 2002) (citation omitted); *see also, e.g.*, *Barr v. Clinton*, 370 F.3d 1196, 1202 (D.C. Cir. 2004) (dismissing complaint where "'plaintiff can prove no set of facts in support of his claim which would entitle him to relief'") (citation omitted).  Although the Court should draw all reasonable factual inferences in favor of the plaintiff, it is not bound to accept inferences drawn by the plaintiff that are not supported by the facts alleged in the complaint, nor legal conclusions presented as factual allegations.  *See Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1134 (D.C. Cir. 2002); *In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30, 34 (D.D.C. 2003) (Hogan, C.J.).

It bears emphasis, however, that this Complaint challenges a published report about a matter of public concern.  To protect free speech and scientific inquiry from the chilling effect of

11

lawsuits that have no legal basis, courts routinely give early scrutiny to and, where warranted, dismiss actions against publishers based on allegedly defamatory statements. *See, e.g., Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 30 (D.D.C. 1995) ("Given the threat to the first amendment posed by nonmeritorious defamation actions, it is particularly appropriate for courts to scrutinize such actions at an early stage of the proceedings to determine whether dismissal is warranted."), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996); *White v. Fraternal Order of Police*, 707 F. Supp. 579, 586 (D.D.C. 1989) ("'In the First Amendment area, summary procedures are . . . essential.'") (citation omitted), *aff'd in relevant part*, 909 F.2d 512 (D.C. Cir. 1990).

In this case, even cursory inspection of the Complaint reveals that plaintiffs cannot maintain their claims against AAP as a matter of law for multiple, independent reasons.

## I.    THE *PEDIATRICS* ARTICLE IS NOT ACTIONABLE IN DEFAMATION

### A.    The Challenged Portion Of The *Pediatrics* Article Is Not Reasonably Capable of Conveying Any Defamatory Meaning

In a defamation action, the Court must determine, as a threshold matter, whether the statements at issue are reasonably capable of conveying the defamatory meaning alleged by the plaintiff. *See White*, 909 F.2d at 518; *Agora, Inc. v. Axxess, Inc.*, 90 F. Supp. 2d 697, 702 (D. Md. 2000) ("the determination of whether a statement is capable of a defamatory meaning is a question of law to be determined by the court").[3] To be defamatory, a statement must "'expose a person to public scorn, hatred, contempt or ridicule.'" *Crowley v. Fox Broad. Co.*, 851 F. Supp. 700, 702 (D. Md. 1994) (citation omitted); *see also Community for Creative Non-Violence v. Pierce*, 814 F.2d 663, 670 (D.C. Cir. 1987) ("*CCNV*") (statement defamatory "if it tends to injure

---

[3] The Geiers reside in Maryland, but filed this action in the District of Columbia, *see* Compl. ¶¶ 3-4, thereby presenting potential choice of law issues. As indicated throughout the text of this memorandum, however, the relevant aspects of Maryland and District of Columbia law are indistinguishable. Consequently, for purposes of this motion, the Court need not address the choice of law issue.

plaintiff in his trade, profession or community standing, or lower him in the estimation of the community") (citations and quotation marks omitted). However, to be actionable, an "allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear odious, infamous, or ridiculous." *Fleming v. AT & T Info. Servs.*, 878 F.2d 1472, 1475 (D.C. Cir. 1989) (citations and quotation marks omitted); *see also Crowley*, 851 F. Supp. at 702 ("'merely offensive or unpleasant statements are not defamatory'") (citation omitted).

To determine whether the Article is capable of conveying the defamatory meaning alleged by the Geiers, the Court must consider the challenged words "as a whole," looking at the statements in "the context in which they are used." *Chesapeake Publ'g Corp. v. Williams*, 661 A.2d 1169, 1174 (Md. 1995); *see also White*, 909 F.2d at 526 (court must "examine the entire context" of publication). "[W]ords have different meanings depending on the context in which they are used and a meaning not warranted by the whole publication should not be imputed." *Chesapeake Publ'g Corp.*, 661 A.2d at 1174 (citation and quotation marks omitted). Accordingly, in the context of this motion, the Court must review the full content of the *Pediatrics* Article, not just the single passage that the Geiers allege defamed them.

As the discussion that follows demonstrates, however, the Article is not reasonably capable of conveying the meaning alleged by plaintiffs, or any defamatory meaning, as a matter of law.

### 1.     The ordinary meaning of the *Pediatrics* Article is not defamatory

In determining whether the challenged words are capable of conveying a defamatory meaning, the Court must consider them "'in their common and ordinary meaning, in the sense in which they are generally used.'" *Chesapeake Publ'g Corp*, 661 A.2d at 1174 (citation omitted);

*see also Klayman v. Segal*, 783 A.2d 607, 614 (D.C. 2001) (court must consider "plain or fair and natural meaning of the words used").

Notwithstanding the Geiers' repeated contention that the Article accuses them of falsifying and fabricating data, the ordinary meaning of the Article, at most, is that it was not clear from the face of their study as published how they were able to estimate the total number of thimerosal-containing and thimerosal-free vaccines given to children in the United States. Nowhere does the *Pediatrics* Article state that the Geiers "falsified," "fabricated," invented, or lied about the data concerning their estimate of the total number of each type of vaccine given to children in the United States. To the contrary, the Article explains that the Geiers cited the "Biological Surveillance Summaries" of the CDC as their source, and noted that the CDC does not release manufacturer-specific data that would have allowed the Geiers to approximate how many of each type of vaccine had been distributed: "It is *unclear* how the authors estimated manufacturer-specific data because, on the basis of agreements with manufacturers, CDC does not release these data," the Article indicates, adding that "[n]o source is cited in the publication." *Pediatrics* Article at 796 (emphasis added).

