**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**OFFICE OF SPECIAL MASTERS**

| | | |
|---|---|---|
| NAN CONLON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 02-1133V |
| | ) | Special Master Margaret M. Sweeney |
| SECRETARY OF HEALTH | ) | |
| AND HUMAN SERVICES, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**MOTION TO EXCLUDE THE TESTIMONY OF PETITIONER'S**
**EXPERT, MARK R. GEIER, M.D.**

Pursuant to the August 6, 2004 Order issued by the Special Master, the Secretary of Health

and Human Services (respondent) moves to exclude the testimony of Mark R. Geier, M.D.  Nan

Conlon (petitioner) alleges that she was administered two tetanus toxoid (TT) vaccinations on

September 7, 1999, and October 19, 1999, which resulted in the development two months later of

arthritis and arthralgia.  Petitioner claims that the TT vaccinations caused-in-fact her injuries.  See

generally Amended Petition (Am. Pet.).  In support thereof, petitioner has submitted opinions authored

by Dr. Geier, with accompanying material.  Dr. Geier opined to a "reasonable degree of medical and

scientific probability that [petitioner's] current permanent and debilitating polyarthralgias and arthritis

were due to the two [TT vaccination]."  Petitioner's Exhibit (Pet. Ex.) 10 at ¶ 14.[1]

---

[1] Further, Dr. Geier averred that TT "could" cause arthritis; TT "has been implicated" as a
"cause for **rheumatoid like arthritis** as seen in [petitioner];" petitioner suffered an **"autoimmune"**
reaction; petitioner suffered from a **"compound rheumatoid factor response that contributed
significantly to her rheumatoid arthritis condition;"** and that his opinions are consistent with the five

"continued"

Dr. Geier lacks the requisite qualifications in the form of education, training, experience or otherwise to render any valid scientific or medical opinions regarding petitioner's alleged condition or its purported causal relationship to the administration of petitioner's TT vaccinations.  Further, Dr. Geier's opinions are unreliable and irrelevant to the subject matter.  As such, respondent urges the special master to exclude his testimony.

## I.    FACTUAL AND PROCEDURAL HISTORY

The facts and respondent's theory of the case are set forth in the Vaccine Rule 4(b) Report filed on August 4, 2003.  See generally Respondent's (Resp.) Rule 4 Report (Rule 4 Report).[2] In support of respondent's Rule 4 Report, respondent submitted the opinions and analysis of rheumatologist, Alan I. Brenner, M.D., and epidemiologist, Steven H. Lamm, M.D., F.A.C.O.E.M., F.A.C.E.  See Respondent's Exhibits (Resp. Exs.) A, A1 (Dr. Brenner's opinions and abstract);  B (Dr.

---------------------------------------

prong test of causality promulgated by Chief Special Master Golkiewicz in the Stevens case.  Pet. Ex. 10 at ¶¶ 16, 17, 17 [sic] 18 (emphasis added).  Dr. Geier's affidavit, Exhibit 10, contains duplicate paragraphs numbered 17; thus, for ease of reference herein, respondent identifies the paragraphs within the affidavit, Exhibit 10, using the page number.  See Stevens v. Sec'y of HHS, 2001 WL 387418 (Fed. Cl. Spec. Mstr. Mar. 30, 2001).  In support of his opinions, as part of Exhibit 10, Dr. Geier submitted twenty pages of what he represented were the contents of fifty-seven Vaccine Adverse Event Reporting System (VAERS) reports contained in a computerized print-out.  Pet. Ex. 10D.  Dr. Geier also submitted, within Exhibit 10, an excerpt with three case reports from the Institute of Medicine (IOM), Exhibit 10B; an editorial, Exhibit 10C; and three articles, Exhibits 10E, 10F, and 10G.

[2] For purposes of this analysis, respondent assumes that petitioner's claim, while not precisely pled, alleges injuries that have been identified in her medical records as polyarthralgia, and inflammatory polyarthritis also known as polyarthralgia, and/or polyarthritis, non-rheumatic polyarthralgia and reputed non-rheumatic polyarthritis.  See generally Pet. Exs. 2, 8-9, and Resp. Rule 4 Report generally.  On October 30, 2003, petitioner filed Exhibit 13 representing a letter dated October 9, 2003 from Gregory S. Rihacek M.D., opining, inter alia that petitioner suffered and suffers from arthritis and arthralgia. Pet. Ex. 13 at 80.  Thus, respondent identifies petitioner's condition as "arthritis" and "arthralgia" – distinct from Dr. Geier's "diagnosis" of rheumatoid arthritis.

Brenner's curriculum vitae); C (Dr. Lamm's opinions and appendix); and D (Dr. Lamm's curriculum vitae).[3]

In the Rule 4 Report, respondent challenged Dr. Geier's qualifications, as well as the reliability and relevancy of his opinions that petitioner's alleged rheumatological conditions were vaccine-related. Thus, in support of the instant motion, and given the breadth of the previously filed material, respondent fully incorporates as if set forth herein, all of the arguments set forth in his Rule 4 Report, as well as the opinions and supporting literature provided by Dr. Brenner and Dr. Lamm as they relate to Dr. Geier.

A.    Additional Documentation Relevant to Dr. Geier Filed After the Rule 4 Report

On December 30, 2003, the Special Master ordered petitioner to file, among other things, the fifty-seven VAERS documents considered by Dr. Geier, and referenced in petitioner's Exhibit 10D. Order, Dec. 30, 2003. On February 5, 2004, petitioner submitted Exhibit 15, which apparently reflected another computerized print-out of the fifty-seven underlying VAERS documents, previously identified in petitioner's Exhibit 10D. See Pet. Ex. 15. On March 10, 2004, respondent sought further clarification from Dr. Geier, through petitioner's counsel, regarding the difference between the information reflected in petitioner's Exhibit 15 and the information reflected in Exhibit 10D.[4]

On March 30, 2004, petitioner submitted Exhibit 17, which consisted of Dr. Geier's affidavit responding to respondent's counsel's March 10, 2004 letter. On June 1, 2004, respondent filed Dr. Lamm's supplemental report in response to Dr. Geier's supplemental VAERS data, Exhibit 15, and his

---

[3] Respondent also produced excerpts from the IOM, and later supplemented the report with literature cited by his expert witnesses. See Resp. Exs. E through I, including Tabs.

[4] A copy of respondent's counsel's letter to petitioner's counsel is filed herewith as respondent's Exhibit N.

new affidavit, Exhibit 17. <u>See</u> Resp. Ex. L, along with corresponding literature filed as Exhibit M, Tabs

1-5. On June 14, 2004, the Special Master ordered petitioner to file any further supplemental reports

from petitioner's respective experts. <u>Order</u>, June 14, 2004. On July 30, 2004, petitioner represented

that she was not filing any further documentation on behalf of her respective witnesses. <u>See</u> Pet. Status

Rep., July 30, 2004.

