# United States District Court
# District of Columbia

―――――――――――――――――――

Dr. Mark Geier, et al.,

v.

Dept. Of Health and Human
Services, et al.

―――――――――――――――――――

No. 1:05CV01749 (RWR)

## <u>Opposition to Federal Defendants' Motion to Dismiss</u>

<u>Introduction</u>.

The Geiers allege that Defendants falsely claimed they committed scientific misconduct, specifically fabricated research results, in an Article (Govt. Mem. Ex. 3) published by Defendant American Academy of Pediatrics in its peer-reviewed Journal *Pediatrics*.  Federal defendants (the agency, HHS, and its employees Drs. Schwartz and Pickering) have moved to dismiss Counts VI and VII of the Complaint.  Count VI alleges that the Article was "adverse agency action and imposed on the Geiers a severe sanction," and seeks declaratory and injunctive relief (no damages), applying the ordinary review standards of the APA.  Defamatory agency publications are routinely subjected to judicial review.  There is no requirement that agency action be limited to publishing law or issuing orders,

as labels aren't controlling, and the definition of agency action includes the type of sanction at issue here.  Judicial review would in no way interfere with any mission to provide crucial and timely information for the public's information or protection.  HHS has no unreviewable discretion to publish objectively false allegations; there are easily manageable standards against which to determine if publication was arbitrary and capricious.  The issue of whether vaccines containing mercury in the form of thimerosal are a cause of what is often diagnosed as autism spectrum disorder is indeed one of immense public interest and importance–perhaps <u>the</u> most prominent example of regulatory malpractice or negligence of our time.  But the Government has no right to bias this vital debate–at least in a manner immune from judicial scrutiny–by lying about key experts.

Count VII alleges a *Bivens* claim against the two agency authors, Schwartz and Pickering.  They are not entitled to qualified immunity.  The Article interfered with two clearly established Constitutional rights.  First, the Geiers have a liberty interest in seeking and being fairly considered for employment as expert witnesses in vaccine court (and any follow-on) proceedings.  Even though "mere defamation" is not routinely actionable in a *Bivens* case, the present case comes within this Circuit's "reputation plus" jurisprudence.  In addition, publication of the Article

interfered with the Geiers' access to the courts, on their own behalf and on behalf of vaccine-injured claimants. The judiciary must be kept free of contamination by false statements in order to function effectively. The Government's motion should be denied.

## Argument.

## I. Publication of the Article and Its Continued Use Are Agency Action Reviewable Under the APA.

With passage of the APA, Congress waived sovereign immunity so that those aggrieved by agency action could seek judicial review thereof and an appropriate remedy. Section 10(a) of the APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . ., is entitled to judicial review thereof." 5 U.S.C. ' 702. The Complaint challenges two agency actions: (1) publication of the false and defamatory article; and (2) its use by HHS to deter and prevent the Geiers from serving as experts in vaccine court.

## A. The Article is Sufficiently Final and Adverse as a Sanction to Trigger Routine Review Under the APA.

Agency actions come in countless flavors: rules, interpretations, licenses, adjudications, sanctions, etc. Publication of the Article is but one more example. The Supreme Court held in *Chrysler Corp. v. Brown*, 441 U.S. 281 (1979), that the APA authorized a cause of action to block publication under FOIA of Chysler's data concerning its employment of women and minorities. *Id.* at 318-19. *See, e.g., Sears, Roebuck & Co. v. General Services Administration*, 384 F. Supp. 996 1000, 1001 (D.D.C. 1974). It follows logically that the APA authorizes review of an agency decision to publish (and continue to rely on) the Article. Whether HHS's challenged actions fit neatly within one of the labels set forth in § 551, Mem. at 7, is not controlling. All that is required is that the Geiers identify specific actions that injure them (for purposes of establishing standing) so that judicial review (and a remedy) will be focused and meaningful. *See, e.g., Independent Broker-Dealers' Assn. v. SEC*, 442 F.2d 132, 141-42 (D.C. Cir. 1971) (holding that SEC pressure on exchange to abandon a practice inconsistent with retaining a minimum rate structure was reviewable agency action).

There is no requirement that an agency promulgate "law," Mem. at 6-8, in order for its actions to be judicially reviewable. The APA authorizes review of "[a]gency action made reviewable by statute and final agency action" for which

there is no other adequate remedy in a court.  5 U.S.C. § 704.  The APA also

specifies that standing for judicial review requires that a party be "adversely

affected or aggrieved by agency action." *Id.* § 702.  In turn, the Act defines agency

action as "the whole or a part of an agency rule, order, license, sanction, relief, of

the equivalent or denial thereof, or failure to act." *Id.* § 551(13).  Courts have

consistently found jurisdiction in cases such as this alleging defamation and related

injuries.  If APA review is available for an agency decision to release or publish a

document, *e.g., Chrysler Corp. v. Brown*, 441 U.S. 281, 317-18 (1979), then surely

it authorizes an agency decision, as here, to publish a document containing a

defamatory allegation.1

    In  *Howard v. Lyons*, 360 U.S. 593 (1959) (pre-*Bivens* absolute immunity

for federal official acting within scope of employment), for example, the Court

examined a letter from a Navy commander to the Massachusetts Congressional

delegation that allegedly defamed labor unions.

    Several organizations claimed in *Joint Anti-Fascist Refugee Committee v.*

*McGrath*, 341 U.S. 123 (1951), that they were defamed by the Attorney General by

publication on a list labeled as Communist.  The Court recognized a cause of

action for defamation based upon the published list:

---

1    Subject of course to other restrictions on reviewability, not relevant here, e.g., standing,
ripeness, mootness, and exhaustion.

When the acts of the Attorney General and of the members of the Loyalty Review Board are stripped of the Presidential authorization claimed for them by the respondents, they stand, on the face of these complaints, as unauthorized publications of admittedly unfounded designations of the complaining organizations as "Communist." Their effect is to cripple the functioning and damage the reputation of those organizations in their respective communities and in the nation. The complaints, on that basis, sufficiently charge that such acts violate each complaining organization's common-law right to be free from defamation. "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement, Torts, § 559. These complaints do not raise the question of the personal liability of public officials for money damages caused by their ultra vires acts. . . . They ask only for declaratory and injunctive relief striking the names of the designated organizations from the Attorney General's published list and, as far as practicable, correcting the public records. The respondents are not immune from such a proceeding. . . . [T]he standing of the petitioners to bring these suits is clear. The touchstone to justiciability is injury to a legally protected right and the right of a bona fide charitable organization to carry on its work, free from defamatory statements of the kind discussed, is such a right. . . . It is unrealistic to contend that because the respondents gave no orders directly to the petitioners to change their course of conduct, relief cannot be granted against what the respondents actually did. We long have granted relief to parties whose legal rights have been violated by unlawful public action, although such action made no direct demands upon them.

*Id.* at 139-41.[2]

_____

2      Justice Black explained the same point in his concurring opinion: "[P]etitioners have standing to sue for the reason among others that they have a right to conduct their admittedly legitimate political, charitable and business operations free from unjustified governmental defamation. Otherwise, executive officers could act lawlessly with impunity." 341 U.S. at 143 (Black, J., concurring). Justice Frankfurter, in a lengthy concurring opinion, concluded: "On the balance of all considerations, the exercise here of judicial power accords with traditional canons for access to courts without inroads on the effective conduct of government." 341 U.S. at 160 (Frankfurter, J., concurring). Justice Douglas, also concurring, said: "An organization branded as 'subversive' by the Attorney General is maimed and crippled. The injury is real, immediate,

The issue in *B.C. Morton Intl. Corp. v. FDIC*, 305 F.2d 692 (1ˢᵗ Cir. 1962), was whether an amended complaint charging that FDIC caused substantial injury to plaintiff by issuing a press release which deliberately misrepresented application of federal law for the specific purpose of destroying plaintiff's business was sufficient to state a cause of action against the agency for declaratory and injunctive relief. The court distinguished an action for damages (which would not be allowed against officials for common law torts in this pre-*Bivens* action) from an action, as here, for declaratory and injunctive relief:

> We do not think the principle announced in *Barr v. Matteo, supra*, and *Howard v. Lyons, supra*, can properly be extended to bar the present action. The protection of public officials from the fear of civil damage suits is not a concern in an action for declaratory and injunctive relief; and the Supreme Court has so held. In *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951), which seems to control the case at bar, it was alleged that the Attorney General of the United States, purporting to act under an Executive Order, had defamed the petitioning organizations by designating them as Communist in a list furnished to the Loyalty Review Board for use in connection with determinations of disloyalty of government employees. The Board's dissemination of the list to all departments and agencies of the federal government by publication in the Federal Register resulted in nationwide publicity. Petitioners alleged that the designation was contrary to fact and that it was made in a patently arbitrary manner. The complaints sought

---

and incalculable." 341 U.S. at 175 (Douglas, J., concurring). Justice Jackson agreed that the designation was more than a mere press release without legal consequences (thus rejecting the view held by the three dissenting Justices) because of its effect upon the substantive legal right to future government employment of the members of the petitioning organizations. 341 U.S. at 183-185 (Jackson, J., concurring).

declaratory and injunctive relief against the Attorney General.  The
Supreme Court upheld the complaints against motions to dismiss.
What was then the leading case on the question of privilege of public
officials, *Spalding v. Vilas*, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780
(1896) was distinguished on the basis that:

> These complaints do not raise the question of the
> personal liability of public officials for money damages
> caused by their ultra vires acts. *See Spalding v. Vilas*, 161
> U.S. 483 (16 S.Ct. 631, 40 L.Ed. 780).  They ask only for
> declaratory and injunctive relief striking the names of the
> designated organizations from the Attorney General's
> published list and, as far as practicable, correcting the
> public records.  The respondents are not immune from
> such a proceeding.  Only recently, this Court recognized
> that 'the action of an officer of the sovereign (be it
> holding, taking or otherwise legally affecting the
> plaintiff's property) can be regarded as so 'illegal' as to
> permit a suit for specific relief against the officer as an
> individual . . . if it is not within the officer's statutory
> powers or, if within those powers . . . if the powers, or
> their exercise in the particular case, are constitutionally
> void.  *Larson v. Domestic and Foreign Commerce Corp.*,
> 337 U.S. 682, 701-702 (69 S.Ct. 1457, 93 L.Ed. 1628).
> The same is true here, where the acts complained of are
> beyond the officer's authority under the Executive Order.

341 U.S. at 139-140, 71 S.Ct. at 632.  Consistent with the position
taken by the Supreme Court in *Joint Anti-Fascist Committee, supra*,
we see no basis, in reason or authority, for extending the immunity
against civil damage suits afforded to individual public officials by the
*Barr* and *Howard* cases to actions for declaratory and injunctive relief
against a government agency.  Therefore, we hold that appellee is not
so privileged in this action.

*Id.* at 695-96.  *See also, e.g., Silver King Mines, Inc. v. Cohen*, 261 F. Supp. 666

(D. Utah 1966) (district court had general equity jurisdiction to enjoin SEC from

issuing pre-adjudication damaging press release).

The listing of organizations is *Joint Anti-Fascist*, the letter in *Howard*, and the press release in *Morton,* each of which was a discretionary agency action, did not impose legal obligations on plaintiffs.  Yet in each case the courts recognized jurisdiction over final agency action that adversely affected a legally protected right, as here, the right to pursue lawful business without unjustified interference from government.  The Government is not challenging the Geiers' standing, i.e. whether their injury is sufficient concrete and redressible to satisfy Article III's "case or controversy" requirement.  Accordingly, the Government's argument, Mem. at 7, that publication of the Article is not "agency action," but instead only "advisory information for the scientific community" is without merit.  *See Invention Submission Corp. v. Rogan*, 357 F.3d 452, 457 (4th Cir.2004) ("Inasmuch as the APA's definition of 'agency action' includes agency sanctions, adverse publicity might be a 'sanction" and therefore an agency action in certain circumstances."); *Indus. Safety Equip. Assoc., Inc. v. EPA*, 837 F.2d 1115, 1119 (D.C.Cir.1988) ("[A]n agency intent on penalizing a party through adverse publicity, especially false or unauthorized publicity, might well merit a review of its action."); *Impro Prods., Inc. v. Block*, 722 F.2d 845, 847 (D.C.Cir.1983) (criticizing interpretation of Afinal agency action@ that Awould preclude judicial review under the APA of an agency's dissemination of information that is

concededly false and, therefore, completely inconsistent with the statutory purpose of promoting a prosperous agriculture"); *cf. Trudeau v. FTC*, 384 F. Supp. 281 (D.D.C. 2005) (acknowledging that an agency press release can be reviewable agency action in certain circumstances but the release at issue was not demonstrably false). Moreover, at least at the pleading stage, the allegation, Compl. & 93, that the Government has continued to use the Article against the Geiers in vaccine court proceedings (and not for abstract consumption by the general scientific community), must be taken as true.

The Article is not "agency dissemination of advisory information," Mem. at 7, but is a final agency action concluding that the Geiers committed science fraud by claiming, falsely it turns out, that they did not have data actually given them by the agency on the number of vaccinations distributed by each manufacturer to the public. There is no requirement that "agency action" impose final legal obligations on parties, at least so long as there is, as here, immediate adverse impact. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (biological opinion issued under ESA had "direct and appreciable" legal consequences and constrained agency's further actions; distinguishing Franklin and Dalton on grounds that the agency actions in those cases nevertheless left the President with unfettered discretion); *Airline Pilots Assn. v. DOT*, 446 F.2d 235, 241-42 (5th Cir. 1971) (FAA

determination that a high-rise apartment was not a hazard held reviewable final

agency action even though it imposed no legal obligations; "It may well be, as the

FAA contends, that the only effectiveness of its determination of 'no hazard' or

'hazard' lies in the power of 'moral suasion' ascribed to the determination. But it

takes little knowledge of the goings-on about us to be aware that 'moral suasion' is

a considerably potent force in our society. The FAA does not deny, to be sure, that

its determination of 'hazard to air navigation' either erects or removes, whichever

the case may be, a practical 'stumbling block' to the construction of the proposed

buildings."); *Dow Chemical v. CPSC*, 459 F. Supp. 378 (W.D. La. 1978) (decision

to list chemical on list of carcinogens reviewable; "Furthermore, agency action

may be reviewable even though it is never to have any formal effect. In recent

years federal courts have become sensitive to the need in particular controversies

for judicial review of federal administrative action even though it imposes no direct

obligation and has no enforcement effect.").  The closest analog to the categories

of agency action named in § 551 is that is a sanction,3 in effect a finding that the

---

3  The APA broadly defines "sanction" to include a "limitation, or other condition affecting the freedom of a person" and "taking other compulsory or restrictive action."  The Article adversely affects the Geiers' freedom to seek employment in vaccine court, and acts as an important restriction on that right.  "Although legislative history was not discussed in Hearst Radio, Congress itself did note that in certain circumstances adverse publicity might operate as a sanction. H.Rep. No. 79-1980, 79th Cong., 2d Sess. (1946) (House of Representatives Report on APA) (noting that unauthorized use of publicity as penalty or punishment is "troublesome subject"). Thus, though adverse impact alone would not necessarily make agency publicity reviewable as a sanction, see American Telephone & Telegraph Co. v. FCC, 602 F.2d 401, 408 (D.C.Cir.1979), an agency intent on penalizing a party through adverse publicity, especially false

Geiers engaged in scientific misconduct. The Article has had an adverse effect on the Geiers' legal right to appear in vaccine court, and has been used as a finding by the agency to prevent their participation in vaccine court.