Entirely apart from the fact that these statements are accurate, a statement that the source of data cited in a published medical study is "unclear" – the most that the *Pediatrics* Article can be said to assert about the Geiers – is simply not defamatory. As the Court of Appeals concluded in similar circumstances, questions about data relied on by the authors of a study does not "tend[] to injure [a person] in his trade, profession or community standing" or "make the plaintiff appear odious, infamous, or ridiculous." *CCNV*, 814 F.2d at 670-71 (citations and quotation marks omitted). In *CCNV*, a report issued by the Department of Housing and Urban Development regarding the number of homeless stated that "'[n]o one has done a thorough census of the

14

homeless population,'" but that "'some observers'" had claimed that it was as high as two or

three million. *Id.* at 665, 671 (quoting report).  The report said that this estimate originated in

testimony by CCNV before a committee of the House of Representatives, and quoted from a

book written by two CCNV members in which they explained how they arrived at the 2.2 million

figure. *Id.*  The report, however, "repudiates these figures," *id.* at 665, asserting that "'[t]here is

a clear need for more systematic evidence to help in assessing existing estimates,'" *id.* at 671

(quoting report).

Considering whether the report was reasonably capable of a defamatory meaning, the

Court of Appeals held that "a reader might conclude that CCNV's figure is grossly

overestimated, is not the result of 'a thorough census,' and was not drawn from equally

'systematic evidence.'" *Id.* (quoting report).  However, the Court of Appeals concluded, such "a

suggestion of inaccuracy and of utilizing inadequate research is not defamatory." *Id.*[4]  Thus, the

*Pediatrics* Article, which simply notes that the source of the data at issue is uncertain, is not

reasonably capable of defamatory meaning as a matter of law.

### 2.    The *Pediatrics* Article does not reasonably imply that the Geiers falsified data

Perhaps because the Article clearly is not defamatory on its face, the Geiers in their

Complaint strenuously allege that it implies they falsified and fabricated data. *See, e.g.*, Compl.

¶ 48 ("To make a public accusation that the Geiers did not actually possess the data that provided

---

[4] That the *Pediatrics* Article is not reasonably capable of a defamatory meaning is further underscored by comparison to a separate set of allegedly slanderous remarks about CCNV that the Court of Appeals determined in that case properly gave rise to a cause of action:  Two government officials had expressly said that CCNV's numbers were "'grabbed . . . out of the air'" and that there was "'no legitimate or systematic basis'" for the numbers advanced by CCNV.  *CCNV*, 814 F.2d at 671 (citation omitted).  The Court of Appeals held that a reasonable listener could understand "these comments as allegations that CCNV intentionally fabricated" the numbers. *Id.* at 671-72.  No such statements are to be found anywhere in the *Pediatrics* Article at issue here.

the foundation for their articles is to accuse the Geiers of fabricating their results."); *see also*

*supra* n.2.   As a matter of law, however, the Article is not reasonably capable of conveying such

an implication.

A claim for libel by implication "stems not from what is literally stated, but from what is

implied."  *White*, 909 F.2d at 518.  In determining whether a plaintiff has stated such a claim, the

Court must consider the challenged words in the context of the entire publication and "in the

sense in which it would be understood by the average [reader]."  *Southern Air Transp., Inc. v.*

*Am. Broad. Cos.*, 877 F.2d 1010, 1015 (D.C. Cir. 1989); *see also Crowley*, 851 F. Supp. at 703.

Moreover, the Court "must be vigilant not to allow an implied defamatory meaning to be

manufactured from words not reasonably capable of sustaining such meaning."  *White*, 909 F.2d

at 519; *see also Crowley*, 851 F. Supp. at 703.  Indeed, in the law of defamation, "what meaning

a communication is capable of bearing" is a very different inquiry from identifying "the

inferences that can reasonably be drawn from it" – "the former is the essential inquiry, under

existing law, for determining whether a given communication is actionable."  *White*, 707 F.

Supp. at 589 n.12.  In *White*, Judge Gasch illustrated this "important, but subtle, point" as

follows:

> If a newspaper accurately reported that an individual was arrested and
> charged with a crime, a reader could reasonably infer, *i.e.*, guess,
> surmise, or derive as a probability, that the individual actually
> committed the crime.  However, unless the newspaper article,
> considered as a whole, in context, could be reasonably understood to
> express that the individual in fact committed the crime, the newspaper
> report would not be actionable, questions of privilege aside.

*Id.* at 589 & n.12.

In this respect, courts have rebuffed efforts to transform publications that merely raise

legitimate questions about matters of public concern into defamatory implications of fact.  For

example, in *Chapin v. Knight-Ridder, Inc.*, the Fourth Circuit dismissed a defamation action

based on a newspaper article that "pointedly questioned the finances" of a non-profit

organization that had "sponsored a program to send 'Gift Pacs' to American soldiers in Saudi

Arabia," and the "apparent 'hefty mark-up' between the wholesale cost of the items in the Gift

Pac and the price charged the public."  993 F.2d 1087, 1091 (4th Cir. 1993).  The court, rejecting

plaintiff's contention that the article communicated the defamatory implication that he had

defrauded the public, concluded:

> "Fundamentally, the . . . article raises questions about the Gift Pac
> project.  In the Court's view, it is a story constructed around questions,
> not conclusions.  But the mere raising of questions is, without more,
> insufficient to sustain a defamation suit in these circumstances.
> Questions are not necessarily accusations or affronts.  Nor do they
> necessarily insinuate derogatory answers.  They may simply be, as
> they are here, expressions of uncertainty.  The . . . article advances
> alternative answers to the questions it raises, presenting both favorable
> and unfavorable views, but does not ultimately adopt any particular
> answer as correct.  From this, a reasonable reader would not be likely
> to conclude that one answer is true and the other false."