## II.    CAUSATION-IN-FACT STANDARDS UNDER THE VACCINE ACT

The Vaccine Act "relaxes proof of causation for injuries satisfying the Table, but does not relax

proof of causation in fact for non-Table injuries." <u>Grant v. Sec'y of HHS</u>, 956 F.2d 1144, 1148 (Fed.

Cir. 1992). According to the Federal Circuit, proving actual causation requires petitioners to show that

a covered vaccine was a legal cause in bringing about the alleged injuries. <u>Shyface v. Sec'y of HHS</u>,

165 F.3d 1344 (Fed. Cir. 1999). To be a "legal cause," the claimed vaccination must be a "substantial

factor" in bringing about the harm. <u>Id.</u> at 1352. A vaccination can be a substantial factor, however,

only if petitioners can show "a medical theory casually connecting the vaccination and the injury." <u>Id.</u>

at 1352-53. To make out a <u>prima facie</u> actual causation case, petitioner is required to demonstrate

". . . a logical sequence of cause and effect showing that the vaccination was the reason for the injury."

<u>Id.</u> at 1353. Further, proof of a temporal association between the vaccination and the onset or

worsening of the injuries does not suffice to prove causation under the Vaccine Act. <u>Id.</u>; <u>Hasler v.</u>

<u>United States</u>, 718 F.2d 202, 205 (6th Cir. 1983), <u>cert. denied</u>, 469 U.S. 817, 105 S. Ct. 84 (1984)

("[T]he inoculation is not the cause of every event that occurs within the ten day period . . . Without

more, this proximate temporal relationship will not support a finding of causation."). Proving causation

based solely on a temporal relationship has similarly been rejected by the IOM.[5]

Further, "evidence showing an absence of other causes does not meet petitioner's affirmative duty to show actual or legal causation." Grant, 956 F.2d at 1149; see also Lampe v. Sec'y of HHS, 219 F.3d 1357, 1367 (Fed. Cir. 2000) ("In an actual-causation case, . . . evidence that no other cause has been identified is not sufficient to compel a finding that the vaccine caused the injuries in question.").

To support an award of compensation for a causation in fact case, petitioner must affirmatively establish that one (or both) TT vaccination(s) can cause her alleged arthralgia and arthritis, and that the vaccine did cause her conditions. Hines v. Secy of HHS, 940 F. 2d 1518, 1527 (Fed. Cir. 1991) (citing with approval the special master's separation of causation into distinct inquiries, 'can it cause' and 'did it cause').[6]  Relevant to the instant matter, "[a] reputable medical or scientific explanation must

_____

[5] Set forth in its chapter examining causation between childhood vaccinations and the onset of adverse neurological reactions, for example, the IOM stated,

> [t]he arousal of one's suspicions that a vaccine might be the cause of an adverse event that occurs within hours, days, or weeks following receipt of a vaccine is natural and understandable. But the mere fact that B follows A does not mean that A caused B; inferring causation solely on the basis of a proper temporal sequence is the logical fallacy of post hoc ergo propter (literally, 'after this, therefore because of this.').

1994 IOM Report, at 23 (emphasis added); see generally IOM Chapter 2, "Causality and Evidence," Resp. Ex. F.

[6] The burden rests on the petitioner to show that the TT vaccinations in question more likely than not caused the specific injury, under the same "preponderance of evidence" standard that applies in traditional tort litigation.  Hines, 940 F.2d at 1525; Strother v. Secy of HHS, 21 Cl.Ct. 365, 369- 70 (1990), aff'd, 950 F.2d 731 (Fed.Cir.1991).  The preponderance of the evidence standard requires that the trier of fact "believe that the existence of a fact is more probable than its nonexistence before (he) may find in favor of the party who has the burden to persuade (the judge) of the fact's existence." In re Winship, 397 U.S. 358, 371-72 (1970) (Harlan, J., concurring) (quoting F. James, CIVIL PROCEDURE 250-51 (1965)).  Mere conjecture or speculation does not meet the preponderance standard. Snowbank Enter. v. United States, 6 Cl.Ct. 476, 486 (1984).

support this logical sequence of cause and effect." <u>Grant</u>, 956 F. 2d at 1148. To satisfy their

evidentiary burden, petitioners are required to proffer reliable expert testimony. <u>See Gamache v. Sec'y</u>

<u>of HHS</u>, 27 Fed. Cl. 639, 645 (1993) (dismissal of actual causation case appropriate where

petitioner's expert failed to explain mechanism of injury or provide scientific support for opinion.),

<u>aff'd</u>, 5 F.3d 1505 (Fed. Cir. 1993) (Table).

    The expert's opinion on the issue of general and specific causation must be derived from a

scientifically valid methodology. <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).

In evaluating each scientific proposition advanced by petitioner, the special master must heed the

Supreme Court's holding in <u>Daubert</u>, where that Court established that:

> [I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived
> by the scientific method. Proposed testimony must be supported by appropriate
> validation -- i.e. 'good grounds,' based on what is known. In short, the requirement
> that an expert's testimony pertain to 'scientific knowledge' establishes a standard of
> evidentiary reliability.

<u>Id.</u> at 590.[7] The expert's opinion must consist of "more than subjective belief or unsupported

---

    [7] The application of the <u>Daubert</u> framework in Vaccine Program cases was approved by the
Court of Federal Claims and adopted by the U.S. Court of Appeals for the Federal Circuit in <u>Terran v.</u>
<u>Sec'y of HHS</u>, 41 Fed. Cl. 330, 336 (1998) ("While the Supreme Court designed the test to determine
whether evidence is relevant and reliable in the context of the Federal Rules of Evidence, it is equally
capable of being used to determine whether information is relevant and reliable in the context of the
Vaccine Act."), <u>aff'd</u>, 195 F.3d 1302 (Fed. Cir. 1999), <u>rehearing and rehearing en banc denied,</u>
(2000). "We view the Special Master's analysis as using <u>Daubert</u>'s questions as a tool or framework
<em>for conducting the inquiry into the reliability of the evidence</em>." <u>Terran v. Sec'y of HHS</u> 195 F.3d
1302, 1316 (Fed. Cir. 2000) (emphasis added) <u>citing</u> <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526
U.S.137, 151 (1999). While special masters are not required to assess the reliability of scientific
evidence using solely the <u>Daubert</u> guidelines, if the <u>Daubert</u> standards are not employed, a special
master must articulate and apply some other discernible test for assessing the reliability of scientific
evidence. Discretion in choosing how best to test the reliability of an expert's opinion "is not discretion
to abandon the gatekeeping function" entirely or to perform it inadequately. <u>Kumho Tire</u>, 526 U.S. at

"continued"

speculation." Daubert, 509 U.S. at 590; Higgins v. Diversey Corp., 998 F. Supp. 598, 602 (D. Md. 1997) ("'conjecture, hypothesis, subjective believe, or unsupported speculation ' are impermissible bases for expert opinion and must be discarded.") (citations omitted).  This requires that the proponent demonstrate that there is "some objective, independent validation of the expert's methodology." Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1316 (9th Cir. 1995) (Kozinski, J.) (on remand) (Dabuert II).  Factors in making that determination may include:

> [W]hether the theory or technique employed by the expert is generally accepted in the scientific community; whether it's been subjected to peer review and publication; whether it can be and has been tested; and whether the known potential rate of error is acceptable.