Government action need not impose an absolute legal compulsion on anyone in order to constitute reviewable final agency action. In *Chamblee v. Espy*, 100 F.3d 15 (4th Cir. 1996), the held that the Farmers Home Administration's ("FmHA") decision to suspend temporarily its consideration of an application to restructure a delinquent loan constituted "final agency action" because the decision would have significant and direct effects on the applicant - even though the effects would come about by the actions of third parties. *Id.* at 17, 18. As a result of suspension of consideration of the loan restructuring application, the applicant's numerous creditors were pressing for repayment of their loans, and executor of the applicant's late husband's estate had brought a court action to force the sale of her farm. Unless the loan restructuring was granted immediately or unless the applicant could find another source of funds, she would lose her farm and would have no further need for a restructuring. But although the FmHA's suspension set in motion the chain of events that would almost surely result in the loss of the farm

_____

or unauthorized publicity, might well merit a review of its action." *Industrial Safety Equip.*, 837 F.2d at 1119.

and the mootness of the restructuring application, it most certainly was not the case that the FmHA's suspension legally compelled anyone to seek a forced sale of the farm. Citing *Franklin*, the Court held that the FmHA's temporary suspension of the restructuring application constituted "final agency action;" the Court explained that such determinations must take into account whether the result "is one that will directly affect the parties" and must "consider the 'practical effect of the [agency's] determination.'" *Id.* at 17 (quoting *Kershaw v. Resolution Trust Corp.*, 987 F.2d 1206, 1208 (5th Cir. 1993). *See also, e.g., Kaiser Aluminum & Chemical Co. v. CPSC*, 414 F. Supp. 1047, 1054-55 (D. Del. 1976) (district court had jurisdiction to review as final agency action CPSC public statements regarding problems with aluminum wiring in homes); *Utah Fuel Co. v. Coal Commission*, 306 U.S. 56, 59 S.Ct. 409, 83 L.Ed. 483 (1939) (district court's equity jurisdiction extended to bill for injunction to prevent Commission's release of allegedly confidential information, even though administrative hearing in which the information was proposed to be used was pending); *Silver King Mines v. Cohen*, 261 F.Supp. 666 (D.Utah 1966) (district court suit to enjoin SEC's unwarranted releases of damaging information was proper despite pendency of SEC proceedings to which releases pertained).

The Government relies on inapposite cases. The issue in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), was whether a report by the Secretary of Commerce of census data to the President that ultimately led to allocation of reapportioned seats on Congress was final agency action subject to review. The Court concluded that it was not because the initial report was only to the President, not the public, and was merely interlocutory, and because the President was not an "agency" within the meaning of the APA:

> At issue in this case is whether the "final" action that appellees have challenged is that of an "agency" such that the federal courts may exercise their powers of review under the APA. We hold that the final action complained of is that of the President, and the President is not an agency within the meaning of the Act. Accordingly, there is no final agency action that may be reviewed under the APA standards.

*Id.* at 796. HHS obviously does not claim here that it is not an agency or that its actions are immune from judicial review under the APA.

The Fourth Circuit held in *Flu-Cured Tobacco Cooperative Stabilization Corp. v. EPA*, 313 F.3d 852 (4th Cir. 2002), that, although EPA was an agency whose decisions were generally subject to APA review, EPA's issuance of a report on the adverse health effects of second-hand smoke was not "agency action." By statute, the report could have no regulatory effect. *Id.* at 858-59. There is no such limitation in the present case. Another difference is that the agency action was not final, contemplating issuance by other agencies such as GSA of anti-smoking

restrictions based upon the EPA report that would be subject to judicial review. *Id.* at 860 & n.8. The principle impediment to reviewability wsa lack of finality. In the present case, the action in publishing the defamatory article is final in the sense, inter alia, that it is being used by HHS to prevent the Geiers from serving as experts in vaccine court.

The issue in *Industrial Safety Equipment* was whether an informational guide published by NIOSH effectively decertifying 11 of 13 respirators used to protect against asbestos exposure was rulemaking or other agency action reviewable under the APA. The Court rejected EPA's claim that only legally binding publications could ever be subject to judicial review, 837 F.2d at 1117, but did not accept trade association's contention that publication of the guide was reviewable agency action akin to a de facto decertification of certain of the respirators.4 The trade association based its reviewability argument on EPA's action as a rule rather than as a sanction, which is the more appropriate characterization in the present case. And, unlike the present case, no claim was made that the review of respirators was false or misleading. 837 F.2d at 1119.

---

4       *Cf. Tozzi v. HHS*, 271 F.3d 301, 308-09 (D.C. Cir. 2001) (recognizing an aggrieved party's right to challenge an "information only" listing of carcinogens based in part on the actions of third parties based upon such listing; but concluding that the listing was not arbitrary or capricious).

The Geiers are mindful of the fact that the APA "does not provide judicial review for everything done by an administrative agency." *Hearst Radio v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948). Even though there is no blanket rule on the reviewability of agency publications,5 and reviewability decisions need to be sometimes made on a case by case basis, <u>this</u> case falls easily on the side of reviewability6. The accusation in the Article that the Geiers committed scientific

---

5    More recent cases in this Circuit have criticized *Hearst* and favored reviewability. The Court explained in *Impro Products v. Block*, 722 F.2d 845, 849 (D.C. Cir. 1983): "Despite its obvious relevance, we nonetheless have reason to question the continued validity of the *Hearst Radio* decision, particularly in a case such as this one in which there is a specific statutory authorization for dissemination of information. The *Hearst Radio* doctrine has not been reconsidered carefully since 1948. During the thirty-five years since the issuance of the decision in Hearst Radio, the Supreme Court and lower courts have developed a more expansive interpretation of the term 'agency action' than the one suggested by *Hearst Radio. See, e.g., FTC v. Standard Oil Co. of California*, 449 U.S. 232, 238 n. 7, 101 S.Ct. 488, 492 n. 7, 66 L.Ed.2d 416 (1980) (holding that FTC issuance of a complaint meets the APA definition of 'order' and therefore is ;agency action,' even if not 'final agency action') (quoting broad language of APA legislative history defining 'gency action'). Indeed, we find it troubling that literal adherence to the Hearst Radio rule in a case like this one would preclude judicial review under the APA of an agency's dissemination of information that is concededly false and, therefore, completely inconsistent with the statutory purpose of promoting a prosperous agriculture. Moreover, because the Federal Tort Claims Act expressly preserves sovereign immunity from suits for money damages for libel and slander, 28 U.S.C. § 2680(h) (1976), the agency would also be insulated from civil tort liability. With these considerations in mind, we believe that Hearst Radio may no longer be a viable precedent; we are therefore disinclined to find that no "agency action" has taken place." (footnotes omitted). *See also Writers Guild of America, West, Inc. v. FCC*, 423 F.Supp. 1064 (C.D.Cal.1976) (multiple speeches that were extra-legal, yet deliberate agency method for regulating the industry, found reviewable); *Cinderella Career and Finishing Schools, Inc. v. FTC*, 425 F.2d 583 (D.C. Cir. 1970) (Commissioner speeches reviewable and revealed bias amounting to denial of due process); cf. *Independent Broker-Dealers' Trade Ass'n v. SEC*, 442 F.2d 132, 142, 143 (D.C.Cir.), *cert. denied*, 404 U.S. 828 (1971) (court implies that APA review might be proper where agency publicity pressure, itself possibly ultra vires, leads party to take action that injures another).

6    Professor Gelhorn cogently stated the need for judicial review: "Adverse publicity causes concern for two primary reasons. First, it imposes a deprivation on private persons or firms without the due processes of law normally associated with government action encroaching upon property or persons. Formal orders from administrative agencies are preceded by notice with an

-16-

misconduct is objectively and demonstrably false.  *See California Canners and*

*Growers Assn. v. US*, 7 Cl. Ct. 69, 91-92 (1984) (congressional reference case;

damages awarded based upon FDA's false statements that cyclamates caused

cancer in animals);7 cf. *Trudeau v. FTC*, 384 F. Supp. 2d 281, 289-90, 292-93

---

opportunity for hearing, and the orders are often supported by a reasoned decision.  But usually no protection other than the common sense and good will of the administrator prevents unreasonable use of coercive publicity. Furthermore, judicial review cannot undo the widespread effects of erroneous adverse agency publicity.  The result is that the person or industry named may be irretrievably injured by inaccurate, excessive, or premature publicity.