*Id.* at 1098 (quoting district court).  Put differently, the Fourth Circuit recognized in *Chapin* that

a publication that "invite[s] the public to ask" questions about matters of pubic concern is the

"paradigm of a properly functioning press."  *Id.* at 1096.  Although the court acknowledged that

the "answer" that "Chapin is a dishonest man . . . was certainly within the wide range of

possibilities" flowing from the defendant's article, that is "precisely why we need and must

permit a free press to ask the question."  *Id.*

Simply put, raising questions about the scientific reliability of a study does not, as a

matter of law, imply that the research was falsified or fraudulent.  Indeed, the Court of Appeals

rejected just such a contention in *CCNV*.  There, the plaintiff alleged that the report at issue

suggested that the figure of two million homeless in the United States was "'baseless' and

therefore implies that CCNV's estimate is fraudulent and imputes dishonesty to CCNV." *CCNV*, 814 F.2d at 671. After holding that the report was not defamatory on its face, the court turned to whether it could "possibly be construed as CCNV alleges." *Id.* Based on the same "suggestion of inaccuracy and of utilizing inadequate research" that the court said was not defamatory on its face, the court also held it could not "conclude that a reader of average interest could reasonably understand the Report to signify that CCNV's figures are fraudulent or dishonest." *Id.* Because nothing stated in the report or reasonably implied by it was capable of a defamatory meaning, the court dismissed the libel cause of action for failure to state a claim. *See id.*

To the same effect – and equally analogous to the present case – is *El-Ghori v. Grimes*, 23 F. Supp. 2d 1259 (D. Kan. 1998). The plaintiff there, a professor at Kansas State University, was denied tenure. *Id.* at 1261. He alleged defamation against the Chairman of the Research Department, who had written a letter opposing tenure. *Id.* at 1265. The letter criticized the plaintiff's research, stating, among other things, that El-Ghori had "left a statistical analysis incomplete in one of his published articles." *Id.* According to El-Ghori's complaint, this statement "'insinuated that the plaintiff had falsified research data.'" *Id.* at 1269 (quoting complaint). The court, however, rejected that as "an unreasonable construction" of the letter. *Id.* "Dr. Grimes asserted that Dr. El-Ghori drew an inference or made an assumption from certain statistical data without having fully completed the analysis necessary to prove the inference; he in no way asserted that plaintiff 'falsified research data.'" *Id.*; *cf. Lane v. Random House, Inc.*, 985 F. Supp. 141, 151-52 (D.D.C. 1995) (assertion that author on book about assassination of President Kennedy is "guilty of misleading the American public" does not imply that author intentionally deceived public).

The Geiers' contention here that AAP implied they falsified research data is just as unreasonable a construction of the *Pediatrics* Article as the constructions urged by the plaintiffs and firmly rejected by the courts in *CCNV* and *El-Ghori*. The Article certainly raises questions about the source of the data on which the Geiers relied, but such an inquiry cannot reasonably be construed as an accusation that the Geiers deliberately falsified or fabricated their conclusions.

3.      **The *Pediatrics* Article cannot in any event reasonably be understood as intended by AAP to convey the implication alleged by the Geiers**

Even were the Court to conclude that a reasonable reader could draw from the Article the inference that the Geiers fabricated data, the claim for libel by implication would still fail because the Geiers must also establish that, on its face, the Article demonstrates that AAP *intended* to convey the defamatory implication. As a matter of law, however, the Article does not convey such an intention.

In evaluating the Geiers' libel-by-implication claim, "'[t]he usual test applied to determine the meaning of a defamatory utterance is whether it was reasonably understood by the recipient of the communication *to have been intended* in the defamatory sense.'" *White*, 909 F.2d at 519 (quoting F. Harper & F. James, *The Law of Torts* § 5.4 (1986)); *see also Crowley*, 851 F. Supp. at 702 (same); *Chesapeake Publ'g Corp.*, 661 A.2d at 1177 (affirming directed verdict for newspaper defendant where news report at issue could not be construed as having been "intended to suggest" defamatory meaning alleged by plaintiff); *Restatement (Second) of Torts* § 563 (1977) (meaning of challenged publication is that which audience would reasonably understand "was intended" by publisher). This requirement is critical where, as here, the plaintiffs complain of alleged implications arising from the challenged statement. *See* Robert D. Sack, *Sack on Defamation* § 2.4.5, at 2-31 (3d ed. 2005) ("If unrestrained, . . . the theory of libel

by implication would allow a jury to draw whatever inferences it wished from statements of fact.").

For example, in *White* itself, a police officer brought suit against, *inter alia*, the Washington Post and NBC, alleging that their news reports concerning routine drug tests he had taken falsely indicated that he had used drugs. *White*, 909 F.2d at 514-16. Specifically, the Post and NBC reported that White had failed his first drug test, but had passed his second. *Id.* Although the Court of Appeals recognized that a reasonable person might infer, based on the facts reported in the articles and the broadcast, that White used drugs, it nevertheless held that the news reports at issue were not reasonably capable of conveying the defamatory meaning ascribed to them by plaintiff where the "word choice," even when coupled with the reporter's "dramatic intonation," was not "sufficiently suggestive to enable a viewer to infer that [the media defendants] intended or endorsed a defamatory inference" that plaintiff used drugs. *Id.* at 526.