Id.

The Supreme Court instructed federal district courts to serve as "gatekeepers" -- insuring that the fact-finding process does not become distorted by what is popularly called "junk science."  Lust v. Merrell Dow Pharmaceuticals, Inc., 89 F.3d 594, 597 (9th Cir. 1996).  As such, federal courts are to evaluate expert witnesses and determine whether their proffered testimony would "assist the trier of fact to understand or determine a fact in issue."  Daubert II, 43 F.3d at 1316.

Scientific evidence is reliable if it is based on an assertion that is grounded in methods of science.  The primary focus is on the principles and methodology, not on the conclusion.  Id. at 592, 595-94.  However, the Supreme Court in General Electric Co. v. Joiner made it clear that federal

_____

158-59 (J. Scalia, concurring); see also Goebel v. Denver and Rio Grande Western R.R. Co., 215 F.3d 1083, 1088 (10th Cir. 2000) ("We specifically hold that a district court, when faced with a party's objection, must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper.").

courts were not precluded from looking at an expert's conclusions:

> [C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the <u>ipse dixit</u> of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997); <u>see</u> also <u>Lust</u>, 89 F.3d at 598 (A court may

scrutinize anomalous conclusions and reject expert opinion if expert fails to identify and defend the

reasons why expert's scientific methodologies yielded novel results). "A statement does not become

scientific knowledge because it is uttered by a doctor. Nor can an expert witness' self-serving assertion

that his conclusions were derived by a scientific method be deemed conclusive."   <u>In re Breast Implant</u>

<u>Litigation</u>, 11 F. Supp. 2d 1217, 1230 (D. Colo. 1998) (citations omitted).

## III.    THE SPECIAL MASTER SHOULD PRECLUDE DR. GEIER'S TESTIMONY BECAUSE HE LACKS REQUISITE QUALIFICATIONS TO OPINE ON THE PROPOSED SUBJECT MATTER AND HIS OPINIONS ARE UNRELIABLE AND IRRELEVANT

Under the Vaccines Rules, special masters must ensure that any and all scientific, technical or

other specialized testimony or evidence admitted is not only relevant, but also reliable. <u>See</u> RCFC,

Appendix B, Vaccine Rule 8(b)(the trier of fact to consider "relevant, reliable evidence."). This

language contemplates regulation of the qualifications of a proposed expert, as well as the subjects and

theories about which an expert witness may testify.[8] In conducting this inquiry, special masters should

---

[8] The initial requirement that an expert witness be qualified is a well-established component of Federal Rule of Evidence 702. Rule 702 permits a witness to testify "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," a witness is qualified as an expert by "knowledge, skill, experience, training or education, . . . "

8

"continued"

evaluate the experts' qualifications, their methodology and their conclusions in order to determine whether the science relied upon can reasonably support those conclusions.

A petitioner who seeks to have the special master credit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable. "A reputable medical or scientific explanation does not mean, however, any theory that a medical expert is willing to espouse." Corder v. Sec'y of HHS, No. 97-0125V, 1999 WL 476256, at *6 n.15 (Fed. Cl. Spec. Mstr. May 28, 1999). This requires "some objective, independent validation of the expert's methodology." Trojanowicz v. Sec'y of HHS, No. 95-0215V, 1998 WL 774338, at *6 (emphasis added). The expert's assurances that he has utilized generally accepted scientific methodology is insufficient. See Daubert II, 43 F.3d at 1316.

Recognizing the extraordinary nature of respondent's motion as filed within the Program, respondent contends that excluding Dr. Geier's testimony will better ensure a legally sound and prompt adjudication of petitioner's claims. As a matter of judicial economy, excluding Dr. Geier's testimony will result in a more compact, streamlined, and meaningful hearing. It will provide a clearer focus on relevant and proper medical and scientific issues, avoiding a cluttered record filled with unreliable evidence.

---

FRE 702. While the Federal Rules of Evidence do not apply in Vaccine Act cases, the standards set out in the Federal Rules are looked to for guidance in Vaccine Act cases. See Boehmer v. Sec'y of HHS, No. 90-317V, 1991 WL 242995, at *2 (Cl. Ct. Spec. Mstr. Oct. 31, 1991) applying FRE 702 in determining what standards to apply in weighing expert testimony); McNerney v. Sec'y of HHS, No. 90-1689V, 1992 WL 120345, at *2 (Cl. Ct. Spec. Mstr. May 5, 1992) (applying 501 of the Federal Rules of Evidence in determining whether a physician/patient privilege exists under Program practice).

A.    **DR. GEIER'S TESTIMONY SHOULD BE EXCLUDED BECAUSE IT DEALS WITH ISSUES OUTSIDE OF HIS EXPERTISE**

The qualifications of a purported expert are part and parcel of the Daubert inquiry:

> [A]n expert's qualifications bear upon the scientific validity of his expert testimony . . . 'An expert's opinion is helpful only to the extent that the expert draws on some special skill, knowledge, or experience to formulate that opinion; the opinion must be an expert opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert.' . . . Because an expert's qualifications bear upon whether he can offer special knowledge to the jury, the Daubert framework permits – indeed, encourages – a district judge to consider the qualifications of a witness.

United States v. Vitek Supply Corp., 144 F.3d 476, 486 (7th Cir. 1998) (citations omitted).

Further, "[t]he proponent of expert testimony has the burden of establishing its admissibility by a preponderance of proof." Daubert, 509 U.S. at 592 n. 10. As such, a court must first determine whether the proffered individual is an expert in a particular scientific field. Daubert II, 43 F.3d at 1315.

A review of Dr. Geier's curriculum vitae reveals that the focus of his medical training and professional experience has been in the areas of genetics and obstetrics and gynecology.[9] See Pet. Ex. 10A. This experience is inapposite to the medical and scientific issues that must be resolved in this case.

Furthermore, while Dr. Geier lists a number of publications in his curriculum vitae which purport to address causation by various vaccines of varying conditions or disorders through purported

---

[9] See Pafford v. Sec'y of HHS, 01-1065V, 2004 WL 1717359, * 1 at fn. 2 (special master noted that Dr. Geier was "a geneticist and an obstetrician but not board certified in the areas of rheumatology, pathology, or immunology, which are at issue in this case."). The special master in Pafford, disregarded Dr. Geier's testimony finding his theory untestable. In so doing, the special master cited four other Program cases where entitlement was denied based upon Dr. Geier's proposed "theory" of causation. Id. (citations omitted).