Second, agencies sometimes use adverse publicity as an unauthorized sanction, as the CLC has done to enforce its Phase I dividend restraint policy.  Such use can damage an agency's stature in the eyes of the regulated industries. Furthermore, agency reliance upon publicity as a sanction may stunt the development of legal sanctions and leave novel doctrines untested.  By resorting to ad hoc methods of coercion, agencies circumvent the visibility of legislative approval of sanctions and may even frustrate the legislature's intent to limit their power to coerce. . . . where the case for publicity is not compelling and the authority to use publicity coercively is doubtful, it would seem appropriate for a court to scrutinize the administrative authority closely. . . . Judicial review, provided by statute, of adverse agency publicity need not be tied to final agency action.  That is, the standards for issuing adverse publicity, the procedures for assuring its accuracy, and the refusal to retract or explain ambiguous or erroneous publicity can be reviewed independently of any review of the agency's substantive action.  Moreover, review of these procedural issues is thus not delayed until they are mooted."  Gelhorn, Adverse Publicity by Administrative Agencies, 86 Harv. L. Rev. 1380, 1420-21, 1433-34 (1973).

7    "The difficulty in this case is with the content of the public statements and press releases of the FDA and its highest officials. Where test results are to be publicized, the publicity should at the least be accurate. Here the FDA repeatedly reported that cyclamates had been found to have caused cancer when ingested by laboratory animals. But cyclamates had not been found to have caused cancer--only the test substance of cyclamates and saccharin had been found to be a carcinogen. The agency's statements were clearly erroneous and wholly lacking in support. . . . Moreover, indemnification for losses incurred by marketers when the state of the art improves, and reveals defects heretofore unknown, is not unheard of. See, e.g., Federal Insecticide, Fungicide and Rodenticide Act, (FIFRA), 7 U.S.C. § 136m, in which indemnification was statutorily provided; see also TRIS Indemnification Act, Pub.L. No. 97-395, 96 Stat. 2001 (1982). Thus, even if we were here concerned only with the newly-breaking scientific developments and changing status of GRAS, the possibility of indemnification is not automatically foreclosed in an equitable claim.

Here, however, we have an even stronger case. The Government did not merely announce proper regulatory action and changing status of cyclamates. It also characterized cyclamates as carcinogenic, without support. More than a changing state of art was involved

-17-

(D.D.C. 2005) (carefully reviewing press release to determine if it was false).8  See

_____

here. The Government's erroneous characterizations also played a role in contributing to the decline of plaintiff's sales. The Government should not benefit, in an equitable claim, from the fact that it is impossible to separate the losses which might be expected to have resulted from correct and accurate announcements from the losses which were in fact sustained as a result of wholly incorrect and unwarranted charges by the Government.

It is in the public interest and to the public's benefit that the Government engage in such publicity to keep consumers advised of scientific and medical developments and questions concerning a product's safety. Thus, such publicity is to be encouraged. At the same time, however, the marketers of any product should not, in all justice and fairness, be forced to sustain and absorb the losses incurred as a result of erroneous Government statements, particularly those which are wholly unwarranted and carelessly issued.

It is the conclusion of the Hearing Officer that this is a situation in which a Government activity (publicity) benefits the public and is in the Government's interest but which, faultily performed by the Government, has resulted in damage to the plaintiff. There is fault on the part of the Government here, but in a context in which no legal claim would lie against a private party. Moreover, the public benefits by and the Government has an interest in such publicity generally, which here gave rise to plaintiff's damages. In short, plaintiff has an equitable claim based on moral obligation. (See Appendix A.) The fact that the events here would not give rise to any legal claim or indeed to any claim even if brought against a private party, does not preclude plaintiff's recovery based on an equitable claim, recognizing the moral obligation of the United States. Accordingly, such recovery is hereby recommended.  In short, it is concluded that the publicity initiated by the FDA, to the effect that cyclamates had been found to have caused cancer in laboratory animals, was the direct cause of a consumer avoidance of plaintiff's Diet Delight Products and the direct cause of a significant sales' loss during FY 1970 and early FY 1971.  Specifically, the inability to sell some 57 percent of the inventory plaintiff had accumulated from October 1969 to the recall of September 1, 1970, is found to be the result of the Government's adverse and incorrect publicity. Plaintiff should be compensated for these losses as an equitable claim based on the moral obligation of the United States."

8    "Nonetheless, both the D.C. Circuit and the Fourth Circuit have allowed that agency publicity could, in certain circumstances, come within the definition of final agency action, most likely as an agency "sanction."  *See Invention Submission Corp. v. Rogan*, 357 F.3d 452, 457 (4th Cir.2004) ("Inasmuch as the APA's definition of 'agency action' includes agency sanctions, adverse publicity might be a 'sanction' and therefore an agency action in certain circumstances."); *Indus. Safety Equip. Assoc., Inc. v. Envtl. Prot. Agency*, 837 F.2d 1115, 1119 (D.C. Cir.1988) ("[A]n agency intent on penalizing a party through adverse publicity, especially false or unauthorized publicity, might well merit a review of its action."); *Impro Prods., Inc. v. Block*, 722 F.2d 845, 847 (D.C. Cir.1983) (criticizing interpretation of "final agency action" that "would preclude judicial review under the APA of an agency's dissemination of information that is concededly false and, therefore, completely inconsistent with the statutory purpose of promoting a prosperous agriculture").  These decisions suggest that, were a press release ever to qualify as a final agency action, it would be in a case where one and preferably both of two conditions were present. First, there would be evidence that the agency was "intent on

*also, e.g., Writers Guild of America, West, Inc. v. FCC*, 423 F. Supp. 1064 (C.D.

Cal.1976) (multiple speeches that were extra-legal, yet deliberate agency method

for regulating the industry, found reviewable); cf. *Independent Broker-Dealers'*

*Trade Ass'n v. SEC*, 442 F.2d 132, 142, 143 (D.C. Cir.), *cert. denied*, 404 U.S. 828

(1971) (court implies that APA review might be proper where agency publicity

pressure, itself possibly ultra vires, leads party to take action that injures another).

The agency's accusation is apparently an isolated attack and is not part of an

ongoing program of enforcement and consumer protection similar to the often-

challenged pronouncements of such agencies as FDA, CPSC, and SEC. There is

thus no need in this case to balance the efficacy of review to protect the Geiers

with a broad agency mission of informing the public in a timely manner. The

publication action was final, with no enforceable means for correction of errors,

thus there is no further administrative remedy to "exhaust." The claim against the

agency seeks only declaratory and injunctive relief, for which the APA waives

sovereign immunity.

---

penalizing" a private party through adverse publicity. *Indus. Safety*, 837 F.2d at 1119; see also
*Invention Submission Corp.*, 357 F.3d at 457 (declining to find final agency action where the
Patent and Trademark Office's advertising campaign did not reflect "an intent to penalize any
particular company"). Second, there would be evidence that the press release was demonstrably
or concededly false. *See Indus. Safety*, 837 F.2d at 1119 (finding agency publication
recommending against use of certain respirators did not qualify as a final agency action where
plaintiff neither offered "evidence that the Guide was intended to penalize producers or
consumers of the ... criticized respirators, nor evidence that the Guide is false")."

The Geiers recognizes the need to avoid undue interference with ongoing administrative proceedings or interlocutory agency actions, and that judicial review should not encompass just any government action.  But here, the government action is an agency's final position on an issue and is intended to have (and does, in fact, have) significant impact on affected entities.  This action is not ordinary, routine, or hopelessly technical.  It is concrete and highly consequential and must, therefore, be subject to judicial review.

## B.  The Article is Not Immune From Judicial Scrutiny as a Discretionary Act.

The Government seeks immunity from judicial scrutiny, Mem. at 8-9, claiming that publication is "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  There is no showing of Congressional intent, much less clear and convincing evidence, to preclude judicial review.  The Geiers aren't challenging the authority per se of the agency to support or publish scholarly articles, even articles concerning the Geiers' research.  Instead, they are only challenging the accusation of scientific misconduct in this article.


The Government's cases are inapposite.  The Court in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971) specifically rejected the "no law to

apply" argument and remanded the Secretary's decision to use federal funds to finance construction of an expressway through a park to the district court for decision on the merits based upon the complete administrative record before the Secretary, rejecting post hoc explanations provided in agency litigation affidavits. The Court found "law to apply" in the Secretary's obligation to consider alternatives that avoided or minimized adverse effects on public land. *Id.* at 411-12.