Similarly, in *Crowley*, an Army National Guardsman alleged that a broadcast depicting his efforts to save two teenagers stranded in the middle of a fast-moving river falsely portrayed him as a "'victim' who was 'stranded' and 'in need of rescue.'" 851 F. Supp. at 703. The court assumed that the broadcast conveyed the meaning that the plaintiff ascribed to it, but nevertheless held that the broadcast did "not establish a libel." *Id.* Recognizing its obligation to "'be vigilant not to allow an implied defamatory meaning to be manufactured from words not reasonably capable of sustaining such a meaning,'" the court held that, simply because such an alleged defamatory implication was possible when a portion of the broadcast was viewed in isolation, such a showing was insufficient to establish that the broadcast, as a whole, was intended to convey that implication. *Id.* (citation omitted). Since "[t]here [was] no suggestion in the telecast that the show intended to portray Mr. Crowley as a victim or as an idiot or as

20

anything other than a brave, 'well-meaning national guardsman who jumped into [sic] help'" – the language used in the broadcast – the plaintiff could not make the required showing.  *Id.*

Here, it is clear that a reasonable person would not have understood the *Pediatrics* Article to intend or endorse the meaning that the Geiers ascribe to it.  To the contrary, the authors declare at the outset that the purpose of the Article "was to identify systematically and evaluate critically the design, methods, analysis, and conclusions of each original research publication that has assessed the epidemiology of thimerosal and [autism]."  *Pediatrics* Article at 794.  The Article then does just that, systematically assessing the methodology and reliability of twelve studies.  As for the Geiers' studies in particular, the *Pediatrics* Article points out several "concerns" about the data on which they relied and how they used it.  *Id.* at 795.  In this context, no reasonable reader would have understood the Article, on its face, as intended by AAP to convey to its members and other readers that the Geiers falsified their data or conclusions.  Rather, the Article implies no more than it expressly says:  that it was unclear from the face of the Geiers' study how they estimated the total number of thimerosal-containing and thimerosal-free vaccines given to children in the United States.  The Geiers' attempt to state a claim for libel by implication therefore fails as a matter of law.

**B.    Viewed In Context, Statements In The *Pediatrics* Article Regarding The Geiers Cannot Reasonably Be Understood As Actionable Statements Of Fact**

Even were the Court to disagree with AAP as to each of the foregoing bases for dismissal of the Geiers' claim for defamation, their claim still would have to be dismissed because the statements in the *Pediatrics* Article about them and their studies were made in the context of an on-going scientific debate about the hypothesized association between thimerosal and autism, and thus constitute a non-actionable expression of opinion rather than actionable statements of fact.  Although the Supreme Court has declined to recognize "a wholesale defamation exemption

for anything that might be labeled 'opinion,'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990), it nevertheless has held that statements are entitled to "full constitutional protection" unless they can reasonably be interpreted to state or imply untrue facts. *Id.* at 20; *see also Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 184 (4th Cir. 1998); *Moldea v. New York Times Co.*, 22 F.3d 310, 313 (D.C. Cir. 1994); *Freyd v. Whitfield*, 972 F. Supp. 940, 945 (D. Md. 1997).

In determining whether the *Pediatrics* Article constitutes actionable statements of fact or protected opinion, the Court must consider the broad context in which it was published, and the understandings and expectations that the intended audience would bring to bear on it. *See, e.g.*, *Moldea*, 22 F.3d at 313-15 (court is required to analyze particular publication "with an eye toward [the audience's] expectations and understandings" in context in which it appears because "it is in part the settings of the speech in question that makes their hyperbolic nature apparent, and which helps determine the way in which the intended audience will receive them"); *Biospherics, Inc.*, 151 F.3d at 186 (in light of its "tenor, language, and context," stock tip story would not have been perceived by reasonable reader as factual statement); *Washington v. Smith*, 893 F. Supp. 60, 62 (D.D.C. 1995) (readers of magazine previewing women's college basketball season understand that much of its content is subjective opinion), *aff'd*, 80 F.3d 555 (D.C. Cir. 1996); *Lewis v. McTavish*, 673 F. Supp. 608, 610-11 (D.D.C. 1987) (Hogan, J.) (in light of "literary context" and "broader social context," letter to plaintiff's superiors not an actionable statement of fact).[5]

---

[5] *See also, e.g.*, *Ollman v. Evans*, 750 F.2d 970, 983-84 (D.C. Cir. 1984) (*en banc*) (courts should examine "broader social context into which the statement fits" since some types of publications signal to their audience that what is being said or heard is not meant to be taken as fact); *Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir. 1995) ("[t]he Supreme Court and other courts have emphasized that one must analyze a statement in its broad context" to determine whether it can carry defamatory meaning); *Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 729 (1st Cir. 1992) (where "format, tone and entire content" of challenged publication

A scientific debate about a medical question of significant public concern clearly is a context in which the intended audience – here, medical professionals – reasonably expects the participants to express opinions.  Scientific and medical research is characterized by inquiry into uncertain and often competing ideas.  Typically, after a theory is advanced, others closely examine the idea, along with the data and scientific methodology on which it is based, and offer their opinions about all of them.  "By publishing your views you invite public criticism and rebuttal; you enter voluntarily into one of the submarkets of ideas and opinions and consent therefore to the rough competition of the marketplace."  *Dilworth v. Dudley*, 75 F.3d 307, 309 (7th Cir. 1996) (dismissing defamation claim based on academic's criticism of mathematics journal article); *see also, e.g.*, *Ezrailson v. Rohrich*, 65 S.W.3d 373, 382 (Tex. App. 2001) ("Scientists continuously call into question and test hypotheses and theories; this questioning advances knowledge."); *Kirk v. CBS, Inc.*, 1987 WL 11831, at *3 (N.D. Ill. June 4, 1987) (because medical science research "is a field in which many different theories and philosophies exist . . . different and sometimes conflicting views will be expressed by different practitioners and organizations").  Accordingly, a reader of a medical journal such as *Pediatrics* reasonably would expect an article in it about a controversial subject to contain opinions about theories and methods.