10

"analysis" of the VAERS database, none of those articles represent any study of TT vaccinations and arthralgia and arthralgia, which are the vaccinations and injuries at issue in petitioner's case. In paragraph 2 of his affidavit, Exhibit 10, Dr. Geier avers that he has "been accepted as an expert witness on vaccine injury in federal, state and Canadian courts." Pet. Ex. 10, ¶ 2. A frequent expert in the vaccine cases brought under the Vaccine Act, however, Dr. Geier's qualifications and testimony have been the subject of severe criticism as an expert witness in the Program for attributing neurological significance to certain events when he is not qualified to do so, and for exceeding his expertise by rendering opinions on vaccine-causation.[10]

---

[10] See, e.g., Thompson v. Sec'y of HHS, No. 99-436V, 2003 WL 21439672, at *20 (Fed. Cl. Spec. Mstr. May 23, 2003)("Neither Dr. Tornatore **nor Dr. Geier is qualified to testify about infantile spasms,** and their testimony is filled with speculation that is directly contrary to the conclusions reached in well-respected and numerous epidemiologic and medical studies ranging over two decades.") (emphasis added); Bruesewitz v. Sec'y of HHS, No. 95-0266V, 2002 WL 31965744, at *16 (Fed. Cl. Spec. Mstr. Dec. 20, 2002)("[Dr. Geier's] affidavits and report are not credible. **First, being a board-certified geneticist and forensic medicine specialist does not qualify him to diagnose neurological diseases and offer an opinion as to how doctors who do specialize in neurology define 'encephalopathy.'**") (emphasis added); Raj v. Sec'y of HHS, No. 96-294V, 2001 WL 963984, at *12 (Fed. Cl. Spec. Mstr. July 31, 2001) ("**Dr. Geier is wholly unqualified** to testify concerning the two major issues in this case [encephalopathy and infantile spasms] . . . ."); Jenkins v. Sec'y of HHS, No. 90-3717V, 1999 WL 476255, at *14 (Fed. Cl. Spec. Mstr. June 23, 1999)("**[Dr. Geier] is not a pediatric neurologist, and his opinion [concerning encephalopathy] is not persuasive** absent supporting documentation.") (emphasis added); Jarvis v. Sec'y of HHS, No. 90-1366V, 1997 WL 639043, at *4 (Fed. Cl. Spec. Mstr. Sept. 22, 1997)("**Dr. Geier's opinion, which is in an area outside his expertise, was not persuasive to the court.**") (emphasis added); Sowdon v. Sec'y of HHS, No. 90-0925V, 1993 WL 41146, at *7 (Fed. Cl. Spec. Mstr. Feb. 4, 1993)("While **I recognize Dr. Geier's expertise as a medical doctor, he is not a neurologist, nor does he treat children with either seizures or breath- holding spells in his practice.** . . . I accord virtually no weight to Dr. Geier's testimony.") (emphasis added); Aldridge v. Sec'y of HHS, No. 90-2475V, 1992 WL 153770, at *8 (Fed. Cl. Spec. Mstr. June 11, 1992) ("Petitioner's medical expert, Dr. Geier, is an **obstetrical geneticist, not a neurologist.** . . . **His expertise in DPT- related injuries stems from his study of the relevant literature, rather than medical training or participation in studies. I would term this an academic rather than professional pursuit.**")

"continued"

More recently, in Capizzano, the Chief Special Master noted that "Dr. Mark Geier has been criticized frequently for **reaching far beyond his expertise in offering testimony**." Capizanno v. Sec'y of HHS, No. 00-759V, 2004 WL 1399178, at *24 fn 40 (citations omitted) (emphasis added) (denying compensation in case alleging that hepatitis B vaccination actually caused rheumatoid arthritis). Likewise, in another recent decision, Special Master Millman determined that Dr. Geier was not qualified to give a neurologic diagnosis. Weiss v. Sec'y of HHS, No. 03-190V, 2003 WL 22853059, at *2. In Weiss, Special Master Millman questioned whether Dr. Geier,

fulfills the American Medical Association (AMA) guidelines for expert witnesses: H.265-994 Expert Witness Testimony: (3)(a) "Existing policy regarding the competency of expert witnesses . . . (BOT Rep. SS A-89) is reaffirmed, as follows: The AMA believes that the minimum statutory requirements for qualification as an expert witness should reflect the following:  (i) that the witness be required to have comparable education, training, and occupational experience in the same field as the defendant['s expert]; (ii) that the occupational experience include active medical practice or teaching experience in the same field as the defendant; and (iii) that the active medical practice or teaching experience must have been within five years of the date of the occurrence giving rise to the claim." American Medical Association, Policy

_____

(emphasis added); Ormechea v. Sec'y of HHS, No. 90-1683V, 1992 WL 151816, at *8 (Fed. Cl. Spec. Mstr. June 10, 1992)("**[Dr. Geier's] testimony is based on his self generated expertise in DPT-vaccine injuries. Because Dr. Geier has made a profession of testifying in matters to which his professional background** (obstetrics, genetics) is unrelated, his testimony is of limited value to the court. . . . I cannot give his opinion any credence.") (emphasis added); Daly v. Sec'y of HHS, No . 90-590V, 1991 WL 154573, at *7 (Clearly, **with regard to the two table injuries, encephalopathy and residual seizure disorder, Dr. Geier is unqualified to render an opinion as to their occurrence. . . . [I]t is clear to this court that Dr. Geier confuses the medical issues involved in the so-called Table cases and inappropriately allows his DPT knowledge to consciously or subconsciously taint his opinions. Dr. Geier has little if any experience in diagnosing the injuries found on the Table** but instead is relying upon the symptoms reported in the DPT literature in rendering his opinions. . . . In summary, **this court is inclined to not allow Dr. Geier to testify before it on issues of Table injuries. Dr. Geier clearly lacks the expertise to evaluate the symptomatology of the Table injuries** and render and opinion thereon.") (emphasis added).

12

Compendium (1999). In addition, the AMA "Code of Medical Ethics" states at 9.07
Medical Testimony: "Medical experts should have recent and substantive experience in
the area in which they testify and should limit testimony to their sphere of medical
expertise. . . . The medical witness must not become an advocate or a partisan in the
legal proceeding." AMA Council on Ethical and Judicial Affairs, "Code of Medical
Ethics" (2002-2003 edition). Dr. Geier's expertise, training, and experience is in
genetics and obstetrics. He is however a professional witness in areas for which he has
no training, expertise, and experience.

Id. * 2 at fn. 1.[11]

The reasoning used by special masters in numerous cases examining Dr. Geier's qualifications

applies with equal force here, where, Dr. Geier seeks to opine that petitioner's alleged rheumatological

condition was caused-in-fact by the TT vaccinations. Dr. Geier's propensity to overreach his area of

expertise is apparent here as well.