In *Drake v. FAA*, 291 F.3d 59 (D.C. Cir. 2002), the Court found unreviewable the FAA's decision not to take enforcement action against a carrier based upon a dismissed flight attendant's claim that it was not following drug testing regulations. The present case is not one of few categories of cases generally exempt from review, e.g. agency refusal to commence an enforcement action or grant a security clearance. *See, e.g., Heckler v. Chaney*, 470 U.S. 821, 831-34 (1988); Webster v. Doe, 486 U.S. 592, 599-600 (1988).

There are adequate standards against which to judge the Article. The Government has not met its burden of overcoming the heavy presumption in favor of reviewability. *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967). It has not

cited, for example, any authority to make false accusations of scientific

misconduct.  While the agency may have discretion to decide which articles to

support or publish, or to publish any articles at all, it may not abuse that discretion

by publishing an objectively false accusation.  *See, e.g., Hall v. Clinton*, 285 F.3d

74 (D.C. Cir. 2002) (decision of Attorney General to represent private party

reviewable; distinguishing unreviewable decision not to act from reviewable

decisions to take same action); *Robbins v. Reagan*, 780 F.2d 37, 46 (D.C. Cir.

1985) ("The 'committed to agency discretion' provision is a 'very narrow

exception.' . . . The requirement of a heightened level of discernible standards

controlling discretion to rebut the presumption of nonreviewability applicable in

decisions not to take enforcement action must not be applied outside of that

context. To do so would be to frustrate Congress's clear intention, and the long

tradition, of allowing judicial review when it can carry out an effective function.")

(citations omitted); *Scanwell Laboratories v. Schaffer*. 424 F.2d 859, 874-75 (D.C.

Cir. 1970) (agency abuses discretion by awarding contract to unresponsive bidder);

*Head Start Family Education Program v. Cooperative Educational Service*, 46

F.3d 629 (7th Cir. 1995) (HHS designation of ineligible grant recipient not

unreviewable discretionary act); *Beverly Health & Rehabilitation Services v.*

*Thompson*, 223 F. Supp. 2d 73, 89-90 (D.D.C. 2002) (validation protocol for nursing home surveys held reviewable).

C.  Alleged Good Faith of the Authors is Not a Defense to a Claim Under the APA that the Agency's Allegation of Scientific Misconduct Was False.

The Article's Claim That the Geiers Engaged in Scientific Misconduct is False.

Assuming, *arguendo*, that the Article is reviewable agency action, the Government next claims, Mem. at 9-10, that it was not arbitrary and capricious "because the PHS defendants had a good faith basis to believe were accurate at the time they were made."  The Complaint, ¶¶ 92-93, alleges that the Article contained the false allegation that the Geiers falsified key data and therefore the results based upon that data, that this adverse agency action was a sanction, and that the Government continued to distribute and rely on the Article.  On this motion to dismiss, these allegations are taken as true.  *SEC v. Zandford*, 535 U.S. 813, 818 (2002); *Saudi Arabia v. Nelson*, 507 U.S. 349, 351, 354 (1993); *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993); *Information Handling Services, Inc. v. Defense Automated Printing Services*, 338 F.3d 1024, 1029 (D.C. Cir. 2003); *Sturm, Ruger & Co. v. Chao*, 300

F.3d 867, 871 (D.C. Cir. 2002); *U.S. v. Phillip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2001). At this point in the case, the Government does not deny and in fact appears to concede (by placing emphasis on its retraction) that the allegation that the Geiers falsified their data was in fact false when made in the original Article (and whenever the Government has subsequently relied on and will continue to rely on the Article).

The issue of "good faith" on the part of the individual Government defendants (Pickering and Schwartz), Mem. at 9, may provide them with a defense to the *Bivens* claim, but good faith is not a defense to the agency sanction, or to a finding that it is arbitrary and capricious and should be set aside. The present motion is styled as a motion to dismiss for lack of subject matter jurisdiction and failure to state a claim, so the declarations of Pickering and Schwartz would, if considered at all, convert the motion into one for summary judgment. Fed. R. Civ. Proc. 12© ("If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."). Summary judgment at this point would

be premature pending at least some discovery relating to the claims in the

declarations (assuming, arguendo, that the 'good faith" claim were even relevant as

a defense to this APA count).9  *See, e.g., Tax Analysts v. IRS*, 214 F.3d 179 (D.C.

Cir. 2000) (motion to dismiss reversed and case remanded for further discovery);

*Cobell v. Babbitt*, 30 F. Supp. 2d 24, 29-30 (D.D.C. 1998).


The Complaint, ¶¶ 93-94, also alleges that the agency has continued to use

the Article to discredit the Geiers, especially in their effort to work in vaccine

court, and that their informal efforts to seek retraction or withdrawal of the Article

have been unsuccessful.  The purported retraction, Complaint ¶ 53, was inadequate

because it was not featured with equal prominence in the Journal, because the

authors failed to correct the Article by acknowledging that the Geiers' calculations

were not fabrications, and because it can be read that the Geiers only claimed to

have the data.

---

9       Even if relevant to this APA count, the declarations raise more factual questions than
they answer.  They state in ¶ 4 that "[w]e had been told by supervisors in the Branch and the
Division where these data are maintained that they would not have been given out."  By whom,
and when?  Before or after publication of the Article?  If they went to the trouble to make
inquiries at CDC, obviously knowing of the import of their contemplated accusation of scientific
misconduct, then why not simply ask the Geiers if, where, and how they had the data.  Since this
was a peer-reviewed journal, and not, say, a daily paper or a news-breaking broadcast, there was
obviously plenty of time for such inquiry.  Their failure to do is is reckless disregard for the
truth.

II.  Schwartz and Pickering Are Not Immune From a *Bivens* Claim.

      Count VII, ¶ 98, alleges a claim under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), that Drs. Schwartz and Pickering interfered with the Geiers' rights (1) seek and be fairly considered for federal contracts (expert witnesses in the NVICP), and (2) access the courts (NVICP and in state and federal civil proceedings) in their capacity as expert witnesses and on behalf of vaccine injury claimants.  Schwartz and Pickering are entitled to qualified immunity if their actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Mitchell v. Forsyth*, 472 U.S. 511, 524 (1985), *quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "Where an official could be expected to know that his conduct would violate statutory or constitutional rights, he should be made to hesitate . . .."  *Harlow*, 457 U.S. at 819. Officials can only escape discovery and trial if the allegations fail to state a "violation of clearly established law."  *Mitchell*, 472 U.S. at 526; *Harlow*, 457 U.S. at 818.  An official's subject good faith is irrelevant when evaluating a claim of qualified immunity.  *Harlow*, 457 U.S. at 815-19.  The qualified immunity defense balances two important yet competing goals: the need to protect citizens from unlawful acts of government officials, and the need of government officials to be able to perform their duties without the constant fear of insubstantial lawsuits.

*Harlow*, 457 U.S. at 857; *Butz v. Economou*, 438 U.S. 478, 504-06 (1978).  In

deciding this motion, the allegations in the Complaint must be read in the light

most favorable to the Geiers.  *Leatherman v. Tarrant County Narcotics*

*Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993).

A.  The Geiers Have a Constitutionally Protected Liberty Interest in Continued
Employment as Expert Witnesses.

The Government claims, Mem. at 13-15, that the Geiers lack a

constitutionally protected liberty interest in continued employment as expert

witnesses in vaccine court.  The Geiers' "right to . . . follow a chosen profession

free from unreasonable governmental interference comes within the 'liberty' . . .

concept[] of the Fifth Amendment."  *Greene v. McElroy*, 360 U.S. 474, 492 (1959)

(revocation of security clearance without procedural due process); *see, e.g., Trifax*

*Corp. v. District of Columbia*, 314 F.3d 641, 643 (D.C. Cir. 2003) (defamatory

audit report about contractor); *Kartseva v. Dep't of State*, 37 F.3d 1524, 1529 (D.C.