To permit the free and open debate that leads to advances in science, courts routinely instruct that views and criticism expressed in this context should not be the subject of litigation.  "[I]n the area of medical science research, criticism of the creative research ideas of other medical scientists should not be restrained by fear of a defamation claim in the event the criticism itself also ultimately fails for lack of merit."  *Ezrailson*, 65 S.W.3d at 382; *see also*

---

render it unreasonable to conclude that author was expressing something other than his own point of view, "the challenged language is immune from liability").

*Immuno AG. v. Moor-Jankowski*, 567 N.E.2d 1270, 1282 (N.Y. 1991) ("The chilling effect of

protracted litigation can be especially severe for scholarly journals."); *Kirk*, 1987 WL 11831, at

\*3 ("The mere expression of an opinion contrary to the views of another is insufficient to serve

as the basis for a cause of action for libel.").  Knowledge is better advanced when a scientist

addresses opinions critical of his or her ideas through more speech rather than by defamation

lawsuits: "Scientific controversies must be settled by the methods of science rather than by the

methods of litigation.  More papers, more discussion, better data, and more satisfactory models –

not larger award of damages – mark the path toward superior understanding of the world around

us."  *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994).  As Judge Posner observed,

"judges are not well equipped to resolve academic controversies . . . and scholars have their own

remedies for unfair criticism of their work – the publication of a rebuttal."  *Dilworth*, 75 F.3d at

310.

 In similar circumstances, for example, the court in *Ezrailson* dismissed a defamation

claim based on a medical journal article precisely because the article voiced non-actionable

opinions about a previously published hypothesis on a controversial public health issue.

Specifically, Ezrailson co-authored an article theorizing that a test he had developed could help

determine whether breast implants were leaking silicone gel into a person's body.  *See Ezrailson*,

65 S.W.3d at 377.  Three years later, another group of researchers published a journal article that

questioned the effectiveness of a test they said was similar to plaintiff's.  *See id.*  After Ezrailson

complained, the publisher of the journal independently evaluated the latter article, and concluded

that the research did not support its claim that plaintiff's test was ineffective.  *See id.*  Although

the publisher retracted the latter article and apologized, Ezrailson sued for defamation.  *See id.*

The court, however, dismissed the case, holding that the latter article, published in the context of

a medical science controversy about the safety of silicone breast implants, was not reasonably

capable of a defamatory meaning as a matter of law.  *See id.* at 380, 382.  Emphasizing that

holding the article defamatory "would serve to unduly restrict the free flow of ideas essential to

medical science discourse," the court concluded:

> The article was published in the context of a discussion in the medical
> science community of ideas relating to public health – ideas which are
> not only of great concern to the medical science community but to the
> public at large.  The article expressed disagreement with Ezrailson's
> medical science ideas, and therefore "belongs to the language of
> controversy rather than the language of defamation."

*Id.* at 382 (quoting *Dilworth*, 75 F.3d at 310).

To the same effect is *Freyd v. Whitfield*, which involved the "hotly contested" theory of

repressed memories.  972 F. Supp. at 945.  After a woman claimed that she had recovered

repressed memories of sexual abuse by her parents, the parents established an organization

contesting the existence of traumatic amnesia and repressed memories.  *See id.* at 942.  The

defendant, a trauma psychologist, discussed the family's case at several professional

conferences, expressing his belief in repressed memories in general and in the daughter's

accusations specifically.  *See id.* at 943.  The court dismissed the parents' defamation case

against Whitfield because, in the context of the controversy over repressed memories, his

"remarks are non-actionable as constitutionally protected opinion."  *Id.* at 946.  Opinions

regarding a theory about which there is "'no uniform agreement'" in the medical, scientific, and

legal communities "are particularly appropriate, and expected, in the broader social context of an

academic lecture," the court concluded.  *Id.* at 945-46 (citation omitted).  In addition, a

reasonable listener hearing Whitfield's statements in the context of a lecture on repressed

memory theory "would recognize their subjective character and discount them accordingly."  *Id.*

at 946.

For the same reasons, the defamation claim here also should be dismissed. In the broad social context of scientific debate, and in the specific context of the controversy over the safety of thimerosal, the intended audience for the *Pediatrics* Article reasonably would have understood the authors of the Article – which expressly was intended as an evaluation of the scientific merit of other published studies – to be voicing opinions about the Geiers' ideas and scientific methods. Accordingly, the statements in the *Pediatrics* Article are not reasonably understood as actionable statements of fact about the Geiers.

## II.    THE GEIERS CANNOT STATE A CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH CONTRACT OR PROSPECTIVE BUSINESS RELATIONS

The Geiers' tortious interference claims all fail as matter a law, both because they cannot invoke these torts to "end-run" the First Amendment strictures applicable to their defamation claim, and because the Complaint is defective at common law as well.

### A.    The Geiers Cannot Use Other Causes Of Action To "End-Run" The First Amendment Limitations On Their Defamation Claim

The Geiers assert claims against AAP for tortious interference with contracts and prospective business relations in Counts II through V of their Complaint. *See* Compl. ¶¶ 65, 72, 78, 85. Based on precisely the same conduct on which their defamation claim is premised – publication of the Article – the Geiers allege they have been damaged in: (1) their existing contracts and prospective business relations "with those who seek their expert testimony in NVICP proceedings and in civil litigation," *id.* ¶¶ 70, 83; and (2) their existing contracts and prospective business relations "for patient care and medical advice," *id.* ¶¶ 76, 89. Indeed, the Geiers expressly allege that all of their purported damages flow directly from *publication* of the Article.