Central to Dr. Geier's opinion is the erroneous assumption of fact that petitioner suffers from

"rheumatoid arthritis."[12] As detailed in respondent's Rule 4 Report and July 27, 2003 expert report,

Dr. Geier's error is readily revealed in petitioner's medical records, diagnostic evaluations, and her

treating rheumatologist. Compare Dr. Geier's affidavit Exhibit 10 at ¶ ¶ 14, 16, 17, 17 (sic) with Resp.

Ex. A1 at 3, 6 (Dr. Brenner's report, citations therein omitted)[13] and with Resp. Rule 4 Rep. at 16-21

---

[11] The special master in Weiss proceeded to question the availability of fees for Dr. Geier's
"testimony" given his utter lack of qualifications in the relevant field. Id.

[12] Dr. Geier states, in part, that, TT "could" cause arthritis; TT "has been implicated" as a "cause
for **rheumatoid like arthritis** as seen in [petitioner];" petitioner suffered an "**autoimmune**" reaction;
petitioner suffered from a "**compound rheumatoid factor response that contributed significantly
to her rheumatoid arthritis condition.**" Pet. Ex. 10 at ¶ ¶ 16, 17, 17 [sic]. (emphasis added).

[13] Dr. Geier fails to explain why he considers petitioner to have rheumatoid arthritis, and fails to
define his use of autoimmune condition. Both conclusions contradict the petitioner's medical records.
See Resp. Rule 4 Rep. 19 (citations omitted), and Resp. Ex. A1 (Dr. Brenner's July 27, 2003 Report).

13

(discussing the erroneous rheumatological assumptions by Dr. Geier) and Pet. Ex. 13 at 80 (Dr.

Rihacek's report reiterating petitioner's past and current diagnosis of **arthritis** and **arthralgia**).  The

distinction between the two conditions is significant, and that Dr. Geier relies upon studies and analysis

based on rheumatoid arthritis,[14] dramatically discredits his opinions even disregarding for the moment,

their other serious shortcomings.

Second, Dr. Geier grossly distorts fundamental epidemiological concepts by purporting to rely

upon VAERS data as evidence that petitioner's rheumatological condition was caused-in-fact by the TT

vaccinations.  Pet. Ex. 10 at ¶ 17 (sic).  Therein, Dr. Geier confuses several epidemiological concepts

in his analysis of twelve years of VAERS data comprising 57 purported cases of arthritis.  As discussed

by Dr. Lamm, Dr. Geier's misuse of VAERS data as a basis of causation contravenes well-settled

medical and scientific principles, and, in particular, those in the realm of epidemiology, and provides

further evidence of Dr. Geier's lack of education, training, and experience in the matter upon which he

opines.  See Resp. Exs. C and L.

Dr. Geier's medical degree alone does not qualify him to opine upon the nature of petitioner's

alleged rheumatological and/or autoimmune conditions or their purported causal link to TT vaccinations

---

[14] **Arthritis** is "[i]nflammation of a joint or a state characterized by inflammation of joints."
STEDMAN'S  MEDICAL DICTIONARY 149 (27th Ed. 2000.)  **Rheumatoid arthritis** is "a
generalized disease, occurring more often in women, which primarily affects connective tissue; a[rthritis]
is the dominant clinical manifestation, involving many joints, especially those of the hands and feet,
accompanied by thickening of articular soft tissue, with extension of synovial tissue over articular
cartilages, which become eroded; the course is variable but often is chronic and progressive, leading to
deformities and disability."  Id.

either generally, or specifically to petitioner's claim.[15]  Notably,

> [t]he simple possession of a medical degree is insufficient to qualify a physician to testify
> as to the advantages of an [sic] spinal fixation device, the medical causation of spine-
> related ailments, or the mechanical functioning of an orthopedic implantation device. . . .
> A blanket qualification for all physicians to testify as to anything medically-related
> would contravene the Court's gate-keeping responsibilities.

Alexander v. Smith & Nephew, 98 F. Supp. 2d 1276, 1281 (N.D. Okla. 2000).  Dr. Geier's lack of

qualifications fatally taints the reliability of his opinions.  See Surace v. Caterpillar, Inc., 1995 WL

303895, * 6 (E.D. Pa. 1995) (lack of qualifications to render such broad "conclusions dovetails with

the lack of reliability of his opinion.").  Failing to qualify as an expert witness in the relevant subject

matter constitutes sufficient basis for precluding Dr. Geier's testimony.  Siharath v. Sandoz

Pharm.Corp., 131 F. Supp. 2d 1347, 1351 (N.D. GA 2001) (failure by proponent of expert witness

to establish expert's qualifications in his filed of expertise precludes expert testimony under FRE 702).

However, the Court need not rest its decision on this basis alone as several additional reasons exist for

excluding the opinion of Dr. Geier.

**B.**     **THE COURT SHOULD EXCLUDE THE TESTIMONY OF DR. GEIER AS
UNRELIABLE**

With over a decade of judicial experience following the Supreme Court's Daubert decision, it is

clear that trial courts are tasked with the responsibility to determine the admissibility of expert testimony

by deciding whether the methodology and reasoning of the expert are sufficiently reliable.  Daubert, 509

---

[15] See O'Conner v. Commonwealth Edison Co., 807 F.Supp. 1376, 1390 (C.D.Ill.1992),
aff'd, 13 F.3d 1090 (7th Cir.), cert denied, 512 U.S. 1222 (1994) ("[N]o medical doctor is
automatically an expert in every medical issue merely because he or she has graduated from medical
school or has achieved certification in a medical specialty.").

U.S. at 590. Although no checklist or strict test is imposed, the federal court undertakes a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Id. 509 U.S. at 592-93. As such,

> some general observations to guide the [special master] are appropriate. Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge is reliable will be whether it can be (and has been) tested. 'Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry.'

Id., 509 U.S. at 593 (citations omitted). Further,

> [a]nother pertinent consideration is whether the theory or technique has been subjected to peer review and publication. Publication (which is but one element of peer review) is not a sine qua non for admissibility or credibility; it does not necessarily correlate with reliability, . . . and, in some instances well-grounded but innovative theories will not have been published, . . . . Some propositions, moreover, are too particular, too new, or of too limited interest to be published. But submission to the scrutiny of the scientific community is a component of 'good science' in part because it increases the likelihood that substantive flaws in methodology will be detected.

Id. As applied, the proponent of the evidence "must show that [the expert's] method is scientifically sound and his opinion is based on sufficiently reliable facts." Alexander, 98 F. Supp. 2d at 1282 (citing Mitchell v. Gencorp Inc., 165 F. 3d 778, 781 (10th Cir. 1999). This requires at a minimum, that the expert "describe the method he used in reaching, and the data supporting, his determination. The Court cannot rely on an expert's mere assurance that the methodology and data are reliable." Id.

Some additional factors favoring Dr. Geier's exclusion include his: (1) reliance on anecdotal evidence (as in case reports); (2) reliance on temporal association; (3) improper extrapolation (as in VAERS reports); and (4) unsupported methodology. Daubert II, 43 F.3d at 1317-1319; Willert v.