Cir.1994) (acknowledging a "constitutionally protected 'right to follow a chosen

trade or profession'" (quoting *Cafeteria & Restaurant Workers Local 473 v.*

*McElroy*, 367 U.S. 886, 895-96 (1961)).

The Court explained in dicta in *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972) (non-tenured assistant professor had no protected property interest in continued employment), that there is a liberty interest in continued government employment:

> The State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality. Had it done so, this would be a different case. For '[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.'[citations omitted]. In such a case, due process would accord an opportunity to refute the charge before University officials. [FN12] In the present case, however, there is no suggestion whatever that the respondent's 'good name, reputation, honor, or integrity' is at stake.

*Id.* at 573. The present case is "such a case," in which the allegations of scientific misconduct by Pickering and Schwartz "might seriously damage their standing and associations in [the scientific and legal] community" and were a "charge of dishonesty."

Schwartz and Pickering interfered with the Geiers' constitutionally protected liberty interest in being fairly considered for NVICP contracts. This right has been "clearly established" primarily in debarment jurisprudence since at least 1974. *See, e.g., Sloan v. HUD*, 231 F.3d 10, 18 (D.C. Cir. 2000); *ATL, Inc. v. United States*, 736 F.2d 677, 683 (Fed. Cir. 1984); *Transco Sec., Inc. v. Freeman*, 639

-28-

F.2d 318, 321 (6th Cir. 1981); *see also Old Dominion Dairy Prods., Inc. v. Secretary of Defense*, 631 F.2d 953, 962-63 (D.C. Cir.1980) (due process demands notice and opportunity to respond to charges before adverse action denying contracts); *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 598 (D.C. Cir.1993) (contractor "has a liberty interest in avoiding the damage to its reputation and business caused by a stigmatizing suspension"); *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 7 (D.C. Cir. 1998) (agency may not even impose temporary suspension without following required procedures); *Horne Brothers, Inc. v. Laird*, 463 F.2d 1268, 1271-72 (D.C. Cir.1972) (fundamental fairness demands that for suspensions longer than a month, contractors be afforded a meaningful hearing including notice and an opportunity to cross-examine adverse witnesses); *Gonzalez v. Freeman*, 334 F.2d 570, 578-79 (D.C. Cir. 1974) (USDA suspension for misuse of inspection certificates invalid without notice, hearing, cross-examination and reasoned decision based upon the record).

The present case falls between formal debarment and "mere defamation," but nevertheless on the actionable side of the dividing line, in what this Circuit has characterized as a "reputation plus" category of cases. Judge Tatel explained the distinction in *Trifax Corp. v. District of Columbia*, 314 F.3d 641 (D.C. Cir. 2003):

In view of the fact that formal debarment would constitute a deprivation of liberty, it would be odd if broad preclusion, equivalent in every practical sense to formal debarment, did not also constitute a deprivation simply because the harm was reputational.  For exactly this reason, and notwithstanding the strong language in Paul v. Davis and Siegert v. Gilley, we have held on several occasions that government stigmatization that broadly precludes individuals or corporations from a chosen trade or business deprives them of liberty in violation of the Due Process Clause.  For example, in Old Dominion Dairy Products, Inc. v. Secretary of Defense, a government contractor unfavorably audited by the government, though not formally debarred, was "effectively put . . . out of business."  631 F.2d at 963.  We held that "when the Government effectively bars a contractor from virtually all Government work due to charges that the contractor lacks honesty or integrity, due process requires that the contractor be given notice of those charges as soon as possible and some opportunity to respond to the charges before adverse action is taken."  Id. at 955-56.  We reached a similar result in Kartseva v. Department of State, where a government contractor fired a Russian translator after the State Department informed the contractor that employing the translator raised "'counterintelligence concerns.'" 37 F.3d at 1525 (internal citation omitted).  We held that a liberty interest was implicated if the State Department's action (1) "formally or automatically excludes Kartseva from work," or (2) "does not have this binding effect, but nevertheless has the broad effect of largely precluding Kartseva from pursuing her chosen career as a Russian translator." Id. at 1528 (emphases in original).  In still another due process employment case, Taylor v. Resolution Trust Corp., 56 F.3d 1497 (D.C. Cir.1995), we relied on Kartseva for the proposition that "government action precluding a litigant from future employment opportunities will infringe upon his constitutionally protected liberty interests . . . when that preclusion is either sufficiently formal or sufficiently broad."  Id. at 1505.

These employment and government contracting due process cases establish what we call a "reputation plus" requirement--plaintiffs must show not only that the government harmed their reputation, but also that the resulting stigma "altered [their] status in a tangible way.":"  Orange v. Dist. of Columbia, 59

> F.3d 1267, 1274 (D.C. Cir.1995) (internal quotation marks and
> citations omitted) (alteration in original). This "change in status
> requirement," id. (internal quotation marks omitted), explains why
> Paul v. Davis and Siegert v. Gilley have no applicability to the claims
> here: Both cases involve harms analogous to common-law
> defamation, while the :"reputation plus" cases involve harms
> approaching, in terms of practical effect, formal exclusion from a
> chosen trade or profession, as in Old Dominion. The key inquiry then
> is this: Has the government, by attacking personal or corporate
> reputation, achieved in substance an alteration of status that, if
> accomplished through formal means, would constitute a deprivation
> of liberty? For this reason, plaintiffs claiming "broad preclusion"
> must show that "the government 'has seriously affected, if not
> destroyed, [their] ability to obtain employment [or contracts] in [their]
> field.'" Taylor, 56 F.3d at 1506 (quoting Greene v. McElroy, 360
> U.S. at 492, 79 S.Ct. at 1411).

*Id.* at 644. Trifax was ultimately unsuccessful at showing the necessary "broad

preclusion" because it continued to win contracts, was unable to show any explicit

connection the unfavorable audit report and lost business, because " the United

States Comptroller General formally prohibited the contracting agency from

penalizing Trifax for the OIG." *Id.* at 645. These findings were made only after

discovery and a summary judgment motion. *Id.* at 643. Similarly, a ruling against

the Geiers based upon a detailed factual analysis of the effects and impact of this

de facto debarment would be premature. See also *Hatfill v. Ashcroft*, 404 F. Supp.

2d 104, 116 (D.D.C. 2005) (plaintiff would have a "reputation plus" cause of

action had the accusation been false when made).

The Government's controlling reliance on *Kartseva v. Dept. of State*, 37
F.3d 1254 (D.C. Cir. 1994) is misplaced.10  First, the Court recognized that a
liberty interest would be implicated if the record on remand revealed that the
Department's security-related concerns amounted to a de facto debarment of future
employment with State or were such that the accusations broadly interfered with
her right to pursue general employment as a Russian translator:

> We think that Kartseva has alleged sufficient facts regarding violation
> of her liberty interest by State to survive a motion to dismiss. Because,
> however, it is not possible to ascertain the precise scope and import of
> the State disqualification from the present record, even as
> supplemented by a letter filed by State at our request, we are unable to
> determine for sure whether State's disqualification actually implicated
> a due process liberty interest.  Accordingly, we remand for further
> findings on the nature and scope of the State disqualification.  The
> critical question on remand is whether State's disqualification has
> worked a change in Kartseva's status under law, either by (a)
> automatically excluding her from a definite range of employment
> opportunities with State or other government agencies; or (b) broadly
> precluding her from continuing in her chosen career of a Russian
> translator. The district court's exploration should proceed along the
> following lines.

*Id.* at 1526.

The second reason Katseva doesn't dictate dismissal of the *Bivens* claim in
the present case is that Court expressly stated that the issue of qualified immunity
could not be determined until the precise nature of the impact of State's sanction

---

10     The Supreme Court subsequently held that the "heightened pleading standard" then used
by this and other Circuits no longer applied.  Crawford-El v. Britton, 523 U.S. 574 (1998).

on her liberty interest could be determined following remand and limited discovery.

The present case goes beyond "government defamation, standing alone." The allegations of scientific misconduct have both of the effects noted above. First, they amount to a de facto debarment from participation in the NVICP, a program run by HHS, the same agency that made the false allegations through Pickering and Schwartz. Second, an allegation of scientific misconduct is so serious, in the limited field of experts on vaccine-cause injuries, especially when made in a peer-reviewed journal, that its effect has been and will be to broadly preclude the Geiers' work in this field.