The Geiers, however, may not evade the requirements of the law of defamation and the First Amendment in this manner.  Any cause of action seeking damages for reputational or related injury sustained as a result of a publication, no matter how denominated in plaintiffs' complaint, is subject to all of the defenses that govern claims for defamation.  In *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988), the plaintiff similarly attempted to avoid the strictures of defamation law by bringing an intentional infliction of emotional distress claim based solely on a publication that plaintiff contended injured him.  The Supreme Court, however, rejected the plaintiff's maneuver, and *Falwell* stands for the proposition that courts may not permit plaintiffs, through creative pleading, to invoke other torts as a means of "end-running . . . requirements of defamation law."  *Foretich v. Advance Magazine Publishers, Inc.*, 765 F. Supp. 1099, 1104 (D.D.C. 1991).

Indeed, courts around the country routinely refuse to permit plaintiffs to circumvent the law of defamation in this manner.  In *Moldea*, for example, the Court of Appeals held that "a plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim," and denied as futile the plaintiff's motion to amend his failed defamation claim to add a claim for interference with prospective business relations.  22 F.3d at 319-20 (affirming *Moldea v. New York Times Co.*, 793 F. Supp. 338 (D.D.C. 1992)); *see also, e.g., Ellis v. Time, Inc.*, 26 Media L. Rep. (BNA) 1225, 1236 (D.D.C. 1997) (statements protected from liability for defamation may not form basis of claim for tortious interference with business relations).[6]  Accordingly, because the Geiers' defamation claim fails as a matter of law for the reasons stated above, their tortious interference claims should be dismissed as well.

---

[6] *See also, e.g., Food Lion, Inc., v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 522 (4th Cir. 1999) (where plaintiff sought "to recover defamation-type damages under non-reputational tort claims, without satisfying the stricter (First Amendment) standards of a defamation claim," such an "end-run around First Amendment strictures is foreclosed by *Hustler*"); *Washington*, 893 F.

27

**B.     The Tortious Interference Claims Fail At Common Law In Any Event**

Even if the First Amendment did not require dismissal of the tortious interference claims,

they still fail as a matter of law for several reasons.  **First**, to state a claim for tortious

interference, a plaintiff must prove "'that the defendant's conduct in interfering with contract or

business relations was accomplished through *improper means.*'"  *Spengler v. Sears, Roebuck &*

*Co.*, 878 A.2d 628, 641-42 (Md. Ct. Spec. App.) (emphasis in original) (citation omitted), *cert.*

*denied*, 883 A.2d 915 (Md. 2005); *see also, e.g.*, *Mercer Mgmt. Consulting, Inc. v. Wilde*, 920 F.

Supp. 219, 239 (D.D.C. 1996) (plaintiff must show that "the defendants' interference [was]

improper").  Means that are "improper" include such activities as fraud, violence and the

initiation of baseless civil lawsuits.  *Mercer Mgmt. Consulting, Inc.*, 920 F. Supp. at  239.

Clearly, the Geiers do not allege that AAP engaged in any such conduct.  Concededly, some

courts also consider defamation to be improper conduct for the purposes of tortious interference

claims.  *See, e.g.*, *Spengler*, 878 A.2d at 642; *Bowhead Info. Tech. Servs., LLC v. Catapult Tech.,*

*Ltd.*, 377 F. Supp. 2d 166, 175 (D.D.C. 2005).  However, as demonstrated above, the Geiers have

failed to state a claim for defamation as a matter of law.  As a result, they cannot show that AAP

engaged in any improper conduct.  *See, e.g.*, *Spengler*, 878 A.2d at 642 (dismissing interference

with business relationship claim where plaintiff's defamation claim failed); *Ellis*, 26 Media L.

Rep. at 1236 (same to extent tortious interference claim was based on allegedly defamatory

publication).

**Second**, to state a claim for tortious interference, "a plaintiff must show that the

defendant's conduct was 'directed at' an existing or prospective economic relationship between

---

Supp. at 64 (dismissing claim for intentional infliction of emotional distress because "[i]t is well
settled law that a plaintiff 'may not use related causes of action to avoid the constitutional
requisites of a defamation claim'") (citation omitted).

the plaintiff and a third party.  The interference cannot be a mere 'incidental effect' of the allegedly wrongful conduct of the defendant." *Cambridge Title Co. v. Transamerica Title Ins. Co.*, 817 F. Supp. 1263, 1276 (D. Md. 1992) (citations omitted) (where defendant merely availed itself of remedies available under agreement and had "no ulterior motive," it did not act "for the purpose of disrupting negotiations" between plaintiff and third party and any resulting interference "was merely an incidental effect" of defendant's conduct), *aff'd*, 989 F.2d 491 (4th Cir. 1993) (unpublished opinion); *see also K & K Mgmt., Inc. v. Lee*, 557 A.2d 965, 977 (Md. 1989) (rejecting tortious interference claims arising from defendants' breach of contract where plaintiffs' alleged loss of business "was an incidental effect of [defendants'] breach of the Agreement and not the object or purpose of the breach"); *Bannum, Inc. v. Citizens for a Safe Ward Five, Inc.*, 383 F. Supp. 2d 32, 45 (D.D.C. 2005) (no liability without "'strong showing of intent'") (citation omitted).