16

Ortho Pharm. Corp., 995 F.Supp. 979, 981-82 (D. Minn.1998) (expert theory comprised of case

reports, anecdotal evidence, and temporal association, in part, because there was no showing that such

theory was tested or otherwise generally accepted by the relevant scientific community). "At its core,

the 'scientific knowledge' inquiry seeks to determine whether there is 'some objective, independent

validation of the expert's methodology." Siharath, 131 F. Supp. 2d 1347, 1351 (N.D. Ga. 2001)

(citations omitted).

    In filing Exhibit 15 and his March 25, 2004 supplemental "clarifying" affidavit, Exhibit 17, Dr.

Geier necessarily claims, inter alia, that he has relied upon a generally accepted "methodology" to

establish causation, chiefly comprised of reviewing self-culled data from "other physicians" who have

"associated arthritis adverse events with tetanus-containing vaccines over a many year period." Pet.

Ex. 17 at 1A. Dr. Geier then asserts that "scientific literature" wherein he identifies one case report

solidifies his conclusion that the TT vaccinations can and did cause petitioner's arthritis and arthralgia.

Id. at 1E.[16]

---

[16] As discussed by respondent in his Rule 4 Report, as well as by respondent's respective
witnesses, Dr. Brenner (Exhibit A1) and Dr. Lamm (Exhibit C), the entire basis of Dr. Geier's opinions
in Exhibit 10 contradict his own evidence submitted as Exhibits 10B-G. Dr. Geier relies upon
inapposite case reports (Pet. Exs. C, D) for proof of causation, he blatantly mis-construes articles that
address injuries and vaccinations entirely different from petitioner's alleged injuries and vaccinations to
(Pet. Exs. E, F. G). More egregious is Dr. Geier's purported use VAERS data as "proof" of causation.
See Resp. Rule 4 Rep. According to Dr. Lamm, Dr. Geier's affidavit is rife with numerous fundamental
errors in his use of, and reliance upon case reports, and his interpretation and use of the VAERS
database as proof of his conclusions on causation. See generally, Resp. Rule 4 Rep. at 21-26, Resp.
Exs. C, E-G. Dr. Lamm highlights Dr. Geier's deficient methodology as erroneously applied to the
VAERS database, which includes Dr. Geier's inappropriate application of epidemiological concepts.
Compare Resp. Ex. C at 3-5, Resp. Exs. E-G with Pet. Ex. 10 at ¶¶ 17, 17 p. 6-8, Pet. Ex. 10B-G.
Further, respondent addressed, together with Drs. Brenner and Lamm addressed the reliability and
relevance of Dr. Geier's other exhibits Pet. Exs. B, C, E, F, and G. Because Dr. Geier has offered no

"continued"

Essentially, Dr. Geier's conclusion of causation is predominately based upon anecdotal evidence, case reports, and temporality. Pet. Exs. 10 and 17. As discussed, supra, such grounds are wholly insufficient and expressly contradicting well-settled legal precedent. The supplemental VAERS printout submitted as Exhibit 15, like the computerized VAERS print-out submitted as Exhibit 10D is meaningless, lacking any descriptive analysis whatsoever. Similarly, Dr. Geier's "clarifying" basis for his conclusion on causation, set forth in Exhibit 17, reveal the unscientifically facile nature of his purported methodology. According to Dr. Geier, his conclusion is based upon

> a case series of arthritis adverse events reported following tetanus-containing vaccines, showing that other physicians in the medical community have associated arthritis adverse events with tetanus-containing vaccines over a many year period.

Pet. Ex. 17 at ¶ 1A.

Dr. Geier's repeated and inappropriate use of the VAERS data to establish causation in vaccine cases violates fundamental epidemiological and scientific principles and is wholly inadequate under Daubert and its progeny. Like the experts in Daubert II, Dr. Geier offers nothing more than "unadorned assertions that the methodology [he] employed comports with standard scientific procedures." Daubert II, 43 F. 3d at 1319.

As noted previously, respondent submitted the supplemental report of Dr. Lamm. See Resp. Ex. L,[17] and Resp. Exs. M 1-5. As explained by Dr. Lamm, Dr. Geier's apparent "approach of just

---

additional exhibits, respondent fully incorporates herein those arguments, expert opinions, and literature as grounds for precluding Dr. Geier's testimony. Resp. Rule 4 Rep., Resp. Exs. A1, C, E-G.

[17] Dr. Lamm offers a descriptive introduction, with citation, to the publically available VAERS database, and its well-publicized strengths and weaknesses. Resp. Ex. L at 1-4. In part, Dr. Lamm emphasizes the express caveats of VAERS denoted by its website. Resp. Ex. L at 2-4. Dr. Geier's representations that his "case-series of arthritis adverse events" allegedly following TT vaccination is

18                                              "continued"

developing a list of people with co-incident exposure and medical outcome is inadequate, because it does not provide any comparison to 'what otherwise would be expected.'"   Resp. Ex. L at 6.[18]

According to Dr. Lamm, Dr. Geier's use of VAERS "case reports" and/or "case series" as a basis of causation stands in stark contrast to any established view within epidemiology and scientific evaluations of causation.

> Dr. Geier's opinions appear to be based on a dataset that he has developed without assessing the reliability of the data or relevance to the case at hand.  The literature is replete with reports describing the reasons why the information in a passive surveillance system, such as VAERS, [f]or hypothesis-generation [is appropriate] but is inappropriate for basing causal inferences. These reasons include 'underreporting, unreliable [] diagnosis [] and the lack of data on numbers of persons vaccinated' or other measures for identifying the exposed population.  These systems are designed to 'raise red flags' to alert someone that a certain hypothesis should be investigated.'

Resp. Ex. L at 8.

At bottom, Dr. Geier concedes that he has nothing to support his opinion on causation than a mere "case-report of a 34 year-old woman who received two doses of tetanus toxoid in November and December 1986 and was subsequently diagnosed with **rheumatoid arthritis** three weeks following her second dose of tetanus toxoid." Pet. Ex. 17 at 1E (emphasis added).  Not only is that

_____

somehow consistent with an association between TT vaccine and arthritis by "other physicians in the medical community," in Pet. Ex. 17 completely misrepresents the nature of VAERS - - a simple reporting database.  <u>Compare</u> Pet. Ex. 17 ¶ 1A <u>with</u> Resp. Ex. L at 2-4.

   [18] In offering an extensive explanation of relevant epidemiological principles relevant to evaluating the reliability of Dr. Geier's opinions, Dr. Lamm exposes the facile nature of Dr. Geier's opinions. Resp. Ex. L at 8.  Notwithstanding the obvious differences between Dr. Geier's "methodology" and that of epidemiologists, Dr. Lamm highlights the utter lack of information relied upon by Dr. Geier in reaching his "conclusions" about causation.  As explained by Dr. Lamm, Dr. Geier's simplistic analysis, which is based upon insufficient data, "is inadequate to be considered an epidemiological base from which any inference on causation or association can be made." Resp. Ex. L at 7.