*Paul v. Davis*, 424 U.S. 693 (1976), and *Siegert v. Gilley*, 500 U.S. 226 (1991), are not in conflict with the Geiers' theory of the case. Davis claimed that defamation in the form of a leaflet distributed by police picturing him as an "active shoplifter." The Court distinguished what it termed "mere defamation" from actionable violations of liberty and property interests protected by Due Process. 424 U.S. at 709-13. "Respondent in this case cannot assert denial of any right vouchsafed to him by the State and thereby protected under the Fourteenth Amendment. That being the case, petitioners' defamatory publications, however seriously they may have harmed respondent's reputation, did not deprive him of

any "liberty" or "property" interests protected by the Due Process Clause." *Id.* at

712.

Similarly, Dr. Siegert complained of "mere defamation," specifically a post-

termination letter from his former federal supervisor to his new hospital:

> The facts alleged by Siegert cannot, in the light of our decision in Paul
> v. Davis, be held to state a claim for denial of a constitutional right.
> This is not a suit against the United States under the Federal Tort
> Claims Act--such a suit could not be brought, in the light of the
> exemption in that Act for claims based on defamation, see 28 U.S.C. §
> 2680(h)--but a suit against Siegert's superior at St. Elizabeths
> Hospital. The alleged defamation was not uttered incident to the
> termination of Siegert's employment by the hospital, since he
> voluntarily resigned from his position at the hospital, and the letter
> was written several weeks later. The statements contained in the letter
> would undoubtedly damage the reputation of one in his position, and
> impair his future employment prospects. But the plaintiff in Paul v.
> Davis similarly alleged serious impairment of his future employment
> opportunities as well as other harm. Most defamation plaintiffs
> attempt to show some sort of special damage and out-of-pocket loss
> which flows from the injury to their reputation. But so long as such
> damage flows from injury caused by the defendant to a plaintiff's
> reputation, it may be recoverable under state tort law but it is not
> recoverable in a Bivens action. Siegert did assert a claim for
> defamation in this case, but made no allegations as to diversity of
> citizenship between himself and respondent.

500 U.S. at 234.

The present case, however, is much more than "mere defamation." Unlike

the allegation in *Davis*, the accusation here of scientific misconduct was

concededly false when made. Unlike the letter in *Siegert* , the Article here is in a

widely distributed peer-reviewed journal. Although the full extent of the harm from the Article has yet to be determined, the agency has repeatedly used it to block the Geiers from serving as expert witnesses in NVICP. The clearly established constitutional right at stake in this case is not the right to be free from "mere defamation (as vital as that right is and as deserving, arguendo, it is of protection from harm inflicted by government agents)," but a case where the concededly false finding of scientific misconduct is attempting to be used as a de facto debarment from NVICP.

B.  The Geiers Have a Clearly Established Constitutional Right of Access to the Courts for Themselves and on Behalf of Vaccine-Injured Claimants.

"[T]he right to sue and defend in the courts," the Supreme Court long ago said, "is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government. It is one of the highest and most essential privileges of citizenship." *Chambers v. Baltimore & Ohio R.R.*, 207 U.S. 142, 148 (1907). The right not only protects the ability to get into court, *see, e.g., Ex parte Hull*, 312 U.S. 546 (1941) (striking down a prison regulation prohibiting prisoners from filing petitions for habeas corpus unless they are found "properly drawn" by a state official), but also ensures that such access be

"adequate, effective, and meaningful." *Bounds v. Smith*, 430 U.S. 817, 822 (1977).11

The present case is analogous to cases holding that government cover-ups and deception that, e.g., conceal a cause of action or make it more difficult to prosecute, violate the right of access to the courts. *See, e.g., Harbury v. Deutch*, 233 F.3d 596, 607-08, 610 (D.C. Cir. 2000) ("Qualified immunity was never intended to protect public officials who affirmatively mislead citizens for the purpose of protecting themselves from being held accountable in a court of law."), *reversed on other grounds, Christopher v. Harbury*, 536 U.S. 403 (2002) (failure to allege the required element of an underlying cause of action); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1261-62 (7th Cir. 1984) (police officials planted evidence and invented a false story to cover up the killing of an unarmed man); *Ryland v. Shapiro*, 708 F.2d 967, 974-75 (5th Cir.1983),(delay in releasing true

---

11      The Court have grounded the right of access to courts in the Article IV Privileges and Immunities Clause, *Chambers v. Baltimore & Ohio R. Co.*, 207 U.S. 142, 148 (1907); *Blake v. McClung*, 172 U.S. 239, 249 (1898); *Slaughter-House Cases*, 16 Wall. 36 (1873), the First Amendment Petition Clause, *McDonald v. Smith*, 472 U.S. 479, 484 (1985) ("[F]iling a complaint in court is a form of petitioning activity; but baseless litigation is not immunized by the First Amendment right to petition." (internal quotation marks and citations omitted)); *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741 (1983); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972), the Fifth Amendment Due Process Clause, *Murray v. Giarratano*, 492 U.S. 1, 11, n. 6 (1989) (plurality opinion); *Walters v. National Assn. of Radiation Survivors*, 473 U.S. 305, 335 (1985), and the Fourteenth Amendment Equal Protection, *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987), and Due Process Clauses, *Wolff v. McDonnell*, 418 U.S. 539, 576 (1974); *Boddie v. Connecticut*, 401 U.S. 371, 380-81 (1971).

facts of murder; falsification of death certificate); *Swekel v. City of River Rouge*, 119 F.3d 1259, 1263-64 (6th Cir.1997) (plaintiff must "[show] that the defendants' actions foreclosed her from filing suit in state court or rendered ineffective any state court remedy she previously may have had"); *Delew v. Wagner*, 143 F.3d 1219, 1222 (9th Cir.1998) (same); *Vasquez v. Hernandez*, 60 F.3d 325, 329 (7th Cir.1995) (plaintiffs must allege either that they have "been prevented from pursuing a tort action in state court or that the value of such an action has been reduced by the cover-up"); *Barrett v. United States*, 798 F.2d 565, 575 (2d Cir.1986) (man died of mescaline injections without consent as part of secret government program; "Unconstitutional deprivation of a cause of action occurs when government officials thwart vindication of a claim by violating basic principles that enable civil claimants to assert their rights effectively."; though defendant government officials "were not under any duty to volunteer to the estate information that would alert it to the existence of a claim against the federal government and certain of its officials . . . government officials were not free to arbitrarily interfere with the estate's vindication of its claims").

The right to be vindicated here is the right to a tribunal (vaccine court and any follow-on proceedings) free of government-sponsored deception. Although

the Supreme Court reversed this Circuit on other grounds (lack of a sufficiently

alleged underlying cause of action that was the ultimate victim of the government's

deception), the right to a deception-free tribunal was clearly established in this

Circuit at least as far back as 2000. *Harbury*, 233 F.3d at 607-10.  Similarly, the

First Circuit found this right (which it characterized as "easy pickings") to be

clearly established by 2004, if not decades earlier, condemning the government's

use of perjured testimony and its suppression of exculpatory evidence in *Limone v.*

*Condon*, 372 F.3d 39 (1st Cir. 2004):

> This is easy pickings.  Although constitutional interpretation
> occasionally can prove recondite, some truths are self-evident.  This is
> one such: if any concept is fundamental to our American system of
> justice, it is that those charged with upholding the law are prohibited
> from deliberately fabricating evidence and framing individuals for
> crimes they did not commit.  See, e.g., Devereaux v. Abbey, 263 F.3d
> 1070, 1074-75 (9th Cir.2001) (en banc).  Actions taken in
> contravention of this prohibition necessarily violate due process
> (indeed, we are unsure what due process entails if not protection
> against deliberate framing under color of official sanction).  Thus, we
> resist the temptation to expound needlessly upon the first element in
> the qualified immunity catechism and simply pronounce that
> requirement satisfied.
>
> The second question in the algorithm asks whether the state of
> the law at the time of the putative violation afforded the defendant fair
> warning that his or her conduct was unconstitutional.  See Hope v.
> Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).
> In the circumstances of this case, that question requires us to
> determine whether the right not to be framed by law enforcement
> agents was clearly established in 1967--the year in which the
> appellants are alleged to have started twisting their investigation to
> target the plaintiffs.  We think that it was.