Nowhere in the allegations offered in support of their interference claims do the Geiers allege that AAP engaged in wrongful conduct "directed at" plaintiffs' existing contracts or prospective economic relations, nor could they.  Even putting the best possible face on the Geiers' Complaint, and importing into the interference claims factual allegations that the Geiers expressly advance only in support of their defamation claim, the most that can be said is that the Complaint conclusorily attributes to defendants a variety of motives in publishing the Article, including "discrediting the Geiers in the on-going debate on the possible links" between thimerosal and autism, defusing "the growing public concern over vaccine safety," and damaging the Geiers "in an effort to make it economically more difficult for the Geiers to continue pursuing their research."  Compl. ¶¶ 58-60.  Only the last of these conclusory assertions conceivably could be seen as a claim that AAP's conduct was directed at plaintiffs' existing

29

contracts or prospective economic relations.  However, a bald assertion that a person made

allegedly defamatory statements with the intent to cause economic harm "is not sufficient to

withstand" a motion to dismiss a tortious interference claim when the plaintiff offers no facts to

indicate how it arrived at this conclusion.  *Southern Volkswagen, Inc. v. Centrix Fin., LLC*, 357

F. Supp. 2d 837, 852 n.6 (D. Md. 2005).

Moreover, it is well-established that disseminating news and similar information to the

public is neither wrongful nor directed at existing or prospective economic relationships.  *See,*

*e.g.*, *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 274 (7th Cir. 1983)

(dismissing tortious interference claim on ground that "it is evident that [plaintiff] does not

believe that the defendants' interest was otherwise than to attract viewers"); *Dulgarian v. Stone*,

652 N.E.2d 603, 609 (Mass. 1995) (granting summary judgment to defendants on tortious

interference claims where "[t]here is no indication that the report was broadcast for any reason

other than the reporting on an issue of public concern").[7]  As one court has explained:

> [A press entity] whose motive and conduct is intended to foster public
> awareness or debate cannot be found to have engaged in the wrongful
> or improper conduct required to sustain a claim for interference with
> contractual relations.  Here, the broadcaster's first amendment right to
> broadcast an issue of public importance, its lack of any motive to harm
> the plaintiff, and obvious societal interest in encouraging freedom of
> the press, negate essential elements of the tort.

---

[7] *See also Schuler v. McGraw-Hill Cos.*, 989 F. Supp. 1377, 1391 (D.N.M. 1997)
(dismissing tortious interference claim predicated on publication of article critical of plaintiff
where "there is simply no evidence that Defendants acted with an improper motive or used
improper means when they published the article"), *aff'd*, 145 F.3d 1346 (10th Cir. 1998); *Wells
v. Marton*, 794 F. Supp. 1092, 1097-98 (S.D. Fla. 1991) (granting summary judgment for
defendants on tortious interference claim after concluding that defendant's "'sole interest in
interviewing [plaintiff] was to obtain and to disseminate important information'") (citation
omitted); *Seminole Tribe of Fla. v. Times Publ'g Co.*, 780 So. 2d 310, 318 (Fla. Dist. Ct. App.
2001) (questioning "whether this common law cause of action could ever be stretched to cover a
case involving news gathering and publications").

*Huggins v. Povitch*, 24 Media L. Rep. (BNA) 2040, 2047-48 (N.Y. Sup. Ct. 1996); *see also Huggins v. Nat'l Broad. Co.*, 1996 WL 763337, at *4 (N.Y. Sup. Ct. Feb. 7, 1996) ("[a]ny interference that occurred was merely incidental to defendants' exercise of their constitutional right to broadcast newsworthy information" and "[d]efendants' purpose was a legitimate one and did not involve an intent to unjustifiably interfere" with contract).

**Third**, the Geiers do not allege and cannot prove that publication of the Article caused harm to their contracts or prospective business relations.  *See, e.g.*, *Lyon v. Campbell*, 707 A.2d 850, 859-60 (Md. Ct. Spec. App. 1998) (plaintiff must prove that "defendant's wrongful or unlawful conduct proximately caused the injury alleged"); *Connors, Fiscina, Swartz & Zimmerly v. Rees*, 599 A.2d 47, 51 (D.C. 1991) (same).  Even if the Geiers had alleged causation, it cannot be disputed that much starker questions about the Geiers and their credibility were raised repeatedly by others, including the Court of Federal Claims, before the Article was published. *See, e.g.*, *Weiss v. Secretary of Health & Human Servs.*, 2003 WL 22853059, at *2 (Fed. Cl. Oct. 9, 2003) (expressing doubts about Dr. Mark Geier's qualifications as an expert witness and listing other NVICP cases in which his testimony was "accorded no weight") (attached as Exhibit 5 to the federal defendants' motion to dismiss).  Indeed, courts have held that plaintiffs failed to establish causation even where the connection between the alleged conduct and the harm is much closer than could possibly be alleged here.  *See, e.g.*, *Connors, Fiscina, Swartz & Zimmerly*, 599 A.2d at 51 (lawyer "blatantly lied" to prospective clients and defamed law firm, but this conduct did not proximately cause clients to terminate relations with firm).[8]

_____

[8] Additionally, the Geiers' claims for tortious interference with contract also should be dismissed because plaintiffs fail to allege the breach of any existing contract.  As for the contracts the Geiers assert they had entered into to testify as expert witnesses in NVICP proceedings, *see* Compl. ¶ 19, there is no allegation in the Complaint that those contracts were actually breached, *see Bannum*, 383 F. Supp. 2d at 44 (dismissing claim for tortious interference with contract because plaintiff "has alleged no actual breach of its contract").  The Complaint

For these reasons, too, Counts II to V should be dismissed as against AAP.

### III.    IN THE ALTERNATIVE, AAP IS ENTITLED TO SUMMARY JUDGMENT BECAUSE ALL OF THE GEIERS' CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

If the Court should for some reason conclude that one or more of the Geiers' causes of action survive AAP's motion to dismiss pursuant to Rule 12(b)(6), AAP in the alternative is entitled to summary judgment pursuant to Rule 56 because all of the Geiers' claims are barred by the statute of limitations. AAP published the Article on August 30, 2004, but the Geiers did not file this action until September 1, 2005 – after the applicable limitations period expired.

The statute of limitations for the Geiers' defamation claim is one year. D.C. Code § 12-301(4).[9] Their tortious interference claims are subject to the same one year statute of limitations because there is no prescribed limitations period for them, and they are "intertwined" with the defamation claim. *See, e.g.*, *Browning v. Clinton*, 292 F.3d 235, 244 (D.C. Cir. 2002).