19

lone unsubstantiated case inapposite to petitioner's injuries of arthritis and arthralgia, such a "report" hardly amounts to reliable evidence that tetanus toxoid vaccinations can cause arthritis and arthralgia generally, or in petitioner's case.

Dr. Geier's analysis simply cannot lead to the conclusions he has generated. Siharath, 131 F. Supp. 2d at 1359-1363 (case reports are insufficient to establish general causation or reliability of medical expert's testimony in product liability case involving exposure to drug bromocriptine and alleged injury).

In rejecting case reports as a reliable means to establish general causation, the court in Siharath provided a comprehensive review of the law, stating,

> [c]ase reports are not reliable scientific evidence of causation because they simply describe [ ] reported phenomena without comparison to the rate at which the phenomena occur in the general population or in a defined control group; do not isolate and exclude potentially alternative causes; and do not investigate or explain the mechanism of causation.

Id. at 1361 (citing Casey v. Ohio Medical Products, 877 F. Supp. 1380, 1385 (1995) (additional citations omitted). The obvious limitations of case reports, have been reiterated by the court in In re Breast Implant Litigation,

> [t]he generally accepted view in the scientific community is that her methodology [case reports and animal studies] can be used to generate hypotheses about causation, but not causation conclusions. [S]cientifically valid cause and effect determinations depend on controlled clinical trials and epidemiological studies . . .

In re Breast Implant Litigation, 11 F. Supp. 2d at 1230 (citing Haggerty v. UpJohn Co., 950 F. Supp. 1160, 1164 (S.D. Fla. 1996) (excluding causation evidence taken from a passive reporting system as scientifically unreliable and irrelevant pursuant to Daubert).

20

In assessing the reliability of one of plaintiff's expert witness's non-epidemiological methodologies advanced as support for his theory of causation, the court in <u>Breast Implant Litigation</u> emphasized that,

> [w]hen a scientist claims to rely on a method practiced by most scientists, yet presents [a] conclusion that are shared by no other scientist, the district court should be wary that the method has not been faithfully applied. It is the proponent of the expert who has the burden of proving admissibility. To enforce this burden, the district court can exclude the opinion if the expert fails to identify and defend the reasons that his conclusions are anomalous.

<u>In re Breast Implant Litigation</u>, 11 F. Supp. at 1235. By extrapolating certain "data" from VAERS and other sources, Dr. Geier mis-applies traditional methods of scientific research involving case reports and case series. <u>See</u> <u>Magistrini v. One Hour Martinizing Dry Cleaning</u>, 180 F. Supp. 584, 602-603 (D. NJ 2002) (applying <u>Daubert</u> factors to medical causation expert's theory in alleging that exposure to dry-cleaning fluid caused injury); <u>O'Conner</u>, 807 F. Supp. at 1398 ("Just as a medical opinion without a verifiable scientific basis is inadmissible, an expert opinion that <u>actually</u> <u>contradicts</u> <u>directly</u> the scientific consensus is inadmissible.") (emphasis in original) (citations omitted). Exercising its gate-keeping function, in <u>Magistrini</u>, the court extensively evaluated the applicable scientific principles involved, together with relevant <u>Daubert</u> criteria. <u>Id.</u> at 590-596. In precluding expert testimony, the court in <u>Magistrini</u>, considered an expert's application of the "weight -of-the evidence methodology" as support of a theory of general causation, unreliable, arbitrary, and inconsistent with known science. <u>See generally id.</u> at 602-608.

Significantly, Dr. Geier's analysis and methodologies have been considered and rejected as lacking validation in those relevant medical and scientific communities. <u>See</u> Frederick Varricchio et al.,

<u>Understanding Vaccine Safety Information from the Vaccine Adverse Event Reporting System</u>, 23

Pediatr. Infec. Dis. J. 287 (April 4, 2004) (containing a thorough discussion of the limitations and mis-

use of the VAERS database), filed as Resp. Ex. M, Tab 5.  Notably, in featuring Dr. Geier's work

(references 32-24), the authors presented a Table entitled "Pitfalls in using and interpreting VAERS

data," identifying selected work authored by Dr. Geier's as an example of "misuse."  Resp. Ex. M, Tab

5 at 292; <u>see also</u> Resp. Ex. G.  More recently, Dr. Geier's publications alleging an association of heart

arrest and neurologic disability with thimerosal were critiqued.  <u>See</u> Sarah Parker, M.D. et al.,

<u>Thimerosal-Containing Vaccines and Autistic Spectrum Disorders A Critical Review of Published</u>

<u>Original Data</u>, 114 Ped. 793-804 (Sept. 3, 2004), attached hereto as Resp. Ex. O.  Therein, the

authors noted, <u>inter alia</u>, that in two of Dr. Geier's articles using VAERS data as proof of "association,"

the "completeness in reporting, diagnostic specificity and validation, and potential diagnostic and

reporting bias cannot be evaluated properly . . . ." <u>Id.</u> at 797.

Moreover, addressing the very issue in the context of the Program, the Chief Special Master, in

<u>Capizzano</u>, reiterated, "as has been shown repeatedly in rebuttal efforts to utilize VAERS data to prove

causation, the data has <u>extremely</u> limited value due to the manner in which it is collected, the lack of

confirmation of the reported information and the lack of any systematic analysis."  <u>Capizzano</u>, 2004 WL

1399178, at *24 (emphasis added).  No amount of "analysis" offered by Dr. Geier will cure the

obvious defect of Dr. Geier's distortion of VAERS data as the fundamental basis for his claim of

causation.  The nature of the VAERS data collection system and its concomitant limitations formed the

basis of the Chief Special Master's rejection in <u>Capizzano</u> of the VAERS data in the context of

petitioner's arguments on causation in fact.

Dr. Geier's proposed "methodology," which amounts to nothing more than an untested hypothesis, based upon unauthenticated and unreliable case reports, draws the unprecedented and unsupported leap in logic proscribed by the Court in <u>Daubert</u> and its progeny.  "An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation."  <u>In re Breast Implant Litigation</u>, 11 F. Supp. 2d at 1227.  Given the inability to validate Dr. Geier's bare conclusions in this case, particularly in view of the published studies expressly rejecting Dr. Geier's approach using VAERS data, his conclusions should be rejected.  Valid reasoning should include application of the expert's knowledge and should not consist exclusively of the expert reviewing and then regurgitating sources he believes are relevant.  <u>See</u> <u>Daubert II</u>, 43 F. 3d at 1318-1320 (rejecting expert's assurances of reliability absent any attempt to demonstrate application of a reliable scientific method).