From a jurisprudential perspective, our delving goes back some seventy years. In Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935) (per curiam), the Supreme Court explained that due process is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Id. at 112, 55 S.Ct. 340.  The following term, the Court reaffirmed that the Due Process Clause forbids convictions predicated on deliberate deceptions.  See Brown v. Mississippi, 297 U.S. 278, 286, 56 S.Ct. 461, 80 L.Ed. 682 (1936).  Six years later, the Court needed only a single paragraph and a citation to Mooney to buttress its conclusion that "allegations that [the petitioner's] imprisonment resulted from perjured testimony, knowingly used by the State authorities to obtain his conviction, and from the deliberate suppression by those same authorities of evidence favorable to him . . . sufficiently charge a deprivation of rights guaranteed by the Federal Constitution."  Pyle v. Kansas, 317 U.S. 213, 216, 63 S.Ct. 177, 87 L.Ed. 214 (1942).  Given these precedents, it is not surprising that, as early as 1951, this court described Mooney's core premise as "well-settled."  Coggins v. O'Brien, 188 F.2d 130, 138 (1st Cir.1951).

In 1959, the Supreme Court confirmed that the Mooney right covered circumstances in which "the State, although not soliciting false evidence, allows it to go uncorrected when it appears."  Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).  In raising the bar to this modest level, the Court recognized that its prior case law "established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." Id. (citing Mooney ).  The Court viewed such a right as "implicit in any concept of ordered liberty." Id. And in 1967--the very year that the violations in the instant case are alleged to have begun--Justice Stewart, writing for a unanimous Court, reiterated the point:

More than 30 years ago this Court held that the Fourteenth Amendment cannot tolerate a state criminal conviction obtained *46 by the knowing use of false

evidence. There has been no deviation from that
established principle.

Miller v. Pate, 386 U.S. 1, 7, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967)
(citations omitted).

. . .

It is certainly true that the manner in which a right is defined can
make or break a qualified immunity defense. Courts must be careful
not to permit an artful pleader to convert the doctrine of qualified
immunity into a hollow safeguard simply by alleging a violation of an
exceedingly nebulous right.  See Wilson, 526 U.S. at 614-15, 119
S.Ct. 1692; Hatch v. Dep't for Children, Youth & Their Families, 274
F.3d 12, 20 (1st Cir.2001).  Courts must be equally careful, however,
not to permit a defendant to hijack the plaintiff's complaint and
recharacterize its allegations so as to minimize his or her liability.
Here, the amended complaints, fairly read, are not susceptible to the
appellants' animadversions.  The right defined by the plaintiffs and
recognized by the district court does not even approach the level of
generality thought to be impermissible. See, e.g., Anderson, 483 U.S.
at 639, 107 S.Ct. 3034 (discussing what level of generality is
permissible with respect to due process violations); Hatch, 274 F.3d at
20 (same, with respect to "the right to familial integrity" and "the
parental interest in the care, custody, and control of children").

*Id.* at 43-44.  *See, e.g., Manning v. Miller*, 355 F.3d 1028, 1033 (7th Cir. 2004) (no

qualified immunity for creation of false evidence).

The status of the Geiers as expert witnesses has no bearing on the

fundamental right of access.  First, as required by *Harbury*, the underlying cause of

action interfered with is precisely identified, vaccine claims under the National

Vaccine Injury Program, 42 U.S.C. § 300aa-1, et seq.  Vaccine-injured plaintiffs

sue the Secretary of HHS in a specialized vaccine court staffed by special masters

organized within the Court of Federal Claims. *Id.* §§ 300aa-11, 300aa-12 . If

unsatisfied with the judgment, claimants can proceed to state or federal court

against industry under traditional tort remedies. *Id.* § 300aa-21. The Geiers right

of access has been interfered with in two related but distinct ways. First, they are

vindicating the rights of the underlying claimants to have the Geiers as expert

witnesses. These claimants' right of access is impaired by the allegations of the

Geiers' scientific misconduct just as if they faced an unreasonably high filing fee

or an unduly burdensome administrative process,12 or retaliation.13   Plaintiffs in

constitutional litigation are typically allowed to vindicate the rights of absent third

parties.14  The Geiers' second but related right is their own personal right to

---

12      *See, e.g., Johnson v. Avery*, 393 U.S. 483 (1969); *Burns v. Ohio*, 360 U.S. 252, 257 (1959); *Griffin v. Illinois*, 351 U.S. 12, 20 (1956).

13      See, e.g., Harrison v. Springdale Water and Sewer Comm'n, 780 F.2d 1422 (8th Cir. 1986) (frivolous condemnation counterclaim held unconstitutional retaliation); Silver v. Cormier, 529 F.2d 161 (10th Cir. 1976) (local officials threatened to withhold money due plaintiffs if they filed independent legal action; punitive damages awarded for interference with right of access by retaliation).

14      See, e.g.,  Powers v. Ohio, 499 U.S. 400, 411 (1991) (defense attorneys can raise rights of unselected jurors); Secretary of State of Md. v. Joseph H. Munson Co., 467 U.S. , 947, 956 (1984); Warth v. Seldin, 490 U.S. 510 (1975) (*citing* Doe v. Bolton, 410 U.S. 179 (1973); Griswold v. Connecticut, 381 U.S. 479 (1965); Barrows v. Jackson, 346 U.S. 249 (1953)); see Craig v. Boren, 429 U.S. 190 (1976) (beer vendors can assert the rights of young prospective customers): Carey v. Population Services, 431 U.S. 678, 682-84 (1977) (sellers of mail-order contraceptives can raise rights of prospective purchasers); Eisenstadt v. Baird, 405 U.S. 438, 443-46 (1972) (distributors of birth control to unmarried persons can assert the rights of potential recipients); Barrows v. Jackson, 346 U.S. 249, 254-58 (1953) (white sellers of land can raise the rights of prospective black purchasers).

appear in vaccine court (and subsequent courts) as expert witnesses, a tribunal uncorrupted by false statements by government agents.

Schwartz and Pickering apparently do not dispute that the allegations, if true, deprive and interfere with the Geiers' right (personally and on behalf of claimants) to appear in vaccine court.  The defend on the second prong of the qualified immunity inquiry, Mem. at 11-12, that the "right" was not clearly established. Accordingly, qualified immunity should be denied at this stage of the proceeding because, as explained above, the right of access was "clearly established" long before publication of the Article.


Conclusion.

The Federal Defendants' motion to dismiss the APA and *Bivens* claims should be denied for the reasons set forth above.

Respectfully Submitted,

/s/ James A. Moody

_____

James A. Moody, Esq.
1130 30th Street, NW
Suite 300
Washington, DC  20007
202-298-4766
202-944-8611
moodyjim@aol.com

Joseph Hennessey
P.O. Box 31256
Bethesda, MD  20824-1256
301-654-0341

*Attorneys for Plaintiffs*

December 21, 2005

**CERTIFICATE OF SERVICE**

I, Joseph Hennessey certify that a copy of Plaintiffs' Opposition to Federal

Defendants' Motion to Dismiss was served on December 21, 2005, by the United

States District Court's Electronic Filing System on on the following parties:

**Jay Ward Brown, Esq.**
**Adam J. Rappaport, Esq.**
Levine Sullivan Koch & Schultz, LLP
1050 Seventeenth Street, NW, Suite 800
Washington, DC  20036

**Alan Burch, Esq.**
55 Fourth Street, NW
Washington, DC  2-530

**Erica H. Perkins, Esq.**
**Edward J. Longosz, Esq.**
Eckert Seamans Cherin & Mellott, LLC
1747 Pennsylvania Avenue, NW, Suite 1200
Washington, DC  20006

**Patrick T. O'Rouke, Esq.**
University of Colorado
1380 Lawrence Street, Suite 1325
Denver, CO  80204

_____
Joseph Hennessey
P.O. Box 31256
Bethesda, MD  20824-1256