For defamation claims, the limitations period begins to accrue on the date of publication. *E.g.*, *Mullin v. Washington Free Weekly, Inc.*, 785 A.2d 296, 299 (D.C. 2001); *Foretich v. Glamour*, 753 F. Supp. 955, 961 (D.D.C. 1990); *Thomas v. News World Commc'ns*, 681 F. Supp. 55, 73 (D.D.C. 1988). As this Court's docket reflects, the Complaint was filed on September 1,

---

vaguely alleges that the Geiers had contracts for "patient care and medical advice" that were severed, *see* Compl. ¶ 75, but fails to specify any particular contract the Geiers allege was breached, *see K & K Mgmt., Inc.*, 557 A.2d at 974 (plaintiff required to specify particular contract that was breached).

[9] Where, as here, federal jurisdiction is based on diversity of citizenship, courts apply the choice-of-law rules of the jurisdiction in which they sit. *See Ideal Elec. Sec. Co. v. Int'l Fid. Ins. Co.*, 129 F.3d 143, 148 (D.C. Cir. 1997). The District of Columbia's choice of law rules treat statutes of limitation as procedural, and therefore its courts apply the District's own statutes of limitations even where another state's substantive law might govern other issues. *See A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458 (D.C. Cir. 1995). Forum law also controls "the legal rules for determining whether the statute has run." *Foretich v. Glamour*, 753 F. Supp. 955, 960 (D.D.C. 1990).

2005.  The Geiers allege that AAP published the Article "[o]n or about September 4, 2004."

Compl. ¶ 44.  If this were so, their claims against AAP would have been filed within the statute

of limitations.  The Geiers, however, are mistaken.

While it appears no District of Columbia court has addressed the issue, other courts have

held that, for periodicals that are mailed to subscribers, the date of publication for limitations

purposes is the date the periodical is placed in the mail.  "In ascertaining the date of publication,

the courts have looked to the mailing date to subscribers on the theory that the publisher is

thereby divested of control" over the publication.  *Strick v. Superior Court*, 192 Cal. Rptr. 314,

317 (Cal. Ct. App. 1983).  For example, in *Ratliff v. Farm Progress Cos.*, the defendant

published three farm-related magazines that were sold only by mail subscription.  1992 WL

240661, at *2 (E.D. Ky. May 4, 1992).  The issues bearing the date December 5, 1989 on the

cover contained an article about fraud in the grain industry.  *Id.* at *1.  Despite the cover date, the

magazines were mailed to subscribers on November 30 and December 1, according to postal

receipts provided by the defendant.  *Id.* at *3.  Noting that "[t]he established rule is that the date

of publication is the date 'when the finished product is released by the publisher for sale in

accord with trade practice,'" *id.* at *2 (quoting *Gregorie v. G.P. Putnam's Sons*, 81 N.E.2d 45,

49 (N.Y. 1948)), the court held that the date of publication "can be determined by the date the

Defendant delivered these magazines to the United States Post Office for mailing to the

subscribers," *id.*  As a result, the court held that the defamation claim was barred by the statute of

limitations, expressly rejecting the argument that the date on which subscribers received the

magazines should be considered the date of publication.  *Id.* at *3; *see also Strick*, 192 Cal. Rptr.

at 315, 317 (where subscriber copies of *Los Angeles Magazine* "were presented to the United

States Postal Service for mailing on March 21, 1980," defamation complaint filed on March 27,

1981 was barred by statute of limitations); *Palestri v. Monogram Models, Inc.*, 875 F.2d 66, 68 (3d Cir. 1989) (observing that New Jersey would "apply a time of sending rule" for media publishers).

In this case, it is indisputable that the issue of *Pediatrics* containing the challenged Article was placed in the mail to subscribers on August 30, 2004, more than a year before the Geiers filed their Complaint. As with many journal publishers, it is the normal practice of AAP to have each issue of *Pediatrics* printed and bound by Cadmus Professional Communications in Easton, Maryland. *See* Suchyta Decl. ¶ 5. Cadmus then delivers the copies, addressed to AAP's 60,000 members and other subscribers, to a United States post office. *See id.* ¶¶ 3, 5. Once these copies are delivered to the Postal Service, neither AAP nor Cadmus has any further control over them. *See id.* ¶ 6. This regular practice was followed for the issue of *Pediatrics* dated September 2004, the copies of which were placed in the hands of the Postal Service on August 30, 2004. *See id.* ¶¶ 7-8 & Ex. A. The Article thus indisputably was published more than a year before the Geiers filed their Complaint on September 1, 2004 and the entire action is therefore barred by the statute of limitations. Summary judgment for AAP should be entered accordingly.

34

## CONCLUSION

For the foregoing reasons, AAP respectfully requests that the Court grant its motion to dismiss the Complaint or, in the alternative, grant summary judgment in AAP's favor.

Dated:  December 1, 2005                      Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

By:  /s/ Jay Ward Brown
     Jay Ward Brown (D.C. Bar No. 437686)
     Adam J. Rappaport (D.C. Bar No. 479866)
1050 Seventeenth Street, N.W., Suite 800
Washington, DC  20036
(202) 508-1100

*Counsel for Defendant*
*American Academy of Pediatrics*

35

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 1, 2005, I caused true and correct copies of the

foregoing Defendant American Academy of Pediatrics' Motion to Dismiss and/or for Summary

Judgment, and the memorandum of points and authorities and exhibits thereto, to be served by

the Court's Electronic Case Filing System upon all parties scheduled for electronic notice, and

on the following counsel via first-class mail:

James A. Moody, Esq.
THE CULLEN LAW FIRM, P.L.L.C.
1101 30th Street, N.W.
Suite 300
Washington, DC  20007


/s/ Adam J. Rappaport
Adam J. Rappaport