Finally, Dr. Geier repeatedly refers to the "<u>Stevens</u> standard" in reference to his opinion as apparent "grounds" for his opinions on vaccine-related causation.[19]  First, the Chief Special Master's decision in <u>Stevens</u> is not binding in this case.  <u>See, e.g.</u>, <u>Hanlon v. Sec'y of HHS</u>, 40 Fed. Cl. 625, 630 (1998).  Second, on review of a case in which the <u>Stevens</u> standard had been applied, Judge Braden of the U.S. Court of Federal Claims found that the Chief Special Master's utilization of the <u>Stevens</u> analytical framework was contrary to law.  <u>Althen v. Sec'y of HHS</u> 58 Fed. Cl. 270, 281-82 (Sept. 30, 2003).[20]  Thus, the precedential value of the <u>Stevens</u> case, and the standard to which Dr.

---

[19] <u>See</u> Resp. Rule 4 Rep. at 26-28, incorporated fully herein.

[20] Respondent contends that the judge in <u>Althen</u> incorrectly ignored <u>Daubert</u> and substituted her own findings regarding the evidence that the Chief Special Master rejected as unreliable; however, Judge Braden properly found that the Chief Special Master exceeded his authority in devising a new causation standard at odds with binding law.

Geier pins his opinion, is questionable, at best. Furthermore, it hardly suffices to validate Dr. Geier's

purported medical and scientific methodology underlying his conclusions of causation.

In sum, Dr. Geier's testimony offers the Special Master nothing more than baseless, subjective

conclusions. It represents another inappropriate foray by a witness with a long, checkered history in

Vaccine Act proceedings to bring suspect testimony into a case.[21]

---

[21] See, e.g., Stevens 2001 WL 387418, at *12 (Discussing Special Master Baird's decision in Cucuras v. Sec'y of HHS, 26 Cl. Ct. 537 (1992), "[H]e concluded that the IOM Report was more persuasive, and Dr. Geier's testimony less persuasive . . . . On the record in this case, the court finds no basis for disturbing [Special Master Baird's] decision."); Lewis v. Sec'y of HHS, No. 95-728V, 1999 WL 476262, at *8 (Fed. Cl. Spec. Mstr. June 14, 1999) ("I find that Dr. Geier has failed to demonstrate the validity of his basic theory for determining that particular neurologic injuries were caused by a pertussis vaccination."); Houtz v. Sec'y of HHS, No. 90-3039V, 1996 WL 734676, at *9 n.14 (Fed. Cl. Spec. Mstr. Dec. 5, 1996)("I have heard Dr. Geier in a number of other program cases, and eventually reached the opinion that he is simply not a candid witness. Therefore, I afford his opinion no weight in this case."); Haim v. Sec'y of HHS, No. 90-1031V, 1993 WL 346392, at *11 (Fed. Cl. Spec. Mstr. Aug. 27, 1993) ("The court holds that Dr. Geier's testimony does not reach the level of evidentiary reliability that Daubert requires because it is not based upon scientific validity, valid methodology, peer review or testing, and more than minimal support within the scientific community. . . . [H]is testimony is irrelevant to the court.); Id. at *11 n.9 ("Dr. Geier may be clever, but he is not credible. Unless [his theories] are based on principles and methodology that are scientifically valid, his conclusion are irrelevant to this court."); Id. at *15 ("Dr. Geier's testimony is not reliable, or grounded in scientific methodology and procedure. His testimony is merely subjective belief and unsupported speculation."); Marascalco v. Sec'y of HHS, No. 90-1571V, 1993 WL 277095, at *5 (Fed. Cl. Spec. Mstr. July 9, 1993) ("The special master rejects specifically Dr. Geier's testimony. In the special master's view, Dr. Geier's September 1990 affidavit in this case was seriously intellectually dishonest. The special master accords Dr. Geier's opinion in this case no weight."); Einspahr v. Sec'y of HHS, No. 90-0923V, 1992 WL 336396, at *10 n.10 (Fed. Cl. Spec. Mstr. Oct. 28, 1992) ("Dr. Geier's speculative testimony is essentially worthless to a special master. Yet, all petitioners' counsel and Dr. Geier waste an inordinate amount of time by presenting this testimony in Program cases. As of the date of this decision on entitlement, all petitioners' counsel are on notice that the special master will no longer allow Dr. Geier to offer his speculative testimony about pertussis toxin or endotoxin until Dr. Geier is able to apply the various theories to the particular case."); Chapman v. Sec'y of HHS, No..90-731V, 1991 WL 74152, at *6 (Fed. Cl. Spec. Mstr. Apr. 23, 1991) ("[B]ecause I cannot accept the accuracy of the testimony on which Dr. Geier based his opinion, his testimony is of no support to petitioner here on the causation issue.").

24

**C.    THE COURT SHOULD EXCLUDE THE TESTIMONY OF DR. GEIER AS IRRELEVANT**

Dr. Geier's proposed testimony fails to comport with the final element of <u>Daubert</u> – relevancy. A proponent of expert testimony must establish that the expert's opinions are relevant: in other words, is there "'fit' between the expert's opinion and the facts of the case."    <u>Siharath</u>, 131 F. Supp. 2d at 1352 <u>citing</u> <u>Daubert</u>, 509 U.S. at 591, 113 S. Ct. 2786; <u>Higgins</u>, at 998 F. Supp. 598, 601-602 (focus of inquiry is whether the testimony will "'assist the trier of fact'" and whether it is "relevant" to the case, i.e., whether it "fits" the subject matter) (citations omitted).    Consistent with the teachings of <u>Daubert</u> and its progeny articulated, Dr. Geier's proposed testimony fails to "fit" within the subject matter of petitioner's claims.    As evidenced by cases decided within the Program, Dr. Geier routinely contradicts the facts and offers unsubstantiated conclusions.    Here he even fails to grasp fundamental distinctions between petitioner's actual condition - - arthritis and arthralgia - - and the one he purportedly examines - - rheumatological arthritis.    As evidenced by Drs. Lamm and Brenner, Dr. Geier distorts and confuses fundamental principles of rheumatology, epidemiology and scientific method to establish a causal relationship between the TT vaccinations and petitioner's rheumatological condition.    Dr. Geier's testimony is therefore irrelevant, and respondent urges its exclusion.

**IV.    CONCLUSION**

For all of the reasons identified herein and previously, respondent respectfully requests that the Special Master exclude Dr. Geier's testimony.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

TIMOTHY P. GARREN
Director
Torts Branch, Civil Division

JOHN LODGE EULER
Deputy Director
Torts Branch, Civil Division

MARK W. ROGERS
Assistant Director
Torts Branch, Civil Division


For _____
GABRIELLE M. FIELDING
Assistant Director
Torts Branch, Civil Division


_____
JULIA W. MCINERNY
Trial Attorney
U.S. Department of Justice
Torts Branch, Civil Division
P.O. Box 146
Benjamin Franklin Station
Washington, DC 20044-0146
(202) 353-3919

Dated: 10/4/04

26